**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **L.F.P. IP, LLC, et al.,** | : | **CASE NO.: 1:09CV913** |
| **Plaintiffs',** | : | **Judge Bertelsman** |
| **vs.** | : | |
| | | **ANSWER AND COUNTERCLAIM** |
| **HUSTLER CINCINNATI, INC.,** | : | |
| **Defendant.** | : | **(JURY DEMAND ENDORSED HEREON)** |
| | : | |

Now comes Defendant Hustler Cincinnati, Inc., by and through counsel, and hereby answers Plaintiffs' Complaint as follows:

## PARITES, VENUES AND JURISDICTION

1. Upon information and belief, Defendant admits the allegations contained in Paragraph 1.

2. Upon information and belief, Defendant admits the allegations contained in Paragraph 2.

3. Defendant admits the allegations contained in Paragraph 3.

4. In response to Paragraph 4, Defendant admits that this Court has subject matter jurisdiction. Defendant denies the remaining allegations.

5. In response to Paragraph 5, Defendant admits that venue is proper in the Southern District of Ohio, but denies the remaining allegations. Defendant affirmatively denies that it has committed any acts of false endorsement or unfair competition.

6. Defendant denies the allegations contained in Paragraph 6.

## FACTUAL BACKGROUND

7.     Defendant denies the allegations contained in Paragraph 7.

8.     Defendant denies the allegations contained in Paragraph 8.

9.     Defendant denies the allegations contained in Paragraph 9.

10.    In response to paragraph 10, Defendant admits that it operates a Hustler Cincinnati retail store at 411 Elm Street in Cincinnati, Ohio.  Defendant denies the remaining allegations.

11.    In response to Paragraph 11, Defendant admits that it uses the Hustler / Hustler Cincinnati trade name and mark in connection with its retail operation. Defendant denies the remaining allegations contained in Paragraph 11.

12.    Defendant denies the allegations in Paragraph 12.

13.    Defendant denies the allegations in Paragraph 13.

14.    In response to paragraph 14, Defendant admits that it operates a Hustler retail store at 411 Elm Street in Cincinnati, Ohio and that it sells Hustler and non-Hustler branded products.

15.    Defendant denies the allegations contained in Paragraph 15.

16.    In response to paragraph 16, Defendant admits that beginning in or around 2005, Defendant began transferring $8,400.00 a month to L.F.P., Inc. which were denoted as "licensing fees."  However, Defendant expressly and affirmatively denies that those transfers were, in fact, royalty/license fees.  As further explained herein, and in Defendant's counterclaim, Defendant began transferring monthly fees to LFP beginning approximately 5 years after Defendant was in operation as a Hustler retail store solely as a means of sharing/pooling monies among related and affiliated entities within the incorporated partnership of Jimmy Flynt and Larry Flynt.   As part of Jimmy and Larry's partnership agreement, monies were

2

17. In response to paragraph 17, Defendant admits that it received a letter from Michael Klein dated September 3, 2009 that was purportedly written on behalf of LFP (but not LFP IP, LLC). This letter was written as part of Larry Flynt's efforts to squeeze Jimmy Flynt out of their family business. Prior to the commencement of this action, Defendant never transferred any monies to LFP IP, LLC nor was Defendant ever told that LFP IP, LLC obtained any ownership interests in the HUSTLER marks. Defendant states that Exhibit C to Plaintiffs' Complaint speaks for itself. Defendant denies the remaining allegations in this paragraph not specifically admitted.

18. In response to paragraph 18, Defendant states that Exhibit C to Plaintiffs' Complaint speaks for itself. Defendant denies that it has ever been in default of any licensing obligations and otherwise denies all other allegations in this paragraph.

19. Defendant denies the allegations in Paragraph 19. Defendant specifically denies that it was in default.

20. In response to paragraph 20, Defendant states that Exhibit D speaks for itself. Defendant denies that it was in default of any contract or license agreement and further denies that Plaintiffs had the right to "cancel" any license

21.    In response to paragraph 21, Defendant states that Exhibit E speaks for itself.  Defendant denies the statements made in Exhibit E and further denies that it was in default of any license agreement, that it breached any contract with Plaintiffs, that it caused any damages to Plaintiffs or that it has infringed in any way on the rights of Plaintiffs. Defendant denies the remaining allegations contained in Paragraph 21.

22.    In response to paragraph 22, Defendant admits that it continues to use the Hustler and Hustler Cincinnati trade and service marks in connection with its retail store operation at 411 Elm Street in downtown Cincinnati.  Defendant and its predecessor-in-interest have continuously used these marks in connection with retail services since 1997.  Defendant and its predecessor-in-interest were the first to use the HUSTLER marks in relation to adult-themed retail services, in Cincinnati or anywhere in the U.S.  Defendant has the legal right to use these marks.

23.    Defendant denies the allegations contained in Paragraph 23 of Plaintiffs' Complaint.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

24.    Defendant incorporates by reference its responses to Paragraphs 1 through 23 as if fully rewritten herein.

25.    Defendant denies the allegations contained in Paragraph 25.

26.    Defendant denies the allegations contained in Paragraph 26.

## SECOND CLAIM FOR RELIEF
### (False Designation of Origin: False Impression of Association – 15 U.S.C. 1125(a))

27.    Defendant incorporates by reference its responses to Paragraphs 1 through 26 as if fully rewritten herein.

28.    Defendant denies the allegations contained in Paragraph 28.

29.    Defendant denies the allegations contained in Paragraph 29.

30.    Defendant denies the allegations contained in Paragraph 30.

31.    Defendant denies the allegations contained in Paragraph 31.

## THIRD CLAIM FOR RELIEF
### (Federal Unfair Competition – 15 U.S.C. § 1125(a))

32.    Defendant incorporates by reference its responses to Paragraphs 1 through 31 as if fully rewritten herein.

33.    Defendant denies for want of knowledge the allegations contained in Paragraph 33.

34.    In response to Paragraph 34, Defendant admits that the Hustler brand and mark has been advertised and marketed for the past 40 years within the Ohio partnership of Jimmy and Larry Flynt.

35.    Defendant denies the allegations contained in Paragraph 35.

36.    Defendant denies the allegations contained in Paragraph 36.

37.    Defendant denies the allegations contained in Paragraph 37.

38.    Defendant denies the allegations contained in Paragraph 38.

## FOURTH CLAIM FOR RELIEF
### (State Deceptive Trade Practices Pursuant to RC 4165.01 et al.)

39.    Defendant incorporates by reference its responses to Paragraphs 1 through 38 as if fully rewritten herein.

40.    Defendant denies the allegations contained in Paragraph 40.

41.    Defendant denies the allegations contained in Paragraph 41.

42.     Defendant denies the allegations contained in Paragraph 42.

43.     Defendant denies the allegations contained in Paragraph 43.

44.     Defendant denies the allegations contained in Paragraph 44.

45.     Defendant denies the allegations contained in Paragraph 45.

### FIFTH CLAIM FOR RELIEF
### (Common Law Unfair Competition)

46.     Defendant incorporates by reference its responses to Paragraphs 1 through 45 as if fully rewritten herein.

47.     Defendant denies the allegations contained in Paragraph 47.

### AFFIRMATIVE DEFENSES

1.     Plaintiffs' have failed to join all necessary and indispensable parties pursuant to FRCP 19.

2.     Defendant is entitled to use the Hustler marks by virtue of the partnership and business relationship of Jimmy R. Flynt and Larry C. Flynt, specifically by virtue of the ownership and rights of use of such marks of Jimmy R. Flynt.

3.     Defendant affirmatively denies the existence of any "licensing" agreement or contract with either Plaintiff at any time.

4.     Plaintiffs' claims may be barred by the statute of frauds.

5.     Plaintiffs' claims may be barred due to mistake.

6.     Plaintiffs' claims may be barred due to unconscionability and/or as a matter of public policy.

7.     Plaintiffs' claims may be barred due to lack of capacity of Plaintiffs'.

8.     Plaintiffs' claims are barred due to fraud (actual, constructive and/or in the inducement), undue influence, duress, coercion (express and implied), over-

reaching, intimidation, deception, inequitable conduct, unfair persuasion, and/or abuse of power.

9. The Hustler marks asserted by Plaintiffs as the basis for this action are defective, invalid and/or unenforceable by either Plaintiff against Defendant.

10. Defendant denies Plaintiffs' contention of a likelihood of confusion.

11. Plaintiffs' claims are barred by non-use, abandonment and/or misuse.

12. Defendant is entitled to use the Hustler marks by consent and acquiescence of Jimmy R. Flynt.

13. Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

14. Plaintiffs' are not the real parties in interest with respect to the claims asserted or damages sought.

15. Defendant's use of the Hustler mark has been in good faith.

16. Hustler Cincinnati, Inc., through a predecessor-in-interest, Hustler News & Gifts, Inc., was the first to use the "Hustler" marks in adult-themed retail services in Cincinnati, in Ohio or in the United States. Hustler Cincinnati, Inc. obtained the consent from the Hustler News & Gifts, Inc. to use the "Hustler" mark and to use a similar name.

17. Plaintiffs' claims may be barred by the doctrine of fair use.

18. Plaintiffs' claims may be barred by genericness.

19. Plaintiffs' claims may be barred due to invalid and/or ineffective assignments and/or assignments in gross.

20. The HUSTLER marks are partnership property of Jimmy R. Flynt and Larry C. Flynt. Jimmy R. Flynt was the first to use the HUSTLER mark in the

bar/club business, in publishing, in retail, in apparel and in other goods and services. Jimmy R. Flynt was the first to use these HUSTLER marks in commerce, has an ownership interest in them and has a right to use them in connection with Defendant's retail operation.

21. Plaintiffs' claims are barred by the doctrine of laches.

22. Plaintiffs' claims are barred by the doctrine of estoppel.

23. Plaintiffs' claims are barred by the doctrine of waiver.

24. Plaintiffs' claims are time-barred.

25. Plaintiffs' claims are barred due to ratification and/or acquiescence.

26. Plaintiffs' claims are barred by equitable principles to include the doctrine of unclean hands.

27. Plaintiffs' claims are brought for an improper purpose, in bad faith, and constitute an abuse of process.

28. Plaintiffs' claims may be barred by the first sale exhaustion doctrine.

29. Plaintiffs' claims are barred by the First Amendment to the U.S. Constitution.

30. Plaintiffs' claims are frivolous.

31. Defendant hereby gives notice that it may rely on additional defenses not specifically set forth herein as may become available during discovery proceedings. Defendant hereby reserves the right to amend its Answer to assert additional defenses.

**WHEREFORE**, having fully answered, Defendant Hustler Cincinnati, Inc., through counsel, prays that Plaintiffs' Complaint be dismissed with prejudice at Plaintiffs' costs, that judgment be entered in favor of Defendant as to Plaintiffs'

claims, and that HCI recover its attorneys' fees, expenses and costs. Defendant also seeks an award of sanctions against Plaintiffs.

Respectfully submitted,
REMINGER CO., L.P.A.


/s/ Robert W. Hojnoski
Robert W. Hojnoski (0070062)
Carrie A. Masters (0083922)
525 Vine St., Suite 1700
Cincinnati, OH 45202
Tel: 513/721-1311; Fax: 7212553
Email: rhojnoski@reminger.com
cmasters@reminger.com
**Counsel for Defendant /Counterclaimant Hustler Cincinnati, Inc.**

## JURY DEMAND

Defendant hereby demands a trial by jury on all issues, claims, defenses and disputed matters in the within matter.


/s/ Robert W. Hojnoski
Robert W. Hojnoski (0070062)
Carrie A. Masters (0083922)

## COUNTERCLAIM

Defendant, Hustler Cincinnati, Inc., through counsel, for its Counterclaim against Plaintiffs, states as follows:

1.      Jimmy R. Flynt (hereinafter "Jimmy"), is a natural individual and is currently a resident of Nevada. Jimmy has a second home in Florence, KY and spends just under 50% of his time in the greater Cincinnati area.

2.      Larry C. Flynt (hereinafter "Larry") is a natural individual and is currently a resident of the State of California.

3.      Jimmy and Larry were born and raised in Magoffin County, Kentucky. Larry was born in November of 1942 and Jimmy in June of 1948.  Larry and Jimmy are full-blooded siblings.  Larry moved to Dayton, Ohio in or around 1959.  Jimmy moved to Dayton in the early to mid 1960's as a teenager.[1]

4.      Jimmy and Larry are well known in the greater Cincinnati/Northern Kentucky area as a result of their business dealings and activities over the past 40 years.  As further described herein, Larry and Jimmy have been business partners since November of 1969 pursuant to an express oral partnership agreement they reached in Cincinnati, Ohio to carry on a business as equal 50-50 co-owners for profit.  Their well-publicized partnership has resulted in a successful, well known, multi-level, multi-faceted multi-media business enterprise/empire in the adult entertainment industry with business primarily done under the "Hustler" name/brand/mark.  Jimmy and Larry's partnership and enterprise has always been operated through different business entities (C corporations, S corporations and/or limited liability companies) which have functioned as one privately held close corporation and/or incorporated partnership and/or de facto partnership.  Although the number, type and names of these affiliated and related entities has changed and evolved over the years, regardless of the names or number of entities, there has always been unity of ownership, control, operation, and management.  Like many partners, Jimmy and Larry have dealt with each other and have acted toward each other as partners while obtaining the various advantages of the corporate

---

[1] Jimmy's last name was initially spelled "Flint" but was later legally changed to "Flynt."

form.  As set forth further herein, no persons other than Jimmy or Larry have ever held an ownership interest (equitable or legal) in any of the various privately-held entities that have been set up within their partnership.

5.     Plaintiffs' claims against Hustler Cincinnati, Inc. are the result of a current dispute between Jimmy and Larry.  Beginning in or around February of 2009, Larry embarked on a course of conduct in an effort to squeeze Jimmy out of their family business and to otherwise cause economic harm to Jimmy and to Hustler Cincinnati, Inc.  Plaintiffs' claims are brought for an improper and malicious purpose, are brought in bad faith and are without merit.

6.     Both of the Plaintiff entities, as well as Defendant Hustler Cincinnati, are born out of Jimmy and Larry's Ohio partnership.  Although Jimmy has an ownership interest in the Plaintiff entities, Larry currently contends that he exclusively owns and controls them.  Although Jimmy controls and is the 100% shareholder of Defendant, Larry has recently claimed an ownership interest in Defendant against whom he has initiated this action.  Notwithstanding the manner in which this action is styled, this action was filed by Larry against Jimmy.

7.     Defendant Hustler Cincinnati, Inc. (hereinafter "Hustler Cincinnati" or "HCI") is an Ohio Corporation with its principal place of business at 411 Elm Street in Cincinnati, Ohio.  Hustler Cincinnati was incorporated on March 28, 2000 and since that time has been the on paper operating entity of the Hustler Cincinnati retail store located at 411 Elm Street in Cincinnati, OH.  Jimmy Flynt is the sole named shareholder of Hustler Cincinnati, Inc.  Hustler Cincinnati, Inc. is the successor-in-interest to Hustler News & Gifts, Inc. which gave consent to Hustler Cincinnati, through Jimmy Flynt, to use a similar name when HCI was incorporated.

8.      Hustler News & Gifts, Inc. was incorporated in Ohio on Oct. 21, 1997. It was the on paper operating entity of the Hustler retail store at 34 E. Sixth Street, between October, 1997 and approximately December of 1999. Jimmy Flynt was the sole shareholder, officer and director of this entity. Through this entity, Jimmy Flynt was the first to use the Hustler mark in commerce related to retail services.

9.      Plaintiff, L.F.P., Inc. ("LFP") was formed as an Ohio corporation on September 29, 1976. LFP was formed out of Jimmy and Larry's partnership which was almost seven years old at that point. Through an illusory merger and mere continuation, LFP became a California corporation in or around 1982. LFP is a successor-in-interest and mere continuation of Mini Clubs of America, Inc., an Ohio corporation that was formed as part of Jimmy and Larry's partnership prior to January of 1972. Jimmy was the sole shareholder of Mini Clubs as further set forth herein.

10.     Defendant LFP IP, LLC is a newly formed entity that was registered as a Delaware limited liability company on or around October 30, 2006. Upon information and belief, this entity was set up by Larry and Jimmy's mutual business lawyers (who have been on a yearly retainer since 2001) in connection with efforts to re-structure/re-organize the business affairs and assets within their partnership. LFP, IP LLC purportedly is the entity that has recently been established to hold/acquire certain Hustler and Hustler-related trademarks, service marks and other intellectual property through purported "assignments" from LFP and/or other LFP-related entities within Jimmy and Larry's partnership.

11.     Among other things, HCI seeks a declaration in this counterclaim related to its ownership and/or right to use the HUSTLER marks in connection with

12

its operation of a Hustler retail store in downtown Cincinnati which has been in continuous operation since October of 1997 by HCI and its predecessor in interest.

**Factual Background Regarding Jimmy and Larry's Partnership/Close Corporation (i.e., the Hustler Enterprise)**

12.    For more than 40 years, Jimmy and Larry together have built the Hustler brand side-by-side as partners, expressly and impliedly, by agreement and through their actions.  What started as a string of Ohio go-go clubs (Hustler clubs) turned into a national magazine (Hustler magazine) and today, an international multi-media empire including several adult and non-adult magazines, websites, video content, a chain of gentlemen's clubs (through a royalty/licensing arrangement), a chain of retail stores, a casino/card room in southern California, a clothing/apparel and adult novelty line, and various other adult and mainstream business activities, goods, services and interests.

13.    Larry and Jimmy's incorporated partnership/close corporation/family of companies have generally been referred to over the years as "Mini Clubs," "Hustler" and/or "LFP."  Jimmy and Larry have continuously conducted business in Ohio since 1969.

14.    Over the years, Jimmy and Larry have been held out and have held each other out to the general public / mainstream media and to the adult entertainment industry as business partners, co-owners and/or co-founders of Hustler (as a brand name) including the Hustler/Flynt/LFP family of companies.

15.    Over the years, Jimmy and Larry have held various titles in various different corporations and business entities that have been formed to carry out their partnership business.    Titles have generally been informal and somewhat loose.  Often times, Jimmy and Larry have shared titles.

16.    Larry and Jimmy's Ohio partnership agreement has been continued, renewed, ratified and re-affirmed, expressly and impliedly, many times over the years as their business has grown and diversified.

## The Early Years of The Hustler Trademark

17.    Jimmy and Larry initially entered into an oral partnership agreement in Cincinnati, Ohio in 1969 to go into the bar/club business together.  They agreed to join together to start and carry on a business for profit.  This plan was envisioned in 1967 before Jimmy left for Vietnam.  In or around November of 1969, after Jimmy returned from Vietnam, he and Larry orally agreed, as 50-50 partners, to purchase, open and operate a bar.  This agreement was formed in Cincinnati, Ohio.  Jimmy and Larry struck a deal to purchase an existing bar located at 608 Walnut Street in downtown Cincinnati (the current location of the Aronoff Center) for a purchase price of $5,000.

18.    Jimmy delivered a check for $5,000 to the selling bar owner (Byron Jennings) at the top floor of the Central Trust Tower on Fourth Street.  Jimmy asked him to hold the check for a week or so before negotiating it as he did not have sufficient funds to cover the check when it was written. Jimmy did have some money in his checking account which he put toward this payment but he did not have the entire amount.  This check was written out of Jimmy's personal checking account; Larry did not have a checking account. Larry had no money to contribute. Larry had previously filed for bankruptcy and was on the verge of filing bankruptcy a second time (when Jimmy returned home from Vietnam) but it was too early to do so.

19.     Jimmy and Larry re-named the bar at 608 Walnut Street the "Hustler Club," hired several female dancers/servers and were able to make enough money in the first week or so to cover Jimmy's $5,000 check by the time it was deposited.

20.     An Ohio corporation, Dustoff, Inc. (a name Jimmy came up with) was set up on January 2, 1970 to operate the Cincinnati Hustler Club.  Dustoff was the first business entity formed within Larry and Jimmy's partnership.   Jimmy was the sole shareholder, the President, the sole Director and statutory agent of Dustoff. Through Dustoff, Jimmy personally applied to have the existing liquor license transferred into his name/Dustoff's name. The application was approved. Larry and Jimmy's initial company headquarters were located in an apartment above the Cincinnati Hustler club where Larry and Jimmy lived together for the next several years.  608 Walnut Street became Jimmy and Larry's initial partnership/company "headquarters."  Larry's ownership interest in the Cincinnati Hustler club/Dustoff was by virtue of his oral partnership agreement with Jimmy.

21.     Even though Jimmy was the sole shareholder on paper of the clubs, Larry and Jimmy managed and promoted the Cincinnati Hustler club together. They agreed that they would be 50-50 partners with respect to any subsequent or additional business interests, ventures or activities that would flow from the Cincinnati Hustler club.  As of this time, Jimmy and Larry's primary focus was to make money in the bar/club business.  Jimmy and Larry were young, they were close and their dealings with each other were casual and informal. Their communications and agreements were oral.

22.     The Hustler Club on Walnut Street in Cincinnati was operated (through Dustoff, Inc.) from November of 1969 through the mid to late 1970's.  This Club

served as the model by which Larry and Jimmy opened a string of Hustler Clubs, from 1969-1973, across Ohio in the cities of Dayton, Columbus, Cleveland, Toledo and Akron.

23.    Monies generated from the Cincinnati Hustler Club (that was 100% owned by Jimmy) were used to open the Columbus and Dayton Hustler clubs. Monies generated from the Cincinnati, Dayton and Columbus clubs were used to open the Hustler Clubs in Akron, Toledo and Cleveland.  Monies/revenues were shared between the Clubs, were used to pay expenses, for marketing and promotion, and were otherwise re-invested.  Larry and Jimmy shared in the profits and losses of the Clubs, held each out as co-owners/partners, shared titles, shared control, bound each other, and ran their businesses together.  They each made contributions.  Jimmy made all of the capital contributions; Larry contributed services.  Jimmy was a signatory on all bank accounts that were opened and which were used for their businesses.

24.    By early 1973, there were six total Hustler clubs and approximately several hundred employees on their partnership payroll.  Most of the employees were female dancers/servers.  Larry and Jimmy actively shared the role of managing and promoting the clubs, sharing the profits and losses and trying to grow their business, as partners.

25.    Like the Cincinnati Hustler club, the Dayton, Columbus, Akron, Toledo and Cleveland Hustler clubs were owned and operated on paper by and through separate Ohio corporations that were set up between 1970 and February of 1973 - Kaylar, Inc., West Gay Street Company, 21 South Main Street Company, Jefferson Street Company and Vincent Street Company.  These entities were formed within

Jimmy and Larry's partnership. Jimmy was the President, Director, statutory agent and sole shareholder of each of these entities. Through these entities, Jimmy personally applied for and obtained liquor licenses to operate the various clubs. Larry never applied for any of the liquor licenses and never held any of the licenses for any of the Hustler Clubs. The clubs could not have operated without a liquor license. Although Jimmy was the sole shareholder of the six Hustler clubs, Larry was involved in the operation of the clubs and has always claimed an ownership interest in them. In fact, Larry has always maintained that he (and Jimmy) got their start in the bar/club business. Larry and Jimmy had an oral agreement to operate and control the Hustler clubs as 50-50 partners. Larry's ownership interest in the clubs was solely as a consequence of his oral agreement with Jimmy.

26. Through their mutual lawyers, Larry & Jimmy set up a parent/holding company, Mini Clubs of America, Inc., which was registered and incorporated in Ohio prior to January of 1972. Larry and Jimmy conducted business through Mini Clubs during the early and formative years of their business relationship and partnership. Jimmy was the sole shareholder of Mini Clubs. Like the operating entities of the Hustler Clubs, though Larry did not own any stock in Mini Clubs, he has claimed to have had an ownership interest in it through his business relationship and oral agreement with Jimmy. Larry and Jimmy shared in the profits and losses of Mini Clubs as they did with the Hustler Clubs. Jimmy and Larry also shared titles and exercised mutuality of control. They each made contributions, shared in the ups and downs and the profits and losses. At times, Jimmy and Larry each held the title of President of Mini Clubs. Initially, Mini Clubs was headquartered at 608 Walnut Street in Cincinnati and then the headquarters were

moved to 36 West Gay Street in Columbus where the Columbus Hustler Club was located.  Jimmy was the statutory agent for Mini Clubs.

27.    In   furtherance   of   their   partnership   agreement   and   business arrangement, in order to raise cash and to further promote their Hustler Clubs, beginning in January of 1972, Jimmy and Larry began publishing a short newsletter called the Hustler newsletter, published by and through Mini Clubs. This was the first time Hustler was used in publishing (through an Ohio corporation that Jimmy was the 100% shareholder of).  Larry and Jimmy also developed a Hustler Club membership program for their club patrons.  The Hustler newsletter started as a four page black and white publication.  (See Exhibit A)

28.    From January, 1972 through 1973, the Hustler newsletter grew in length and eventually turned into a color publication.  Its primary purpose was to promote Larry and Jimmy's clubs, specifically, their female dancers.  They began to call the publication "The Hustler," an official publication of Mini Clubs of America, Inc.  For a short period of time, Larry and Jimmy published "The Hustler" regionally. Mini Clubs was regarded as the parent company for the Clubs, i.e., for "Hustler."

29.    Around the time Jimmy and Larry began publishing the Hustler newsletter, as a further continuation and outgrowth of their partnership, Larry and Jimmy made plans to franchise the Hustler Clubs – similar to the then-existing "Playboy clubs."  Through their mutual business lawyers, Jimmy and Larry put together a detailed franchise packet and various informational/marketing materials. They included detailed financial projections based on their newest Hustler Club in Cleveland (operated through Vincent Street Co.). The franchise packet was sent out

18

to various potential business prospects. The franchise packet chronicled the start of the Hustler clubs by Larry and Jimmy as business partners. (See Exhibit B)

30.    Jimmy and Larry used various promotional materials, including table top advertisements in their clubs, to promote their membership program and to advertise their intentions of franchising their clubs.    (See Exhibit C)   Their franchising plan was to be administered through Mini Clubs of America, their holding company.  Larry and Jimmy reached an agreement to sell a Hustler club franchise in or around January of 1974 for $50,000 but the deal fell through.

31.    In June of 1973, Mini Clubs filed an application for a service mark registration for restaurant and nigh club services in the United States Patent Office for Mini Clubs of America with the developed Mini Clubs logo -    which was first used in commerce on or around January 6, 1972.  The Mini Clubs USPTO application was approved in November of 1974 and assigned registration number 997,705. (See Exhibit D) The Mini Clubs logo/service mark became the initial logo/emblem for Hustler Magazine.  This original Mini Clubs logo/mark is still used today within Larry and Jimmy's partnership/Hustler Enterprise.

32.    As a means of promoting their Hustler Club franchising plan, Larry and Jimmy discussed and ultimately agreed, mutually, to publish a national adult – themed men's sophisticate magazine to be called "Hustler."  This magazine was to be an outgrowth of the Hustler newsletter.  Larry and Jimmy continued their oral partnership agreement as 50-50 business partners.   Larry and Jimmy initially funded the magazine through partnership monies generated by the Hustler Clubs, i.e., with partnership funds that Jimmy was the sole on paper owner of.  At the time, the Clubs provided Jimmy and Larry's sole source of revenues.  Jimmy made

significant capital contributions into Hustler magazine through monies that were technically his as the 100% shareholder of the six Hustler Clubs and their parent company, Mini Clubs of America.

33.     Jimmy and Larry reached an agreement with a distributing company out of Derby, Connecticut called Capital Distributing Company to print and distribute their magazine nationally (and to front the printing/distribution costs subject to re-payment out of sales proceeds).  As part of this agreement, Capital, on behalf of Mini Clubs and as the assignee of Mini Clubs, successfully applied to register the "Hustler" trademark with the U.S. patent and trademark office for use in connection with an entertainment magazine – Registration No. 1011011. (See Exhibit E) The application was filed on May 06, 1974 and noted that "Hustler" was first used in commerce (in publishing) by Mini Clubs on January 1, 1972 (by virtue of the first Hustler Newsletter). The trademark registration application was approved on May 20, 1975.

34.     Jimmy, as 100% shareholder of Dustoff, Kaylar, West Gay Street Company, Jefferson Street Company, 21 South Main Street Company, and the Vincent Street Company, and Mini Clubs, was the first to use the Hustler mark in the bar/club business.  Jimmy, as 100% shareholder of Mini Clubs, was the first to use the Hustler mark in commerce in connection with publication of a men's magazine.

35.     The inaugural issue of Hustler magazine as a national magazine, Vol. 1, No.1, was published in July of 1974. Just prior to publication of this issue, Jimmy and Larry established another Ohio corporation – Hustler Magazine, Inc.  Hustler Magazine, Inc. was incorporated on March 14, 1974 and was set up as a <u>wholly</u>

<u>owned subsidiary of Mini Clubs of America</u>.  (See Exhibit F)  Jimmy was the sole "on paper" owner and shareholder of Hustler Magazine, Inc. by virtue of his 100% ownership of Mini Clubs of America.  Hustler Magazine, Inc. was capitalized and funded through monies generated by the Hustler Clubs and through Mini Clubs of America.  Larry claimed and has claimed an ownership interest in Hustler Magazine, Inc. through his oral partnership agreement with Jimmy.  The launch of Hustler magazine reflected the expansion and continuation of Jimmy and Larry's oral partnership to carry on a publishing business for profit as 50-50 co-owners.

36.    At the time Hustler Magazine, Inc. was incorporated, Jimmy and Larry had approximately 9 Ohio corporations through which they did business.  These entities were treated as one company and were all considered within Larry and Jimmy's oral partnership agreement.  As has always been the case, monies were pooled/shared/commingled among the entities out of which Jimmy and Larry took profit distributions (usually in the form of wages/salary). Jimmy was the signatory on all bank accounts.  All of these entities were mutually controlled by Jimmy and Larry.  Jimmy and Larry shared in the profits and losses, made decisions together, exercised mutuality of agency and each made contributions. Partnership property/monies were used to expand, promote and grow the Hustler Clubs, to publish the Hustler Newsletter and to start Hustler magazine.

37.    Although Jimmy was the 100% shareholder of Hustler Magazine, Inc., Jimmy and Larry were co-publishers and were the sole directors and officers of Hustler Magazine, Inc.

38.    Beginning with the inaugural issue of Hustler magazine as a national four-color men's magazine (Vol. 1, No. 1 - July, 1974), Jimmy and Larry included

full-page franchising ads for the Hustler Clubs, to be sold by Mini Clubs.  (See e.g., Exhibit G)

39.    Jimmy and Larry initially lost money with Hustler Magazine.  Jimmy continued to make capital contributions to the magazine through the six Hustler Clubs and Mini Clubs that he was the 100% shareholder of.

40.    It was expensive to publish Hustler Magazine, which was funded by partnership monies generated by the Hustler Clubs.  Jimmy (and Larry) began siphoning withholding tax dollars from their female employees/dancers as a means to fund the magazine and keep it afloat.  Jimmy and Larry became delinquent with their taxes and were getting significant pressure from the taxing authorities to pay their past-due tax obligations. As Jimmy was the sole shareholder of the corporations through which the Hustler Clubs did business, as well as the liquor permit holder, Jimmy faced civil and criminal liability with respect to the burgeoning tax delinquencies.  Hustler magazine was starting to do better, but was barely breaking even.

41.    Larry and Jimmy were about to lose their distributor – Capital Distributing, because the first several issues of the magazine were not profitable and because Capital was printing and distributing the magazine at a loss.  Larry and Jimmy reached an agreement with Capital that Capital would continue to front the costs required to print and distribute Hustler magazine for an additional period of time in exchange for a temporary assignment/security interest in the Hustler mark (1011001).  As such, on or about December 23, 1974, Mini Clubs made a temporary assignment of the mark to its subsidiary, Hustler Magazine, Inc., which in turn made a temporary assignment to Capital Distributing. (See Exhibit H)

42.    In the Spring of 1975, Jimmy and Larry got a tip that there were nude photographs of Jackie Onassis Kennedy that were available for sale through an Italian paparazzi, Settimio Garritano.  Little did they know that this tip would turn their magazine into an instant and overwhelming commercial success though certainly not without controversy.  Larry did not have a passport; Jimmy did. Jimmy and Larry reached an agreement to purchase the available Jackie O. photos for approximately $18,000.  Jimmy and Larry made this decision together.  These funds were to be paid from partnership monies generated by the Hustler Clubs which continued to support the magazine. Jimmy individually traveled to Rome, Italy and brokered a deal for these photographs.

43.    Jimmy traveled back to Ohio from Rome with the purchased Jackie O. photos/film in his possession.  The Jackie O. photos were published in the August, 1975 issue of Hustler magazine.  Mini Clubs of America remained the "on paper" owner of Hustler magazine as of this issue.  The Jackie O. issue essentially turned Hustler magazine into an overnight commercial success story.  This issue generated significant media and public attention across the country, good and bad.  The sales volume and circulation of Hustler magazine dramatically increased.  The Jackie O. issue generated sufficient monies to pay off Jimmy and Larry's tax debts, personally and with respect to the Ohio corporations through which the clubs were operated. Jimmy personally deposited a sizeable check that was received from their distributor from the sales proceeds of the Jackie O. issue into a bank account that Larry and he co-owned and were both signatories on. The remaining money was re-invested into their partnership/company and otherwise shared between them.

Larry and Jimmy shared in the profits and in the success of Hustler magazine as co-owners.

44.    The overnight success of Hustler magazine following the Jackie O. issue garnered significant media attention.  Attached hereto as Exhibit I is a story that ran in Columbus Monthly in September of 1975 which documented same.  This article was written following an extensive interview with Larry.  The article chronicled Larry's initial business struggles and bankruptcy filing before Jimmy's return from Vietnam.  The article noted that Jimmy and Larry **co-owned** Hustler Magazine, Inc. (Jimmy owned 100% of the shares and Larry's interest stemmed from his oral partnership with Jimmy.)

45.    But for Jimmy's actions in obtaining the Jackie O. photos and "loaning" to the partnership funds that were, on paper, his own, Hustler magazine likely would have lost its distributor and otherwise ceased to exist by the end of 1975.  But for the Jackie O. photos, Hustler magazine would not have had the commercial success that it has had for the past 35+ years.

46.    After Hustler magazine became successful following the Jackie O. issue, on or about January 20, 1976, Capital Distributing re-assigned the Hustler mark to Hustler Magazine, Inc. Hustler Magazine, Inc. continued to be wholly owned by Mini Clubs (i.e., by Jimmy as 100% shareholder).  (See Exhibit J)

47.    Following the success of the Jackie O. issue of Hustler magazine, Larry and Jimmy decided to focus their partnership affairs on running, growing and promoting Hustler Magazine and gave up on the Hustler club franchise idea.  They started to take steps to wind down their bar/club business.  Jimmy made

arrangements to sell/transfer the liquor licenses that he owned through the various Ohio entities through which their clubs operated.

48.     Thereafter, Larry focused on the editorial side of the magazine and Jimmy ran the day-to-day business operations and administrative responsibilities. Jimmy was Larry's confidant and business advisor.  They continued to share titles, control, and profits. They made decisions together.  Also, at times, they individually made decisions and entered into contracts in furtherance of their mutual business interests, binding one another. Larry and Jimmy each made significant contributions to the growth and expansion of Hustler magazine and their business operations. The company headquarters remained in Columbus.  Their office space and number of employees started to grow rapidly to keep up with the needs of the magazine.

49.     Continuing and expanding their partnership, Larry and Jimmy created a distributing company, Flynt Distributing, Inc., incorporated in Ohio on April 28, 1976. At the same time, Jimmy and Larry incorporated Chic Magazine Inc. in Ohio on April 29, 1976.  Chic Magazine, Inc. was created as the "on paper" operating entity of a second publication that was developed — Chic magazine.   Flynt Distributing and Chic magazine were developed within Larry and Jimmy's partnership.  Jimmy held the title of "President" of Flynt Distributing and primarily ran it; Larry focused on the publication of Chic.

50.     With the development of their second magazine and plans to develop and distribute additional periodicals and publications, in July of 1976, Hustler Magazine Inc. registered the trade name "LFP publications" with the Ohio Secretary of State.  A few months later, on September 29, 1976, Plaintiff L.F.P., Inc. ("LFP") was incorporated in Ohio.  LFP was to serve as the "on paper" parent/holding

25

company for Hustler and Chic magazines as well as Flynt Distributing.  LFP was to essentially replace Mini Clubs as the parent company within their incorporated partnership.  Since Jimmy and Larry were getting out of the club/bar business, it did not make sense, from a marketing/branding standpoint, for their parent/holding company to be called "Mini Clubs."  As Larry was the older brother and publisher (with Jimmy being co-publisher and otherwise focused on the day-to-day business operations), Larry was promoted as the "face" of Hustler magazine to compete with their primary competition in the men's sophisticate magazine industry - Hugh Hefner (of Playboy) and Bob Guccione (of Penthouse).

51.    LFP was set up within Larry and Jimmy's partnership and was capitalized/funded with partnership assets generated by Hustler Magazine, Inc., Mini Clubs and/or the Hustler Clubs.  Larry and Jimmy continued their partnership agreement to be 50-50 owners of LFP.  LFP was a mere continuation of Mini Clubs, the original owner of the Hustler mark and the original "on paper" parent company of "Hustler."

52.    Jimmy and Larry's partnership, primarily through publication of Hustler magazine, was very profitable in the late 1970's.  Larry and Jimmy were indicted and tried in Hamilton County (as co-publishers and co-owners of Hustler magazine) in 1976-77.  Larry was convicted; Jimmy was acquitted.

53.    Approximately a year after his conviction, Larry was shot in an assassination attempt in Georgia.  He sustained significant injuries including paralysis to his lower extremities.  Larry and his then-wife moved from Columbus to California in or around 1979-1980.

54. Due to a combination of reasons, Larry and Jimmy's partnership/business struggled through much of the 1980's into the early 1990's. Larry developed a severe drug addiction and went through a period of uncontrolled mental illness and mental instability resulting in well-documented reckless, outrageous behavior, including numerous federal contempt findings. Larry spent time in federal psychiatric prison and for a period of time, Jimmy was his court-appointed conservator. Larry and Jimmy's partnership was not smooth during these years but it persevered nonetheless.

### Jimmy and Larry's partnership is re-affirmed and energized and the Hustler name/mark is used for the first time in retail services in downtown Cincinnati (by Jimmy)

55. From the mid to late 1980's into the early to mid 1990's, Jimmy and Larry's partnership/business was sustaining itself but business was flat and was generally struggling. Their business continued to focus primarily on the publication and distribution of magazines, published and sold through Hustler Magazine, Inc. and LFP. In addition to Hustler magazine, Jimmy and Larry developed and/or acquired, published and distributed several additional men's sophisticate and mainstream (non-adult) publications. Although they grew their portfolio of magazines, overall magazine sales numbers/revenues were dropping as adult video content and the internet were emerging.

56. Under the Hustler name/brand, partnership funds were used to test and eventually enter the adult video market, initially through Beta and VHS tapes and later through DVD's and through the internet.

57. While visiting Cincinnati for the movie premier of *The People vs. Larry Flynt* on January 7, 1997, Jimmy and Larry discussed the fact that Hustler

magazine had not been available for sale in Hamilton County since their 1977 trial. Jimmy came up with the idea of opening a book store/news stand in downtown Cincinnati to sell Hustler magazine and other men's sophisticate and mainstream magazines. As of this time, Hustler did not have a retail arm of its enterprise.

58.    Larry supported and agreed with Jimmy's vision to open a Hustler retail store to have its beginning / test market in Cincinnati. While in Cincinnati, Larry and Jimmy orally agreed, as 50-50 partners, to pursue a Hustler retail division of Hustler to start in downtown Cincinnati. This agreement was a continuation, re-affirmation, ratification and expansion of their oral partnership agreement first entered into in 1969 (in Cincinnati) and/or was a new oral partnership agreement and/or an implied partnership agreement. Just as Larry and Jimmy had a vision for a chain of night clubs in the early 1970's (See Exhibits B, C, and G), they envisioned a chain of Hustler retail stores beginning in 1997. (See Exhibit T)

59.    Over the next several months, Jimmy pursued a location to open a retail store / news stand in Cincinnati and sought the necessary permits/licenses. Jimmy found a location at 34 E. Sixth St., formerly occupied by King's News. Jimmy personally negotiated a sub-lease/assignment of lease with the existing tenant/store owner, Polly King. Jimmy also sought out and hired and trained a small staff as well as a bookkeeper/accountant, Allie Jackson III, whose office was and continues to be in Florence, KY.

60.    Jimmy's and Larry's retail vision and concept became a reality on October 22, 1997 when the first ever Hustler retail store opened its doors in downtown Cincinnati. Hustler Books, Magazines and Gifts opened to a long line of

28

customers and with significant local media attention. This was the first time the "Hustler" name/mark was used in connection with retail services.    An Ohio corporation, Hustler News & Gifts, Inc., was set up and incorporated on October 21, 1997 to operate this store.  Jimmy Flynt was the sole shareholder of Hustler News and Gifts, Inc.  Initially, only magazines were sold.  Also, Jimmy came up with the idea of making and selling Hustler-branded apparel.   Jimmy tacked up a few "Hustler" t-shirts on the wall with a sales price. They sold well and he then made arrangements to have Hustler-branded shirts silk screened and inventoried. This was the first time that the "Hustler" brand/mark had been used in apparel.  After several months, Hustler News & Gifts began selling adult videos and other adult and non-adult goods.  Attached as Exhibit K is a photograph that was taken around the time Hustler Books, Magazines and Gifts opened for business.

61.    Due to the instant success of Hustler Books, Magazines and Gifts, Jimmy and Larry made plans to open additional Hustler stores.

62.    Although Larry was closely involved with and held himself out to the Cincinnati media and public, in part, as an owner/co-owner of Hustler News and Gifts, Jimmy was the sole shareholder. Jimmy managed, controlled and operated Hustler News & Gifts. Larry's ownership interest in this store, if at all, stemmed from his oral partnership agreement with Jimmy.

63.    Less than six months after Hustler News & Gifts opened, in early April of 1998, Larry and Jimmy were indicted and charged with various criminal counts of obscenity by the State of Ohio in the Hamilton County Court of Common Pleas under Case Number B9802210.

64.    After Hustler Books, Magazines and Gifts was open for business and while the Hamilton County charges were pending, Jimmy and Larry, as partners, decided to pursue a second Hustler retail store in West Hollywood, California.  They found a site on Sunset Boulevard which was previously occupied by a Blockbuster Video Store and an adjacent/attached Boston Chicken Restaurant.  Jimmy came up with the idea of combining the properties, converting the Boston Chicken Restaurant into a café and the Blockbuster into an upscale retail boutique.  Jimmy came up with the name: "Hustler Hollywood."  Jimmy was involved with the planning, design, construction, and other preliminary aspects of getting the Hustler Hollywood opened for business.  During the preliminary stages, Jimmy coined the phrase: "***Relax...it's just sex!***"  This phrase became and continues to be the popular and catchy motto/marketing slogan of Hustler's retail operations and products, including a recently launched toy and novelty line.

65.    As part of his partnership agreement with Larry to share in the profits and losses of the company as co-owners, and in direct reliance thereon, between July and November, 1998, while the Sunset store was being constructed/remodeled, Jimmy permitted Defendant HH Entertainment, Inc. (a partnership entity) to apply for federal trademark registration of  the "Relax...it's just sex!" slogan for retail store services related to adult entertainment products without direct financial compensation to Jimmy.  Jimmy also permitted LFP to apply for federal trademark protection of "Hustler Hollywood" as a service mark.  Both applications were ultimately approved in 1999.  Jimmy was induced to believe, by Larry and by representatives of LFP, that he would retain an ownership interest in these marks as part of his partnership/ownership in the Hustler "close corporation."

Jimmy was led to believe and did believe that these trademark/service mark registrations and the associated value and goodwill of same were being performed within his and Larry's incorporated partnership/close corporation, that such marks were being obtained as part of their partnership property and that he had and retained an ownership interest therein just as he had an ownership in all other intellectual property acquired by their partnership.

66.    The Hustler Hollywood retail store and café opened for business at 8920 Sunset Blvd., West Hollywood, CA on December 3, 1998.  This store has been owned and operated "on paper" by Defendant HH-Entertainment, Inc. (formerly Hustler Entertainment, Inc.), a non-party to this action. The West Hollywood Hustler Hollywood store was envisioned as part of Jimmy and Larry's partnership, was capitalized with partnership funds and became a partnership entity/asset.  As part of the interior design/décor of the newly built Sunset store, a large backlit wall (roughly 20 feet long and 8 feet tall) was designed, created and installed to greet customers as they entered the store.  This wall, which remains in place today, contains the "Relax...it's just sex!" slogan with credit given to Jimmy Flynt.

67.    In the Summer/Fall of 1999, the City of Cincinnati evicted Hustler News and Gifts from 34 E. 6th St. through eminent domain proceedings as part of the City's plan to build a contemporary arts center at the corner of Sixth and Walnut streets. Hustler News & Gifts operated through this time without payment of any licensing or royalty fees to LFP or to any other person or entity. HNG, through Jimmy, had the right to use the Hustler name.  Larry and LFP were fully knowledgeable of this use and acquiesced to same.

68.     Jimmy proceeded to search for a new location to re-open a Hustler retail store in Cincinnati.  A store was temporarily opened in early November, 1999 at 609-611 Race Street but after a dispute with the building owner, Jimmy/Hustler News & Gifts moved out and sought a new location.

69.     Around this time, in the Fall of 1999, Jimmy and Larry agreed to pursue a third Hustler retail store as part of their partnership.  Jimmy found a site off of I-75 in Monroe, Ohio, at 1038 Lebanon St.  Using funds/partnership monies generated by Hustler News & Gifts, Inc., Jimmy acquired this real estate for $280,000.  He subsequently obtained a deed for this property.

70.     After acquiring the Monroe, Ohio property, Jimmy found an available building at 411 Elm Street to re-open a downtown Cincinnati store.  He personally negotiated and subsequently entered into a lease agreement with an option to buy and the doors of Hustler Cincinnati opened in early April, 2000.[2]    Larry attended the grand opening.  The Hustler Cincinnati store was and is operated by Hustler Cincinnati, Inc., an Ohio corporation incorporated in late March, 2000. Hustler News and Gifts, Inc., through Jimmy Flynt, gave consent to Hustler Cincinnati, Inc. to utilize a similar name. (See Exhibit L) Jimmy Flynt has been the sole shareholder, officer and director of this operating entity as he was with Hustler News & Gifts, Inc., the predecessor-in-interest company.

71.     A few months later, on or about October 12, 2000, as construction was ongoing for the new Monroe store, Jimmy transferred the deed to the Monroe property to Lakeville Properties, Inc., an Ohio Corporation owned on paper by Larry

---

[2] A three year lease agreement (signed April 3, 2000 with a commencement date of February 1, 2000) was executed which contained a purchase option (or, alternatively, a 5 year lease renewal option). The rent for year one was $3,000/month; year two was $3,150/month and year three was $3,308/month. This was an arm's length transaction.

Flynt, for no consideration. Jimmy was induced by Larry and by representatives of LFP/Lakeville, through direct and implied representations, that such property transfer was being made in connection with Jimmy and Larry's ongoing partnership and business dealings and that Jimmy would continue to have an ownership interest in the property, which was acquired with and improved with partnership funds. Jimmy was induced into believing that the Monroe Hustler store and property, like the Cincinnati store (and Sunset Blvd. store) were part of Jimmy and Larry's vision for a Hustler retail chain to be born out of their Ohio partnership agreement.

72. A new Ohio corporation, Hustler Hollywood of Ohio, Inc. (n/k/a HH Monroe, Inc.) was set up and incorporated on November 14, 2000 within Jimmy and Larry's Ohio partnership to serve as the operating entity of the Monroe store. Although the Monroe store, like all other facets of the Hustler enterprise/close corporation, was born out of Jimmy and Larry's partnership, on paper, Jimmy was the 100% stockholder of the shares that were initially issued. Jimmy became the sole officer (President) and sole director.

73. The "Hustler Hollywood" store in Monroe, Ohio held its grand opening on December 16, 2000 and has been in operation ever since.[3] [4]

74. Just before the Monroe, Ohio store opened, a 10 year "retail lease" agreement was put together between Lakeville Properties as the landlord and newly formed Hustler Hollywood of Ohio, Inc. Larry signed the lease as President of

---

[3] Jimmy performed all activities necessary to get the Monroe store opened. He found and purchased the property; worked to obtain the necessary zoning, permits and licenses; attended local zoning/planning meetings; oversaw and coordinated construction activities; got the store set up and stocked; hired and trained the staff and otherwise got the store opened.

[4] The interior of the Monroe store, like the store in West Hollywood, was designed with a curved, six-foot-high wall more than twenty-feet in length to separate apparel and lingerie from adult videos. This wall is commonly referred to as the "Relax" wall. Since the Monroe store opened, this wall has read, in large letters: "Relax...it's just sex!" with credit given to Jimmy. (See Exhibit M)

Lakeville and Jimmy signed the lease as President of Hustler Hollywood of Ohio. The monthly rental amount started at $14,700 and escalated to $17,500 in year 10. These figures were used based on expected sales/profits and part of Jimmy and Larry's plan to share in the profits.

75. The Monroe store was an instant and overwhelming commercial success and exceeded Jimmy and Larry's sales expectations. The store began generating significant amounts of income.

76. After the Monroe store started to generate significant amounts of cash, Jimmy/Hustler Cincinnati exercised the option to purchase the 411 Elm Street property in downtown Cincinnati out of which the Hustler Cincinnati store was operating. The negotiated, arms-length, sales price was $250,000. The building was purchased with partnership funds and became a partnership asset. Closing took place on March 28, 2001, at which time ownership of the building was transferred by warranty deed to Hustler Cincinnati, Inc. The 411 Elm Street property was purchased by Hustler Cincinnati because it was the plan/goal of Larry and Jimmy, through Hustler Cincinnati, Inc., to maintain a long-term Hustler retail presence in Cincinnati. That was certainly Jimmy's intent, plan and understanding and that is what he was affirmatively led to believe.

77. In or around July of 2001, as the Monroe, Ohio Hustler store continued to generate significant amounts of money, Jimmy and Larry agreed, as part of their 50-50 partnership agreement, to further drain the profits out of the Monroe store (owned 100% by Jimmy) back to Lakeville and/or LFP to assist with further growth and expansion of their retail division and various other business interests that they were pursuing. As a means to drain funds, on or about July of 2001, with guidance

from their mutual attorneys and financial advisors, a completely new 10 year lease agreement was drafted between Lakeville and Hustler Hollywood of Ohio, Inc.  This new lease was designed to replace the initial lease (which was less than 6 months into a 10 year term) and to significantly raise the monthly rent from $14,700 a month to $27,000 a month for the first year.  Whereas the initial 10 year lease had a rent escalation clause increasing the rent to $17,500 by year 10 (2010), the new lease provided a rent escalation clause increasing the rent to $30,000 a month for years 4-6 and $33,000 a month for years 7-10.  Larry signed this revised lease on behalf of Lakeville and Jimmy signed it on behalf of Hustler Hollywood of Ohio. No consideration was given to Jimmy/Hustler Hollywood of Ohio to double the monthly rent.  This was not an arms-length transaction.  Jimmy agreed to this revised lease because he was induced to believe by Larry, and by representatives of Lakeville Properties and LFP that the Monroe, Ohio Hustler store was part of their partnership and that all profits generated were partnership profits even if drained back into LFP or other entities within their close corporation.

78.    At the same time that a revised lease was put together for the Monroe store in July of 2001, and in a further effort to drain the significant profits being generated by that store back to California, Jimmy also agreed to sign off on a purported "licensing agreement" whereby Hustler Hollywood of Ohio, Inc. agreed to pay $65,000 a month to LFP for use of the Hustler trademarks.  This was not a true licensing agreement and was not an arms-length transaction.  It was nothing more than a tool to share monies among affiliated entities within Jimmy and Larry's partnership.  Hustler Hollywood of Ohio, Inc., through Jimmy, had every right to use the trade name Hustler and the various Hustler trade and service marks.

79.    The revised "lease" agreement and the new "licensing" agreement that were put in place for Hustler Hollywood of Ohio, Inc. were drafted by Larry and Jimmy's mutual lawyers with involvement from their mutual financial advisors.

80.    Through the revised "lease" agreement and "licensing" agreement, monies generated from the Monroe store, owned on paper by Jimmy, were poured back into the Hustler enterprise (i.e., Jimmy and Larry's incorporated partnership/close corporation).  For the next several years, Jimmy, through Hustler Hollywood of Ohio, Inc., invested/contributed more than $1,200,000 of money a year into Jimmy and Larry's incorporated partnership/close corporation. Such monies were used to expand, promote and advertise the entire Hustler enterprise, to include the blossoming retail group. These transfers constituted significant capital contributions by Jimmy.

81.    After the Monroe store opened, in addition to overseeing operations at the Cincinnati and Monroe locations, and to a lesser extent, the Sunset store, Jimmy took on the role and responsibility of further growing and expanding the retail arm of the company.  The initial plan/vision was to open 5 new Hustler retail stores a year throughout the country.  Jimmy traveled all over the United States scouting locations for new stores, obtained the necessary building, zoning and operating permits and licenses, coordinated design and construction, recruited, hired and trained staff, got the stores stocked and set-up to conduct business and otherwise managed the store openings and initial operations.   Jimmy attended every store opening; Larry attended several.  (See e.g. Exhibit N)

82.    In February of 2002, the Fourth Hustler retail store opened in San Diego.  A Nevada limited liability company, HH San Diego, LLC, was set up to

operate this store. This store was built, inventoried and capitalized with partnership funds, including funds generated from the Monroe, Ohio store.

83.    In June of 2002, Cincinnati Magazine published an in-depth story about Jimmy entitled "Our Man Flynt." (See Exhibit O) This story focused primarily on Jimmy's ownership, vision, involvement and activities with the Hustler enterprise and retail stores, the success of the stores and his vision for further expansion. The Monroe Hustler Hollywood store was featured in the article. Jimmy was quoted in the article as saying that he intended to have a retail store in the Queen City for many years to come. As of the time this article was published, Jimmy believed (and was led to believe by Larry and LFP representatives) that the existing and forthcoming retail stores, regardless of whose name they were put in, were part of his and Larry's partnership arrangement and vision and that monies generated from those stores (partnership funds) would further grow and diversify the Hustler brand (i.e., Jimmy and Larry's incorporated partnership).

84.    On June 20, 2002, Jimmy was inducted into the Hustler Hollywood Walk of Fame outside the Hustler Hollywood store on Sunset Blvd. This public induction reflected Jimmy's significant contributions to the adult entertainment industry and to the Hustler enterprise over the years.

85.    The Hustler Walk of Fame is modeled after the famous Hollywood Walk of Fame and consists of hand prints cast in concrete molds which are then affixed to the sidewalk directly outside the front doors of the Hustler Hollywood store on Sunset Blvd. in West Hollywood, CA. The walk of fame includes twelve large concrete squares, roughly 16"x16" in size that contain the names and hand prints

of an exclusive (and famous) group of adult film stars and other pioneers in the adult entertainment industry, including Larry and Jimmy.

86.     There was an induction party/ceremony on June 20, 2002 at the Hustler Hollywood store located on Sunset Blvd when Jimmy was inducted into the Walk of Fame.  Larry attended the ceremony and spoke to the large crowd that attended.  Shortly after Jimmy cast his hands in a wet concrete mold, Larry made the following emotional statement, captured by an audio and video recorder:

> **"...I want to say something on a serious note if I can.  He's been a loyal brother and with me from the beginning.  And he's contributed more to this industry than many of you will ever know and I'm very proud of him."**

87.     Jimmy's square which is part of the Hustler walk of fame contains his hand prints, name, date of induction and the saying: "Relax...it's just sex!"  (See Exhibit P)

88.     Between 2004 and 2007, Jimmy and Larry's Hustler retail division grew rapidly.  Through Jimmy's vision, contributions (capital and otherwise), labor, time, energy and talents, "Hustler Hollywood" boutiques (several with cafés) opened in Lexington, KY (July 16, 2004, through HH Lexington, LLC)[5], Fort Lauderdale, Florida (July 23, 2004 through HH Ft. Lauderdale, LLC), New Orleans, LA (November 18, 2004 through HH New Orleans, LLC), Nashville, TN (June 17, 2005 through HH Nashville, LLC), Tacoma, WA, (September 8, 2006 through HH Tacoma, LLC), and St. Louis, MO (May 7, 2007 through HH St. Louis, LLC).[6] Individual corporations/limited liability companies were set up to own/operate these

---

[5] Jimmy, on behalf of the Lexington, KY Hustler Hollywood, was involved in various pieces of litigation in Fayette County, KY in 2004-2005 related to various zoning issues.  Jimmy was held out by Larry, by LFP, by the media and in court documents as the "owner" of the store.  (See e.g. Exhibit Q)
[6] During this period of time, two other stores opened, in South Beach, FL and Tempe, AZ but those stores are no longer in operation.

various stores "on paper" within Larry and Jimmy's Ohio-based incorporated partnership. Each of these stores were funded/capitalized with partnership monies, including monies generated by the Monroe Store when Jimmy was the 100% shareholder and which he re-invested/contributed back into the enterprise.

89. All of the corporations/limited liability companies that have been set up to operate the retail stores became part of the overall Hustler close corporation of which Jimmy is a shareholder. All of these operating entities are born out of Ohio, exist only because of Larry and Jimmy's partnership in Ohio and their decision to open a news stand in Cincinnati in 1997. Money generated from the Hustler Hollywood Monroe store between 2000 and 2003/04 (i.e., partnership funds) were used to capitalize the other stores that were pursued and opened, including acquisition of the real property, construction and design costs, etc.

90. Like the West Hollywood, CA and Monroe, Ohio stores, each of the Hustler Hollywood stores was designed and constructed with a large interior "Relax" wall or sign which contains the "Relax...it's just sex" slogan with Jimmy's name attached. (See Exhibit M, R) In addition, the "Relax" slogan has been and is used to market the stores on Hustler websites, is used on employee uniforms/t-shirts, is used on Hustler merchandise and on the shopping bags that are given to customers following a purchase.

91. In this action, Plaintiffs suggest that Defendant Hustler Cincinnati, Inc. has tried to mislead the consuming public and create the false impression that there is some association, affiliation, sponsorship, endorsement or license relationship between Plaintiffs' products and/or services and HCI's products/services. (See Complaint at paragraph 28) Notwithstanding the fact that

Defendant HCI has been considered an affiliated and related entity within Larry and Jimmy's partnership (up until Larry's recently efforts to squeeze Jimmy out), it has been Plaintiffs themselves who have continued to market and promote HCI as part of the Hustler retail group.

92.    In addition to the brick and mortar Hustler retail boutiques that are currently in operation, since approximately February of 2005, the general public (in Ohio and across the country) has been able to shop for Hustler and non-Hustler goods and products at www.hustlerhollywood.com.  In addition to serving as the online retail store, this site has served to market and promote the various retail stores.  As of the filing Plaintiff's Complaint through the filing of this Answer & Counterclaim, Plaintiffs have affirmatively held out the Hustler Cincinnati store as part of the Hustler retail group.  The Hustler Cincinnati store has been continuously listed under the Hustler Hollywood retail locations link/tab at www.hustlerhollywood.com and www.hustlerworld.com. There are and have been numerous different links on the internet/world wide web to the www.hustlerhollywood.com website.  (See e.g. Exhibit S) Up until very recently and at all relevant times to the filing of this Complaint, any individual who visited the www.hustlerhollywood.com website or the affiliated www.hustlerworld.com or www.hhretail.net websites have learned that the Hustler retail chain/arm/division was as a consequence of Larry _and_ Jimmy's vision for an upscale adult boutique. (See Exhibit T)  Now, it is falsely represented that the Hustler retail concept was "Larry's vision."  (See Exhibit U)  Jimmy's slogan, "Relax...it's just sex!" continues to be used throughout Hustler retail group although Larry is now attempting to take credit for this slogan which he had no part of coming up with.

**This action is part of Larry's efforts to wrongfully and maliciously squeeze Jimmy out of their Partnership, to interfere with the operation of the Hustler Cincinnati store and to cause economic harm to Jimmy and to HCI**

93.     Jimmy has two sons – Jimmy Flynt II and Dustin Flynt.

94.     Jimmy II worked for the Hustler enterprise between approximately 1992 and November of 2007.  Dustin worked for Jimmy and Larry and the Hustler enterprise and "family of companies" from approximately 1997 until November of 2007. Dustin worked for the Cincinnati and Monroe, Ohio Hustler retail stores from 1997 until approximately 2005 when Larry asked Jimmy if Dustin could move to Southern California to be his personal assistant and to begin on an executive track in the company.  By that time, Jimmy II was already working his way up the executive ranks.  Thereafter, Dustin moved to California and moved in with Larry at his personal residence.

95.     In late 2007/early 2008, while Jimmy was traveling overseas, Larry suddenly and without explanation terminated Jimmy II and Dustin.  Severance packages were provided.  These terminations were done without notice to Jimmy. When he was later informed what had happened, not only did a rift occur in his relationship with his sons but tension also started to develop between Jimmy and Larry.

96.     At some point in 2008, Jimmy II and Dustin partnered up to start their company, Flynt Media Corp. Their plan was to enter the adult entertainment industry using their surname, Flynt, to sell and market adult videos.

97.     Jimmy II and Dustin made arrangements to publicly announce and launch their company at the 2009 AVN (Adult Video News) Convention in Las Vegas

in early January, 2009.   Jimmy Flynt was not involved in any way with his boys' start-up company.

98.    At some point, Larry learned of his nephews' plans to enter the adult entertainment industry, initially in the DVD segment, using the Flynt surname.  On or about January 9, 2009, Larry filed a federal trademark infringement lawsuit and sought injunctive relief against his nephews and their company in federal court in Los Angeles.

99.    On or around the time this trademark action was filed, Larry contacted Jimmy demanding that Jimmy "get control of his boys" and exert pressure on his boys to comply with his settlement demands, which included monetary compensation ($100,000) and an agreement not to use the Flynt name, alone, to market products.   Larry made threats to Jimmy that if he could not make the lawsuit go away (i.e., if he could not persuade his sons to give in to Larry's demands) then he would "cut him off" financially.  Larry told Jimmy that he would take his (Jimmy's) compensation and share of the partnership profits and use such monies to fund the lawsuit that he instituted against Jimmy's sons.  Larry was blunt and unequivocal in threatening economic adversity and harm to Jimmy unless Jimmy was willing and able to exert sufficient and effective fatherly influence to affect the outcome of Larry's federal lawsuit in Larry's favor.

100.  As of January of 2009, Jimmy drew his share of the profits of his partnership with Larry (i.e., the Hustler enterprise/close corporation) through non-party, Flynt Management, LLC, a company that was set up in 2003 within Larry and Jimmy's partnership as the entity through which executives (and Larry and Jimmy) would be paid.  In addition to his profit distributions, Jimmy received health and

other fringe benefits, including a 401K retirement plan, a car and an expense account, all through Flynt Management, LLC.

101. Jimmy reached out to his sons in an effort to persuade them to give up on using Flynt name, standing alone, in connection with their newly formed business and to otherwise heed to Larry's demands, which included a monetary payment. Jimmy's sons believed strongly in their legal position and in their newly formed company and were unwilling to simply give up.

102. Beginning in February, 2009, Larry, with the advice, counsel and guidance of Attorney Paul Cambria and other attorneys in his Buffalo, NY law firm, embarked on a course of action intending to "squeeze" Jimmy out of the Hustler business/enterprise, to oppress his ownership interest, to interfere with the operations and interests of Hustler Cincinnati, Inc., and to otherwise cause economic harm/loss to Jimmy and to Hustler Cincinnati, Inc.[7]

103. First, Larry gave the directive to the Vice President of Human Resources for Flynt Management, LLC (Arthur Elizarov) to stop Jimmy's pay (direct deposited every two weeks into Jimmy's personal checking account). Larry claimed that he was taking Jimmy's compensation to fund his lawsuit against Jimmy's sons. No explanation was given to Jimmy outside of Larry's threats. At one point in late February, 2009, Flynt Management direct deposited funds into Jimmy's checking

---

[7] Paul Cambria obtained pro hac vice admission to represent Jimmy in connection the State of Ohio's obscenity prosecution against he and Larry in 1976-77 as well as the second prosecution in 1998-99 (which ended in a plea agreement). In early 2001, Larry and Jimmy hired Paul Cambria and his law firm, Lipsitz Green Scime and Cambria, LLP (based in Buffalo, NY) to serve as their "general counsel" for their partnership and business interests. From 2001 through the end of 2008, Cambria and the Lipsitz Green firm provided legal services and advice to Larry, to Jimmy, and to all of their various "entities" within their enterprise, including Defendant HCI, all of the retail stores, and Plaintiff LFP. Cambria and his staff of attorneys set up Plaintiff LFP IP LLC in 2006. Cambria and his staff took care of USPTO registrations and related work beginning in 2001. Jimmy and HCI currently have pending a legal malpractice against these lawyers and the Lipsitz Green law firm in the Hamilton County Court of Common Pleas. Beginning in 2001, the Lipsitz Green firm has been paid a yearly retainer between $1,200,000 - $1,500,000 for all legal services provided to any of the entities within the Hustler enterprise. Beginning in February of 2009 through the present, Cambria and several attorneys in his firm have assisted Larry and Plaintiffs herein in taking adverse action against Jimmy and HCI to whom they have owed (and owe) fiduciary duties.

account and then a few hours later, took them back out. Jimmy sought an explanation but none was provided.

104.    After Jimmy's pay had been stopped, in early April of 2009, Larry sent Jimmy two legal bills incurred in connection with his lawsuit against Jimmy's sons and asked that Jimmy pay those bills directly.

105.    On or about April 29, 2009, Tom Candy, a long time employee of the Flynt companies (and former CFO), contacted HCI's accountant, Allie Jackson III. Tom asked/instructed Allie to "loan" $400,000 from Hustler Cincinnati, Inc. to LFP Internet Group, LLC in connection with a mysterious "major project" that the "internet group" was working on. Tom held himself out as "Executive Vice President" for LFP Internet Group, LLC, a title he did not actually hold. Oddly, from late 2003 until the present, Tom Candy has worked exclusively at the Hustler Casino located in Gardena, CA. He has had no involvement with respect to the internet group. Tom told Allie that he was aware that Hustler Cincinnati had "excess cash" based on weekly financial reports that, at the time, were provided by Mr. Jackson, on behalf of Hustler Cincinnati, to LFP's accounting group in California. Tom requested Allie send a wire transfer of $400,000 and suggested that time was of the essence – asking for the funds to be wired "tomorrow." Tom followed up his phone communication with an e-mail communication and a proposed "promissory note." Mr. Candy wrote that he was contacting the "different division (sic) that have excess cash and requesting that they transfer funds to us for the project." Tom provided instructions for transferring the money to a bank in Beverly Hills, CA. Allie immediately notified Jimmy of this request. Jimmy told Allie not to make the transfer. Allie called Tom to inform him that Jimmy had instructed him not to make

the funds transfer.  Tom responded:  "this is going to be a problem" (i.e., Larry is going to get angry and retaliate).

106.  Larry has admitted that he gave the directive in or around April of 2009 to use a fraudulent promissory note / loan request in an effort to obtain "excess cash" from the bank account(s)/possession of Hustler Cincinnati, Inc.  Larry believed that he was entitled to those proceeds even though Jimmy was the sole shareholder of Hustler Cincinnati, Inc.

107.  There was no "major internet project," no other divisions were requested to loan "excess cash" and Larry/LFP Internet Group, LLC had no intention of paying the requested $400,000 loan back.  The actions related to the fraudulent loan request constituted securities fraud under Ohio law.

108.  Less than a week after the $400,000 loan request was denied, by letter dated May 5, 2009, and sent via overnight mail to Hustler Cincinnati, Inc. at 411 Elm Street, a lawyer with the Lipsitz Green law firm sent a letter to the Hustler Cincinnati store indicating that it was in breach of its written lease agreement with Elm 411, LLC, demanded $31,419 in alleged "back rent" and demanded that Hustler Cincinnati vacate the premises.

109.  On May 20, 2009, Hustler Cincinnati received another purported eviction notice.

110.  On May 22, 2009, under Hamilton County Case No.: A0905138, Hustler Cincinnati instituted an action for declaratory relief against Elm 411, LLC related to the alleged "lease dispute." Elm 411, LLC subsequently filed a forcible entry and detainer action against HCI.  Those actions were consolidated and remain pending before the Hamilton County Court of Common Pleas.  Larry claims that he

"owns and controls" Elm 411 which is nothing more than a shell entity that was created in 2004 within the incorporated partnership of Jimmy and Larry and which currently serves as one of Larry's alter egos.

111. A letter dated June 15, 2009 was sent by an agent of Flynt Management Group, to Jimmy at his Las Vegas residence advising him that his purported position as an "unpaid consultant" was being terminated by FMG. Jimmy had never heard of this title.

112. On June 25, 2009, Jimmy received a second letter at his Las Vegas residence from Flynt Management advising that due to "recent events that have clearly placed you in a conflict of interest of Mr. Larry C. Flynt" he was being terminated, effective immediately, and that all of his benefits were being stopped. He was instructed to turn in his company car under threats that if he failed to do so, "FMG shall deem the vehicle stolen, and take whatever legal actions are available to it to secure the return of the vehicle." Jimmy returned his company car to a dealership. Flynt Management did not follow the normal course of events or company policy in their purported "termination" of Jimmy. No compensation or severance was offered. Larry did not offer to buy out Jimmy's share of their partnership. There was no legitimate business reason to terminate Jimmy's pay and benefits.

113. On or around September 3, 2009, Michael Klein, President of LFP, Inc., wrote a letter to Hustler Cincinnati, Inc. alleging that HCI was in default of alleged "licensing obligations" to LFP. No mention was made to LFP IP, LLC. Mr. Klein wrote another letter dated September 14, 2009 seeking to terminate an alleged

"licensing" contract between LFP and HCI. Again, no mention was made to LFP IP, LLC.

114. On November 9, 2009, Attorney Jon Brown of the Lipsitz Green law firm wrote a baseless "cease and desist" letter to HCI's counsel (the undersigned) threatening to institute a trademark infringement action against HCI on behalf of Defendants LFP, Inc. an LFP IP, LLC.

115. On December 17, 2009, Jimmy and HCI filed a civil action against Larry Flynt, L.F.P, Inc., LFP IP, LLC, Flynt Management Group, LLC, and several other entities that were established within Jimmy and Larry's partnership seeking a dissolution and accounting of Jimmy and Larry's partnership and asserting numerous other claims for monetary, equitable and injunctive relief. Jimmy and HCI have recently filed an Amended Complaint. Plaintiffs herein have not yet filed a responsive pleading in that action which remains pending.

116. LFP, Inc. and LFP IP, LLC instituted this trademark infringement action on December 18, 2009, the day after Jimmy and HCI filed the Hamilton County partnership dissolution and accounting action.

117. As Plaintiffs have recently learned, in furtherance of Larry's efforts to squeeze Jimmy out of their partnership and to otherwise cause economic harm to him and to HCI, Larry, with the assistance of various representatives of LFP, is currently pursuing a new Hustler retail store to open at 16-18 East Seventh Street in downtown Cincinnati. Pursuit of a second downtown Hustler store, blocks away from HCI, is presumably being done in order to "compete" with HCI and/or interfere with HCI and/or "trade off" of HCI's goodwill and name, is in further breach of Larry's fiduciary duties to Jimmy, is tortious and inequitable. Larry is attempting to

use partnership funds to pursue a second downtown Cincinnati Hustler retail store only to inflict economic harm to Jimmy and HCI and as part of his continuing course of conduct that amounts to bad faith, willfulness, and maliciousness.

118.   Upon information and belief, this action, like the Elm 411 eviction action, was initially commenced in a malicious effort to prevent Jimmy/HCI from using the Hustler name in connection with its retail store which has been in operation since 1997 and to otherwise "pave the way" for Larry to open a new Hustler retail store in downtown Cincinnati, to create confusion with HCI's operation, to trade off HCI's name, advertising and goodwill and to otherwise steal their customers and interfere with their business.   Upon information and belief, employees of the Monroe, Ohio Hustler Hollywood retail store, at the insistence and urging of Larry and representatives of LFP, have been telling customers that "they are going to close down at 411 Elm Street in downtown Cincinnati and re-open on Seventh Street this Fall."

**Count 1 – Declaratory Judgment**

119.   Defendant restates and incorporates by reference herein all preceding paragraphs in this Counterclaim.

120.   Defendant seeks a declaration of rights from this Court that it has not infringed on any rights of Plaintiffs, that it has not breached any contract or agreement with Plaintiffs, that it has not caused any damages or harm to Plaintiffs and that it bears no liability to Plaintiffs in law or equity.   Defendant further seeks a declaration regarding its ownership and rights to use the "Hustler," "Hustler Cincinnati," "Relax...it's just sex!" and related marks in connection with its established retail operation.   Defendant seeks a declaration that it has the legal and

equitable right to use these marks. Defendant further seeks a declaration and Order that Plaintiffs (and all entities affiliated or related to Plaintiffs, including any person or entity in privity with Plaintiffs) be permanently enjoined from any further interference with Defendant's business including the use of the Hustler and Hustler Cincinnati marks.

## Count 2 – Unjust Enrichment / Constructive Trust

121. Defendant restates and incorporates by reference all preceding paragraphs as if fully re-written herein.

122. "Unjust enrichment" occurs when a person has and retains money or benefits that in justice and in equity belong to another."

123. A "constructive trust" is a trust by operation of law which arises against one who, by fraud, actual or constructive, by duress or abuse of confidence or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. The constructive trust is an equitable remedy that protects not only against fraud, but also unjust enrichment, where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. Ordinarily, constructive trust arises without regard to intention of person who transferred property. Where a confidential or fiduciary relationship exists between donor and donee, a transfer is generally looked upon with some suspicion that undue influence may have been brought to bear on the donor by the donee. Thus, where there has been a gift to a fiduciary, a presumption [of undue influence] arises, and the party with the superior position must go forward with proof on the issue of undue influence and fairness of the

transaction while the party attacking a completed gift on that basis retains the ultimate burden of proving undue influence by clear and convincing evidence.

124. Defendant asserts that Plaintiffs have been unjustly enriched due to benefits conferred by Defendant with Plaintiff LFP's knowledge and with LFP's retention of those benefits under circumstances where it would be unjust to do so without fair payment/compensation. Specifically, Defendant asserts that Plaintiff LFP has been unjustly enriched by virtue of monetary payments Defendant has made since approximately February of 2005 to LFP for purported "licensing fees."

125. There was never a valid, arms-length licensing/royalty agreement entered into between the parties. At no time has HCI paid any monies to LFP IP, LLC even though LFP IP, LLC claims that it has previously acquired certain Hustler marks by assignment from LFP.

126. Defendant used the Hustler and Hustler Cincinnati marks without payment of any fees (to LFP or to any other individual or entity) since March of 2000 when it opened at 411 Elm Street. Before that, Defendant's predecessor-in-interest, Hustler News & Gifts, Inc. used the Hustler marks in connection with a retail store in downtown Cincinnati from October of 1997 through December of 1999. Jimmy Flynt, through Hustler News & Gifts, and then through Hustler Cincinnati, Inc., was the first to use the Hustler marks in commerce in connection with adult-themed retail services (as well as Hustler apparel), in Ohio or anywhere in the U.S. Jimmy was also the first to use in commerce the Hustler marks in connection with adult-themed retail services in Ohio under the "Hustler Hollywood" mark beginning in December of 2000 in Monroe, Ohio. All of these uses were with full knowledge and acquiescence of Larry Flynt and LFP.

127.   Defendant only agreed to begin making monthly payments of $8,400 a month to LFP beginning in or around February of 2005 as part of Jimmy and Larry's partnership agreement, plans and goals.  Such monies were paid because Jimmy was induced to believe, and did believe, by Larry and by representatives of LFP, that such transfers were being made as part of his partnership agreement with Larry and in an effort to share/pool partnership funds for further growth and expansion of the Hustler enterprise. These $8,400 per month payments were capital contributions by Jimmy through HCI into his incorporated partnership with Larry.   These contributions were induced through fraud, undue influence, and breach of confidence and fiduciary duty.  Had HCI known that LFP would some day institute a trademark action against it arguing that it had superior rights to the Hustler marks in connection with retail services (in Cincinnati or elsewhere), HCI never would have began making such payments in the first place.  LFP induced HCI to begin making these payments by virtue of the confidential and fiduciary relationship between these entities within Larry and Jimmy's partnership.

128.   HCI did not receive any consideration in exchange for payments that have been made for purported licensing fees for which there was no contract and which were not otherwise legally required. Such transfers were not gifts.  It would be inequitable to allow LFP to retain those payments based on LFP's initiation of this action and other related conduct that is being taken adverse to HCI's interests as more fully described herein.

129.   Defendant seeks damages in excess of $25,000.

**Count 3 - Fraud / Constructive Fraud / Fraudulent Inducement / Constructive Trust**

130.    Defendant restates and incorporates by reference all preceding paragraphs as if fully re-written herein.

131.    Actual fraud requires (a) a representation or, where there is a duty to disclose, a concealment of fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) an injury proximately caused by the reliance.

132. Constructive fraud is any inequitable conduct which is not accompanied by affirmative false representations.  Constructive or legal fraud may arise from the circumstances of a transaction or the relationship of the parties without the existence of fraudulent intent affecting the conscience. Constructive fraud is synonymous with legal fraud and is such as is implied by law from the nature of the transaction itself.  The remedy of constructive fraud is designed, in part, as protection against the effects of overweening confidence, self-delusion, or the infirmities of hasty and precipitate judgment.  Constructive fraud leads to consequences equivalent to those following actual fraud.  Constructive fraud may be found from the relation of the parties to a transaction, or from circumstances and surroundings under which it takes place.  Constructive fraud does not require fraudulent intent, and, therefore, constructive frauds are assumed to have been committed by acts without regard to motive; however, a constructive fraud claim does require the existence of some peculiar confidential relationship between the

parties which affords the power and means of one to take undue advantage of or exercise undue influence over another.

133.   A claim of fraud in inducement arises when party is induced to enter into an agreement through fraud or misrepresentation; the fraud relates not to nature or purport of contract, but to facts inducing its execution.   Fraudulent inducement occurs because of misrepresentation of facts outside a contract or other wrongful conduct which induces a party to enter into a transaction.

134.   For the reasons stated herein, HCI was fraudulently induced by LFP to begin making monthly "licensing" payments in or around February of 2005. Defendant seeks a determination that there was no such licensing contract or obligation.   Defendant seeks recoupment of all purported "licensing" fees paid to LFP as well as recovery of monies currently being put into escrow. Defendant further seeks a determination that Defendant bears no future obligation to make any monetary transfers to LFP or to LFP IP, LLC or to any related or affiliated party.

135.   Defendant seeks damages under this count in excess of $25,000.

**Count 4 - Unfair Competition / Abuse of Process / Malicious Bad Faith Pursuit of Litigation / Tortious Interference with Business Activities / Tortious Interference with Business Expectancy**

136.   Defendant restates and incorporates by reference all preceding paragraphs as if fully re-written herein.

137.   Abuse of process arises when one maliciously misuses legal process for an ulterior and wrongful purpose. Malicious pursuit of litigation in bad faith constitutes unfair competition under Ohio law.

138.   For the reasons set forth herein, Defendant asserts that this action is not founded upon good faith but was instituted with the intent and purpose of

harassing and injury Jimmy Flynt (through Defendant).  This action is part of Larry Flynt's ongoing attempt to squeeze Jimmy out of their business, to interfere with HCI's business, and to cause economic harm/damages to HCI.  This action is also part of Larry Flynt's and Plaintiff LFP's ongoing efforts to open a new Hustler retail store in downtown Cincinnati and to trade off HCI's goodwill, advertising and customers all to the detriment of Jimmy and HCI.

139.   Defendant seeks damages in excess of $25,000.

**Count 5 — Injunctive Relief**

140.   Defendant restates and incorporates by reference all preceding paragraphs as if fully re-written herein.

141.   For the reasons stated herein, Defendant seeks this Court to enjoin Plaintiffs, to include any individual or entity related or affiliated or in privity with Plaintiffs, from further pursuit of a "Hustler" retail store in the greater Cincinnati / Northern Kentucky area, and from further interference with Defendant's goodwill, customers or business contracts or operations.

**WHEREFORE**, based on the foregoing, Counterclaimant Hustler Cincinnati, Inc., requests the following relief:

1.   For compensatory damages in excess of $25,000,

2.   For a Declaration of Rights as requested herein,

3.   For injunctive relief as requested herein,

4.   For an award of punitive damages for Plaintiffs' malicious actions,

5.   For recovery of Defendant's attorneys fees, costs and expenses,

6.   For monetary sanctions, and

7.    For any and all other relief to which Defendant is entitled, legally or equitably.

Respectfully submitted,

REMINGER CO., L.P.A.

/s/ Robert W.  Hojnoski
Robert W. Hojnoski (0070062)
Carrie A. Masters (0083922)
525 Vine St., Suite 1700
Cincinnati, OH 45202
T: (513) 721-1311; F: 721-2553
Email: rhojnoski@reminger.com;
          cmasters@reminger.com
***Trial Counsel for Defendant /
Counterclaimant, Hustler Cincinnati,
Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been electronically filed this 22nd day of July, 2010, through the Court's CM/ECF system. Electronic notice of this filing will be automatically sent to counsel for Plaintiffs.

/s/ Robert W. Hojnoski
Robert W. Hojnoski, Esq.