# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **L.F.P. IP, LLC, et al.,** | : | Case No. 1:09cv913 |
| | : | |
| | : | Judge Bertelsman |
| Plaintiffs, | : | |
| | : | Magistrate Wehrman |
| vs. | : | |
| | : | |
| **HUSTLER CINCINNATI, INC.,** | : | |
| | : | **PLAINTIFFS' PREHEARING** |
| | : | **MEMORANDUM** |
| Defendant. | : | |

Plaintiffs L.F.P. IP, LLC ("LFP IP") and LFP, Inc. ("LFP") (collectively, "Plaintiffs")

hereby submit their Prehearing Memorandum in advance of the Preliminary Injunction

Hearing against Defendant Hustler Cincinnati, Inc. ("HCI") on October 12, 2010:

Respectfully submitted,

/s/ Mark A. Vander Laan
Mark A. Vander Laan (0013297)
E-Mail: mark.vanderlaan@dinslaw.com
Amanda P. Lenhart (0072517)
E-Mail: amanda.lenhart@dinslaw.com
Joshua A. Lorentz (0074136)
E-Mail:  joshua.lorentz@dinslaw.com
Robert M. Zimmerman (0079584)
Email:  robert.zimmerman@dinslaw.com
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio  45202
Phone:        (513) 977-8200
Fax:            (513) 977-8141

**Attorneys for Plaintiffs**
**LFP, Inc. and L.F.P. IP, LLC**

## TABLE OF CONTENTS

I.    **SUMMARY**.......................................................................................1

II.   **JURISDICTION**...........................................................................2

III.  **KIND OF ACTION**.....................................................................2

IV.  **STATEMENT OF FACTS**.......................................................3

     A.    **THE PARTIES**...............................................................3

     B.    **THE MARKS AT ISSUE**.............................................3

     C.    **LARRY OPENS HCI WITH JIMMY AS SOLE SHAREHOLDER, AND HCI ENTERS INTO A LICENSE AGREEMENT WITH LFP**.................................................4

     D.    **HCI BREACHES THE LICENSE AGREEMENT, AND LFP TERMINATES HCI'S LICENSE FOR THE HUSTLER MARKS**.........6

     E.    **THE HISTORY OF LARRY'S USE OF THE HUSTLER MARKS**...............................................7

     F.    **JIMMY'S PRIOR JUDICIAL ADMISSIONS CONCERNING LFP'S OWNERSHIP OF THE HUSTLER MARKS**...........................8

          1.    **Jimmy Seeks A Conservatorship Of Larry's Estate And Agrees To Take A Security Interest In The Hustler Marks**.....8

          2.    **Jimmy Testifies Under Oath In 1987 That He Has Not And Has Never Been An Owner Of LFP**................................9

          3.    **Jimmy Disavows Any Ownership Interest In LFP Or The HUSTLER Marks Under Oath In His Domestic Proceedings In 2003**............................................10

          4.    **Jimmy's Son Dustin's Prior Judicial Admissions That Larry Owns LFP and Controls The HUSTLER Marks**...........11

          5.    **Jimmy's Accountant Testifies That Jimmy Never Told Him That He Was Larry's Partner Or Co-Owner**.................11

     G.    **HUSTLER NEWS & GIFTS, INC. OPENS IN CINCINNATI BUT CLOSES AFTER TWO YEARS**.......................................11

     H.    **THE HUSTLER HOLLYWOOD BRAND IS ESTABLISHED**

AND REGISTERED, AND LFP RE-ENTERS THE
CINCINNATI MARKET.................................................................13

I.  HUSTLER HOLLYWOOD OHIO OPENS FOR BUSINESS
AND EXECUTES A LICENSE AGREEMENT WITH LFP.............13

V.  ISSUES OF LAW (PROCEDURAL).....................................................14

VI. ISSUES OF LAW (SUBSTANTIVE)......................................................14

A.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS
FOR FALSE DESIGNATION OF ORIGIN, FALSE IMPRESSION
OF ASSOCIATION, UNFAIR COMPETITION, OHIO
DECEPTIVE TRADE PRACTICES, AND COMMON LAW
UNFAIR COMPETITION..............................................................15

1.  Plaintiffs Have Ownership Of A Valid Trademark.............16

2.  HCI Is Using Plaintiffs' Hustler Marks.................................16

3.  A Likelihood Of Confusion Is Demonstrated By
HCI's Continued Use After Plaintiffs Termination
Of The License Agreement Between HCI and LFP.............17

a.  An Oral Or Implied License Agreement
Existed Between LFP and HCI....................................18

b.  Because A License Agreement Exists Between
HCI And LFP, HCI Is Estopped From Challenging
The Degree Of Quality Control Exercised By
Plaintiffs Or Plaintiffs' Ownership Of A
Valid Trademark.........................................................23

c.  Any Alleged Common Law Rights In The
HUSTLER Marks Claimed By HCI Were Merged
Into The License Agreement With LFP....................24

B.  PLAINTIFFS' LIKELIHOOD OF SUCCESS IS ALSO
ESTABLISHED BY THE EIGHT FACTOR LIKELIHOOD
OF CONFUSION ANALYSIS.........................................................25

1.  Strength of the Marks..........................................................26

2.  Relatedness of the Goods.....................................................26

3.  Similarity of the Marks.......................................................27

    4. Actual Confusion.................................................................28

    5. Marketing Channels...........................................................28

    6. Degree of Consumer Care..................................................29

    7. Intent in Selecting the Mark..............................................29

    8. Likelihood of Expansion....................................................30

    9. There is a Strong Likelihood of Confusion in This Case.....30

  C. PLAINTIFFS WILL BE IRREPARABLY HARMED IF HCI'S
    USE OF THE HUSTLER MARKS IS NOT
    PRELIMINARILY ENJOINED................................................30

  D. THE THREAT OF HARM TO PLAINTIFFS GREATLY
    OUTWEIGHS THAT TO HCI...................................................31

  E. THE PUBLIC INTEREST IS BEST SERVED BY
    ISSUING A PRELIMINARY INJUNCTION AGAINST
    HCI'S USE OF THE HUSTLER MARKS...............................31

  F. PLAINTIFFS ARE ENTITLED TO AN AWARD OF
    ATTORNEYS' FEES DUE TO HCI'S WILLFUL AND DECEPTIVE
    INFRINGEMENT OF THE HUSTLER MARKS..............................32

VII. ISSUES OF LAW (EVIDENTIARY)............................................33

VIII. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW...........33

IX. WITNESS LIST.......................................................................34

X. EXHIBIT LIST........................................................................34

## PLAINTIFFS' PREHEARING MEMORANDUM

### I.  SUMMARY

Despite the distortions and distractions offered by HCI and its sole shareholder Jimmy R. Flynt ("Jimmy"), this case presents a straightforward path to an injunction.  The only truly relevant facts are:  (1) LFP IP owns the registered HUSTLER marks; (2) HCI licensed the marks from LFP with LFP IP's express approval; and (3) LFP terminated the license agreement with HCI, but HCI has continued to use the marks.  As a result of these facts, Ohio law provides that: (1) HCI cannot challenge validity, ownership of the mark, or quality control by Plaintiffs; (2) any common law rights HCI may have had were extinguished and merged into the subsequent license with LFP; and (3) upon termination of the license, likelihood of confusion and irreparable harm are established by HCI's continued use.

In sum, the existence of the license between the parties and breach thereof by HCI is sufficient to end the Court's substantive inquiry on liability and preclude any defenses by HCI.  Thus, under the law of trademarks, a preliminary injunction is warranted.

Jimmy and HCI are keenly aware that the license agreement between HCI and LFP definitively establishes Plaintiffs' entitlement to injunctive relief.  As a result, Jimmy and HCI have sought to distract the Court from these crucial facts by asserting a variety of vague defenses, including that Jimmy is a co-equal partner with his brother Larry C. Flynt ("Larry").[1]  As a result of this fictional "partnership," Jimmy claims to have rights to the HUSTLER marks.

---

[1] LFP is owned by the Larry Flynt Revocable Trust (the "Trust").  Larry controls the Trust, LFP, LFP-IP and all of their affiliates.

But aside from being utterly irrelevant to the above analysis, Jimmy and HCI's arguments are comprehensively refuted by their own prior conduct. Any previous use of the HUSTLER marks has always been done with the express permission of Larry or entities he controls, usually pursuant to a license agreement with LFP. Neither Jimmy nor HCI has ever previously contested Plaintiffs' ownership of the HUSTLER marks nor the validity of any license agreements. ***In fact, Jimmy has consistently disavowed, both through written contracts and sworn testimony, any ownership interest whatsoever in LFP or the HUSTLER marks***. Indeed, Jimmy has never claimed any rights to LFP or the HUSTLER marks until LFP terminated the license agreement with HCI in 2009.

## II.    <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this trademark infringement action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(b) because this action arises under the Lanham Act, 15 U.S.C. § 1501 *et seq*. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) and (c) because HCI resides in this district and because HCI has committed acts of false endorsement and unfair competition in the Southern District of Ohio.

## III.    <u>KIND OF ACTION</u>

This is a trademark infringement case where HCI, a former licensee of Plaintiffs, has continued to improperly use Plaintiffs' world-famous and federally-registered HUSTLER marks after the termination of HCI's license agreement with Plaintiffs. Plaintiffs seek to enjoin HCI from infringing on Plaintiffs' HUSTLER marks and from unfairly competing by using such marks without permission.

2

IV.  **STATEMENT OF FACTS**

A.  **THE PARTIES**

LFP owns and controls several affiliates, including LFP Publishing Group, LLC ("LFPPG"), and LFP IP.  LFP and LFP IP share common management through Larry, Michael Klein, Michael Cummings, and Theresa Flynt (among others).  LFP IP is the owner of eighty-three trademark registrations, including the world-famous HUSTLER marks at issue herein.  Thirty-two of LFP IP's registrations contain "HUSTLER" as the sole or dominant feature of the trademark.

Jimmy is the sole shareholder of HCI, which operates an adult-boutique, located on a pedestrian walk-way, selling HUSTLER merchandise, including but not limited to clothing items from LFP Apparel, LLC and adult videos from LFP Video Group, LLC ("LFP Video"), both of which are ultimately owned by the Trust.  HCI's location, design, and business model are based upon LFP's highly successful HUSTLER HOLLYWOOD stores. (Jimmy Depo. pg. 31-32).

B.  **THE MARKS AT ISSUE**

The HUSTLER marks has become an internationally recognized symbol of excellence in the adult entertainment industry and is used in connection with various goods and services, including but not limited to the HUSTLER clothing line; HUSTLER magazine; HUSTLER skin care; HUSTLER jewelry; HUSTLER foot wear; HUSTLER movies; the HUSTLER TV Channel on DirectTV, Verizon, and Dish Network; adult toys and novelties; and the HUSTLER HOLLYWOOD boutique stores.  An example of the mark is below:

The records of the United States Patent & Trademark Office ("USPTO") conclusively establish that the trademark registrations for HUSTLER, HUSTLER HOLLYWOOD, HUSTLER CLUB, HUSTLER HD and DESIGN, HUSTLER HUMOR, HUSTLER VIDEO, HUSTLER TV, and numerous others are owned by LFP IP.  From 1995 to 2003, LFP was the registrant of the HUSTLER marks.  LFPPG was assigned the entire interest to the marks in July of 2003.  Since October 2006, LFP IP has been the registrant of the HUSTLER marks.

LFP and its affiliates spend approximately $5 to $10 million per year to promote its HUSTLER brand of products, and it spends approximately an additional $1,000,000 per year to promote its HUSTLER HOLLYWOOD retail stores.

## C.     LARRY OPENS HCI WITH JIMMY AS SOLE SHAREHOLDER, AND HCI ENTERS INTO A LICENSE AGREEMENT WITH LFP

In the spring of 2000, eager to expand his growing chain of retail stores, Larry decided to open HCI in downtown Cincinnati.  (Larry Depo. pg. 159).  In order to avoid personal exposure to criminal prosecution and obtain his California gaming license, Larry made Jimmy the sole owner of HCI to act as an agent of LFP and its affiliates.  As in the past, Jimmy was a W-2 employee of LFP at the time.  Jimmy's son Dustin Flynt ("Dustin") assisted with the management of the HCI store.  (Dustin Depo. pg. 7).  HCI used the HUSTLER marks pursuant to express permission from Larry and LFP.  Jimmy was a paid employee of LFP, and later FMG, and therefore his job required him to provide quality control of the HUSTLER marks.

In addition, LFP, through Theresa Flynt ("Theresa"), Larry's daughter and an executive vice-president of Flynt Management Group, LLC ("FMG") exercised quality control over HCI's use of the HUSTLER marks.  Theresa inspected the HCI store both on

4

site and via remote video camera, consulted with HCI regarding décor, and regulated the flow of HUSTLER-branded goods to HCI. LFP also routinely examined HCI's financial statements and sales reports. Each night, HCI called their sales numbers in to HH-Sunset, LLC.

In November of 2004, with HCI doing steady business, LFP and HCI determined that license payments were appropriate. Accordingly, LFP and HCI prepared, but never signed, a written license agreement requiring HCI to pay LFP $8,400.00 per month to use the HUSTLER marks. (Jackson Depo. pp. 51-53).

While the parties never signed the license agreement, on February 24, 2005, HCI paid LFP $159,600 for license fees for the years 2003 and 2004. (Jackson Depo. pg. 92). HCI's and Jimmy's accountant of thirteen years, Allie Jackson ("Jackson") confirmed that this check was for license fee expenses and was accounted for as such by HCI. (Jackson Depo. pg. 93). Then, beginning May 4, 2005, and continuing through May 1, 2009, HCI paid LFP $8,400 per month to license the HUSTLER marks. Each of the checks issued by HCI to LFP identified the payment as "license fee" expenses. Jackson also testified that he recorded these payments on HCI's financial records as "license fee expenses." (Jackson Depo. pg. 71). Jackson further testified that HCI listed these license fee expenses on its annual tax returns and claimed a deduction for such expenses for the years 2004-2007, which resulted in a personal tax savings for Jimmy. (Jackson Depo. pp. 114- 121).

HCI's right to use the HUSTLER marks arose solely from authorization from and its licensing payments to LFP, and it was clearly aware of the value of the HUSTLER marks, as it paid LFP nearly $600,000, to use the marks. HCI paid this fee to attain the name

recognition, prestige, and goodwill associated with the HUSTLER marks in the adult entertainment industry.[2]

### D. HCI BREACHES THE LICENSE AGREEMENT, AND LFP TERMINATES HCI'S LICENSE FOR THE HUSTLER MARKS

From July 2003 through May 2009, HCI made license payments to LFP for use of the HUSTLER marks. Jimmy was terminated from FMG, as of June 15, 2009. From June through August of 2009, HCI did not make license payments to LFP. (Jackson Depo. pg. 89). While HCI had occasionally made late license fee payments in the past, it had always paid in full within a reasonable time.

On September 3, 2009, after three months of non-payment by HCI, LFP's president, Michael H. Klein, sent a letter to HCI demanding that it make the required license payments. HCI did not make any effort to cure its default, and on September 14, 2009, Klein sent HCI a letter revoking and terminating its license to use the HUSTLER marks and providing it one week to remove the HUSTLER marks from its store. Additionally, Theresa Flynt instructed LFP to stop taking orders for HUSTLER merchandise from HCI. Since that time, LFP has not accepted any orders from HCI for its HUSTLER goods.

After HCI ignored LFP's repeated requests to stop using the HUSTLER marks, LFP's attorneys sent HCI a cease and desist letter, demanding that HCI remove the HUSTLER marks from its store. HCI disregarded that demand and has admittedly continued to use the HUSTLER marks despite the termination of the license agreement.

---

[2] On July 13, 2003, the HUSTLER marks were assigned by LFP to LFPPG. On October 19, 2006, the HUSTLER marks were assigned by LFPPG to LFP IP. LFP retained the right to use and sublicense the HUSTLER marks pursuant to an oral license agreement with LFP IP. Quality control was still performed throughout this time through Theresa as the appointed representative for LFPPG and LFP IP.

### E. THE HISTORY OF LARRY'S USE OF THE HUSTLER MARKS

Though not directly relevant to the Court's analysis of the terminated license agreement, the history of the HUSTLER marks and Jimmy's limited role in his brother's business ventures may be helpful to the Court. Particularly telling is Jimmy's consistent conduct acknowledging that he held no rights to the HUSTLER marks.

Larry, through entities he owns and controls, has used the HUSTLER marks for decades. In 1974, Larry began publishing "Hustler" magazine. On May 20, 1975, HUSTLER was first registered with the United States Patent and Trademark Office for the first time.

Even at this early stage of the HUSTLER brand, Jimmy acknowledged that he had no rights to the HUSTLER marks. On June 1, 1978, Larry, Jimmy, and Larry's wife Althea Flynt ("Althea") executed an Agreement which was intended to "resolve any and all differences which exist or may exist in the future between the parties hereto regarding the ownership of any company or properties owned or controlled by L.F.P., Inc." (the "1978 Agreement"). The 1978 Agreement called for Larry and Althea to convey to Jimmy "all stock certificates representing one hundred percent (100%) of the ownership of the company known as Leasure Time Products ("LTP")."

In the 1978 Agreement, Larry and Althea also granted to Jimmy the right to use the HUSTLER name in LTP's business. However, Larry and Althea "reserve[d] the right to reasonably refuse such use." Thus, Jimmy acknowledged he had no ownership of the HUSTLER marks. LTP has long since dissolved.

7

### F. JIMMY'S PRIOR JUDICIAL ADMISSIONS CONCERNING LFP'S OWNERSHIP OF THE MARKS.

#### 1. Jimmy Seeks A Conservatorship Of Larry's Estate And Agrees To Take A Security Interest In The Hustler Marks

Jimmy's next admission of non-ownership occurred in 1984, when Larry was imprisoned in Butner, North Carolina. On March 12, 1984, Jimmy filed a Petition for Appointment of Conservator of the Estate of Larry requesting the authority "[t]o do and perform all acts which the proposed conservatee [Larry] would be able to do and perform with respect to L.F.P., Inc., as sole shareholder, director and chairman of the board thereof, and on behalf of all of its wholly-owned subsidiaries." Apart from identifying Larry as "sole shareholder, director, and chairman," Jimmy implicitly recognized that he had no ability to manage LFP or its primary brand, HUSTLER. Jimmy was appointed conservator of Larry's estate, and managed the affairs of LFP for approximately six months.

In order to resolve a dispute between Larry and Jimmy arising out of the conservatorship, Larry, LFP, and Jimmy executed a Consulting Agreement and Security Agreement (collectively, "Consulting Agreement") on November 18, 1984. Pursuant to the Consulting Agreement, the conservatorship was terminated, and Larry agreed to pay Jimmy $55,000 per year for the next ten years for certain consulting services. To secure such payment, Larry, LFP, and Hustler Magazine, Inc. granted Jimmy "a security interest in and to that certain trademark and service mark of 'Hustler' for periodicals and other publications, or any interest therein, whether such trademark and service mark is subsisting at common law or otherwise and including all applications and registrations therefor and all proceeds thereof." Obviously, if Jimmy had any rights to the HUSTLER marks, the security interest would be worthless.

On November 30, 1984, Larry and Jimmy renegotiated the Consulting Agreement and executed a Release. This Release (hereinafter "Buyout Agreement") accelerated the payments to be made by Larry and LFP to Jimmy, such that Jimmy would receive a $400,000 lump sum payment. In exchange for this payment, Jimmy released Larry and LFP of any obligations under the Consulting Agreement, including the security interest in the HUSTLER marks. Specifically, the Buyout Agreement states that Jimmy "hereby forever releases, discharges LFP and [Larry] and reconveys to LFP and any related or affiliated entities any and all rights [Jimmy] may have obtained pursuant to the [Consulting Agreement]." Accordingly, even if Jimmy did have rights to the HUSTLER marks, he released and reconveyed them entirely.

### 2. Jimmy Testifies Under Oath In 1987 That He Has Not And Has Never Been An Owner Of LFP.

Just a few years later, Jimmy again confirmed that he did not own LFP or any rights to HUSTLER. On September 24, 1987, Jimmy gave deposition testimony in an insurance case captioned *LFP, Inc. v. National Union Fire Insurance Co.*, U.S.D.C. C.D. California Case No. CV-86-2146. Jimmy testified as follows:

> Q: And Larry's position was what during that period of time?
> A: Chairman.
> Q: Chairman of LFP?
> A: Yes.
> Q: And how was Flynt Distributing Company related to LFP?
> A: It's a subsidiary.
> Q: And do you hold any stock or any ownership interest in Flynt Distributing Company?
> A: No.
> Q: Have you ever held any stock or ownership interest in LFP, Inc.?
> A: No.

(1987 Jimmy Depo. pg. 9).

Jimmy invoked his 5th Amendment rights against self-incrimination for the remainder of the deposition. (1987 Jimmy Depo. pp. 11-14).

### 3. Jimmy Disavows Any Ownership Interest In LFP Or The HUSTLER Marks Under Oath In His Domestic Proceedings In 2003.

More than 15 years later, Jimmy was still telling the same story. On June 3, 2003, Jimmy gave deposition testimony in a dissolution of marriage case in Kentucky involving he and his wife, Bernice. Jimmy testified that he was a "consultant" for Larry and LFP. (Jimmy 2003 Depo. pp. 9, 22, 24). He also testified that:

- "Well, you have to understand Hustler is Larry Flynt, you know. Everything that bears that name he has complete control of mind, soul, and body. So when I think of a club, when I think of a store, when I think of a magazine, I think it's him 100 percent." (Jimmy 2003 Depo. pg. 51).

- "He [Larry] owns it 100 percent. So any - the licensing fee, the monies that I got to pay for the initial inventory, the licensing arrangements, that's all I know. The only money as I swear under oath that I got in 2001 was $127,000 with my hand on the bible." (Jimmy 2003 Depo. pg. 53).

- "I don't have - I never see any business records. I don't see any checkbooks. I don't do anything except travel and work for my brother. I don't know what goes on business-wise other than the idea of retail." (Jimmy 2003 Depo. pg. 10).

- "I don't have any stocks." (Jimmy 2003 Depo. pg. 13).

- "I pay him [Larry] an enormous licensing arrangement for that place up there [HH-Ohio]." (Jimmy 2003 Depo. pg. 28).

- "Hustler Hollywood is the name that my brother came up with in the development of the retail stores. And that's what I do is I find locations for him and he builds stores." (Jimmy 2003 Depo. pg. 46).

- "Who is the person that's in charge of Hustler Entertainment? Larry....he runs the show." (Jimmy 2003 Depo. pg. 49).

10

**4.    Jimmy's Son Dustin's Prior Judicial Admissions That Larry Owns LFP and Controls The HUSTLER Marks.**

Jimmy's admission that he had no ownership in any HUSTLER entities has also been confirmed by his own son, who manages HCI's store.  On January 9, 2009, Jimmy's son Dustin M. Flynt ("Dustin") executed a declaration in connection with a trademark litigation in California where Dustin was permanently enjoined from using LFP IP's, LFP Video's and Larry's FLYNT mark.  Dustin testified that "I worked for ten years with my uncle Larry Flynt in his business L.F.P., Inc."  Dustin's declaration also stated that "the 'HUSTLER' marks comprises the primary brand used by L.F.P., and/or other companies owned by Larry Flynt to market, promote, advertise, and sell adult entertainment products and services." (See also 2009 Dustin Depo. pp. 65-67).  Dustin was deposed in the case at bar, and when asked to confirm his prior statements, invoked his Fifth Amendment rights against self-incrimination.  (2010 Dustin Depo. pg. 56).

**5.    Jimmy's Accountant Testifies That Jimmy Never Told Him That He Was Larry's Partner Or Co-Owner.**

Finally, Jackson also confirmed that Jimmy was merely an employee, not a partner or owner.  Jackson testified that Jimmy never told him that Jimmy was Larry's partner.  (Jackson Depo. pg. 123).  Jackson also testified that none of Jimmy's tax returns reflect any partnership between Jimmy and Larry.  (Jackson Depo. pg. 123).  Jackson further testified that Jimmy never told him he is a shareholder in any entity owned by Larry.  (Jackson Depo. pg. 126).

**G.    HUSTLER NEWS & GIFTS, INC. OPENS IN CINCINNATI BUT CLOSES AFTER TWO YEARS**

Jimmy's prior ownership of a separate newsstand in Cincinnati is irrelevant, but also demonstrative of Jimmy's lack of ownership of the HUSTLER marks.  In 1997, Larry sought

to see a HUSTLER magazines in the Cincinnati market, and incorporated Hustler News & Gifts, Inc. ("HNG"). Larry sought to avoid criminal exposure in the Cincinnati market, and thus installed Jimmy as the sole owner of HNG to act as an agent of LFP and its affiliates. Consistent with Jimmy's status as a mere employee, he relied on LFP to finance HNG's start-up operations. HNG's accountant, Jackson, was asked in his deposition "What was the source of funds for the start up of Hustler News and Gifts?" He testified that "The start up funds would have come from LFP." (Jackson Depo. pg. 26). Jackson also testified that Jimmy did not invest any personal funds into the start up of HNG. (Jackson Depo. pg. 58). From HNG's inception until it closed its doors, Jimmy was an employee of LFP.

HNG operated a small newsstand in downtown Cincinnati which sold, among other items, HUSTLER-related publications. (Dustin Depo. pp. 7-9). Larry and LFP expressly authorized Jimmy and HNG to use the HUSTLER marks in connection with the HNG newsstand. (Larry Depo. pg. 159). HNG's operations were markedly different from HCI. Jackson testified that HNG "was a relatively narrow location. It wasn't near as nice as the, you know, the store that opened up afterwards as far as the way they merchandised the - the inventory, and it wasn't as nice looking...they didn't have much in the way of clothing and things like that." When asked if "it's fair to characterize it is a completely different type of store," Jackson testified "Yes." (Jackson Depo. pp. 26-27). Dustin testified similarly. He stated that HNG "was a ma-and-pa shop. It was very small, with a little cash register, and no RMS, no really customer service." (Dustin Depo. pg. 21). Dustin also testified:

> Q. Could HNG compare to Hustler Cincinnati?
>
> A. I think it had different meaning and operation, so you couldn't compare that one to Hustler Cincinnati.

(Dustin Depo. pg. 25).

In the fall of 1999, after pleading guilty to criminal obscenity charges, HNG closed for good.  (Jimmy Depo. pp. 29, 32-33).  There was a gap of approximately eight months between HNG's newsstand closure and HCI's retail store opening.  (Jimmy Depo. pp. 32, 34).

### H.    THE HUSTLER HOLLYWOOD BRAND IS ESTABLISHED AND REGISTERED, AND LFP RE-ENTERS THE CINCINNATI MARKET

Meanwhile, on July 17, 1998, LFP opened the first HUSTLER HOLLYWOOD store in West Hollywood, California.  Several more HUSTLER HOLLYWOOD stores opened over the next decade.  LFP's HUSTLER HOLLYWOOD stores comprise one of the largest groups of adult retail stores in the United States.  These stores sell HUSTLER brand apparel, HUSTLER movies, adult novelties and toys, jewelry and skin care, and other non-Hustler merchandise.  All of the HUSTLER HOLLYWOOD stores are directly owned and controlled by HH-Entertainment, Inc., which is owned by the Trust and controlled by Larry.  The HUSTLER HOLLYWOOD marks are registered by LFP with the USPTO in connection with retail for services.

### I.    HUSTLER HOLLYWOOD OHIO OPENS FOR BUSINESS AND JIMMY EXECUTES A LICENSE AGREEMENT WITH LFP

LFP continued to expand its HUSTLER HOLLYWOOD brand.  On January 1, 2001, Hustler Hollywood Ohio, Inc. ("HH-Ohio") opened for business in Monroe, Ohio.  Like HNG and HCI, Jimmy was shareholder of HH-Ohio, but employed by LFP.  The start-up capital for this store was again supplied by LFP and/or its affiliates under Larry's direction. (Jackson Depo. pg. 34).

That same day, Jimmy, as sole owner of HH-Ohio, executed a License Agreement with LFP for the use of the HUSTLER marks.  (Jackson Depo. pp. 36-37).  Under the HH-Ohio License Agreement, HH-Ohio paid LFP $65,000 per month for the use of the

HUSTLER marks.  (Jackson Depo. pg. 37).  Jackson testified that HH-Ohio took a $780,000 tax deduction for these licensing fees on its 2004 tax return.  (Jackson Depo. pg. 111).  Thus, HCI's license agreement with LFP was not the only time Jimmy agreed to pay LFP for the use of the HUSTLER marks.

On December 15, 2004, Jimmy executed a Stock Sale Agreement whereby he sold his ownership interest in HH-Ohio to HHEI for $150,000.  (Jimmy Depo. pg. 48).

## V.  ISSUES OF LAW (PROCEDURAL)

The Sixth Circuit recognizes four factors to be considered in determining whether to issue a preliminary injunction: (1) the likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) a balance of the irreparable injury suffered by the movant against any harm the issuance of a preliminary injunction would cause to others; and (4) whether the public interest would be served by the issuance of an preliminary injunction.  *See Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998); *Michigan Bell Tel. Co. v. Engler*, 257 F.3d 587, 592 (6th Cir. 2001).  None of these factors, standing alone, is a prerequisite to relief; rather, they must be balanced against each other.  *Michigan Bell*, 257 F.3d at 592; *Golden v. Kelsey Harris Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

## VI.  ISSUES OF LAW (SUBSTANTIVE)

In their Complaint, Plaintiffs have alleged five causes of action: (1) breach of contract; (2) violation of 15 U.S.C. §1125(a) by the creation of a false designation of origin or false impression of association; (3) Federal unfair competition under 15 USC §1125(a); (4) violation of the Ohio Deceptive Trade Practices Act pursuant to R.C. § 4165.01; and (5) Common Law Unfair competition.  Plaintiffs' motion for a preliminary injunction is based on causes 2-5, and does not involve the breach of contract claim.   As set forth below,

Plaintiffs have met their burden with respect to all of the four factors for the granting of a preliminary injunction. Consequently, Plaintiffs Motion for a Preliminary Injunction should be granted.

> **A.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIMS FOR FALSE DESIGNATION OF ORIGIN, FALSE IMPRESSION OF ASSOCIATION, UNFAIR COMPETITION, OHIO DECEPTIVE TRADE PRACTICES, AND COMMON LAW UNFAIR COMPETITION.**

The analysis for a claim of trademark infringement under the Lanham Act is the same as that for false designation of origin, false impression of association, the Ohio Deceptive Trade Practices Act, federal unfair competition, and Ohio common law unfair competition. *See, e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 288 (6th Cir. 1997); *DeGidio v. West Group Corp.*, 355 F.3d 506, 510 (6th Cir. 2004); *see also Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1431 (S.D. Ohio 1990) ("an analysis appropriate for a determination of liability under § 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act); *Mister Twister, Inc. v. JenEm Corp.*, 710 F.Supp. 202, 203-04 (S.D. Ohio 1989) ("the same substantive standard applies in all of plaintiff's claims of trademark infringement and unfair competition [under 15 U.S.C. §§ 1114 and 1125, R.C. § 4165.02 and the Ohio common law]"); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) ("we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks"); *Victoria's Secret Stores v. Atrco Equipment Co.*, Inc., 194 F. Supp. 2d 704, 724 n.8 (S.D. Ohio 2002) (finding analysis under federal law "applies to trademark infringement, unfair competition, Ohio common law, and Ohio's deceptive trade practices statutes"). Thus, in order to prevail, Plaintiffs must simply demonstrate that they are the owners of a

valid trademark, that HCI is using the marks in commerce, and that HCI's use of the mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. *See Daddy's Junky Music Stores,* 109 F.3d at 280; *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

### 1. Plaintiffs Have Ownership Of A Valid Trademark.

Federal registration of a trademark is an extraordinary right which provides numerous benefits to the owner. *See generally*, 1 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §19:9, 19-27 (4th Ed. 2004). "Registration of a mark on the Principal Register of the USPTO creates a rebuttable presumption that a trademark is valid, ...and therefore, protectable under federal trademark law." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.* 502 F.3d 504, 513 (6th Cir. 2007); *see also* 15 U.S.C. § 1115(a) (registration on the principal register is *prima facie* evidence of the validity of the mark).

Plaintiffs' ownership of a valid trademark is evidenced by the thirty-two trademark registrations containing HUSTLER as the sole or dominant feature of the mark which are owned by LFP IP and have been licensed to LFP for use and sublicensing. Moreover, Plaintiffs are the owners of numerous unregistered HUSTLER marks based on decades of use for a variety of adult entertainment related goods and services.

### 2. HCI Is Using Plaintiffs' Hustler Marks

There is no dispute that HCI is making use of the HUSTLER marks in the conduct of business at the Hustler Cincinnati store located at 411 Elm Street in Cincinnati, Ohio. (Jimmy Flynt 2010 Depo. pgs. 9-10). Not only is the mark prominently displayed on signage outside the store, but Dustin Flynt is also admittedly making prominent use of the

mark on business cards he uses when conducting business on behalf of HCI at trade shows and other events. (Dustin Flynt Depo. pgs. 33-39).

### 3. A Likelihood Of Confusion Is Demonstrated By HCI's Continued Use After Plaintiffs Termination Of The License Agreement Between HCI and LFP.

HCI's blatant and continued use of the HUSTLER marks after termination of its license agreement with LFP establishes the likelihood of confusion prong in the infringement analysis. Where a former licensee continues to use a trademark after the trademark license has been cancelled, that continued use satisfies the likelihood of confusion test and constitutes trademark infringement. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1190 (6th Cir. 1997); *Westco Group, Inc. v. K.B. & Associates, Inc.*, 128 F.Supp.2d 1082, 1091 (N.D. Ohio 2001); *Molly Maid, Inc. v. Carlson*, No. 2:08-cv-11736, 2008 U.S. Dist. LEXIS 50544, at *6 (E.D. Mich. July 1, 2008); *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association,* 110 F.3d 318, 333 (6th Cir. 1997); *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 649 (6th Cir. 1982); *Shephard's Co. v. The Thomson Corp.*, No. C-3-99-318, 1999 U.S. Dist. LEXIS 21051, at *16-17 (S.D. Ohio July 15, 1999) (citation omitted). "There is an especially strong need for injunctive relief 'when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder.'" *Molly Maid*, 2008 U.S. Dist. LEXIS 50544 at *6 (citation omitted). Thus, the "likelihood of success of the merits is [...] very substantial" where the license was clearly violated, the plaintiff had a right to terminate, and in fact did terminate the agreement. *KFC Corp. v. Goldey*, 714 F.Supp. 264, 267 (W.D. Ky. 1989). Here, a valid license agreement, as discussed below, governed HCI's use of the HUSTLER marks until

LFP terminated that license in June 2009.  Thus, Plaintiffs have conclusively demonstrated the likelihood of confusion prong of the infringement analysis.

### a.  An Oral Or Implied License Agreement Existed Between LFP and HCI.

A license agreement does not have to be set forth in a written document, but can be an oral agreement between the parties.  *Letica Corp. v. Sweetheart Cup Co.*, 805 F.Supp. 482, 487 (E.D. Mich. 1992); *Unicasa Marketing Group, LLC v. Spinelli*, No. 04-cv-4173, 2007 U.S. Dist. LEXIS 16628, at * 6 (D. N.J. March 7, 2007); *Oreck Corp. v. Thomson Consumer Electronics, Inc.*, 796 F.Supp. 1152, 1158 (S.D. Ind. 1992); *Council of Better Business Bureaus, Inc. v. Better Business Bureau of South Florida, Inc.*, 1978 U.S. Dist. LEXIS 15903, 200 U.S.P.Q. 282, 289 (S.D. Fl. 1978); *Louisiana-Pacific Corp. v. Nu-Sash of Pittsburgh, Inc.*,  1974 U.S. Dist. LEXIS 6057, 184 U.S.P.Q. 593, 596-97 (W.D. Pa. 1974). LFP and HCI established an oral license agreement for use of the HUSTLER marks in connection with the Hustler Cincinnati store from the year 2000 until termination of that agreement by Plaintiffs in September 2009.  This oral agreement is evidenced by the nearly $600,000 in payments to LFP from HCI expressly identified by HCI on the checks and for tax purposes as "licensee fee" expenses.  (Jackson Depo. pgs. 8, 51-52, 70-71, 85-87, 90-91, 108-11, 114-15, and 119-21).

Even if no oral license agreement exited between the parties, an implied agreement arose based upon the conduct of LFP and HCI from 2000 to 2009.  The law is clear that a license agreement can be implied from the course of conduct between the parties, even where no formal agreement exists.  *De Forest Radio Tel. & Tel. Co. v. U.S.*, 273 U.S. 236, 241, 47 S. Ct. 366, 71 L. Ed. 625 (1927); *Villanova University v. Villanova Alumni Educational Foundation, Inc.*, 123 F.Supp.2d 293, 307 (E.D. Penn. 2000); *Lutheran Assoc.*

*of Missionaries and Pilots, Inc. v. Lutheran Assoc. of Missionaries and Pilots, Inc.*, No. 03-6173, 2004 U.S. Dist. LEXIS 27164, at * 26 (D. Minn. November 19, 2004); *Exxon Corp. v. Oxxford Clothes, inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997); *Dumdei v. Certified Financial Planner Board of Standards, Inc.*, No. 3:98-CV-1938-H, 1999 U.S. Dist. LEXIS 15624, at * 14 (N.D. Tex. October 1, 1999); *The Nestle Co., Inc. v. Nash-Finch Co.*, 4 U.S.P.Q.2d 1085, 1088-89 (T.T.A.B. 1987).  Here, the conduct of both LFP and HCI demonstrates the existence of a license agreement between the parties for use of the HUSTLER marks.

An implied license agreement will be found where permission to use the trademark is given by the owner coupled with the exercise of reasonable quality control over the licensee.  *Villanova University,* 123 F.Supp.2d at 307; *Fitger's On-the-Lake, LLC v. The Fitger Co., LLC,* No. 07-CV-4687, 2007 U.S. Dist. LEXIS 93378, at *6-8 (D. Minn. December 19, 2007); *see also Embedded Moments, Inc. v. Int'l Silver Co.*, 648 F.Supp. 187, 194 (E.D.N.Y. 1986) ("It is not necessary, however, for the licenses themselves to contain a written provision for control; actual control by the licensor is sufficient").  Formalized control is not required to find an implied license; only minimal control is required. *Lutheran Assoc. of Missionaries and Pilots*, 2004 U.S. Dist. LEXIS 27164, at *28. Moreover, whether the parties thought of the arrangement at the time in terms of an implied license is completely irrelevant. *Villanova University*, 123 F.Supp.2d at 308.

A determination of proper quality control by a licensor is made on a case-by-case basis and should examine whether the control exercised by the licensor was reasonable under the circumstances.  *Lutheran Assoc. of Missionaries and Pilots*, 2004 U.S. Dist. LEXIS 27164 at *26, quoting Restatement (Third) of Unfair Competition § 33 cmt. c (1995); *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1060 (9th Cir. 1976), cert. denied, 433 U.S. 908, 97 S.Ct. 2973 (1977).  Periodic inspections, regular

discussions between the licensee and licensor regarding the design and manufacture of the licensee's goods, the identification and enforcement of guidelines for the licensee's operations, system wide standardization of décor, buildings, signs and business form, and the provision of training manuals, raw materials, suppliers, merchandising bulletins, and training programs have previously been found to be forms of quality control by the licensor. *Nestle Co. v. Nash-Finch Co.*, 1987 TTAB LEXIS at 63; *Villanova University*, 123 F.Supp. at 308; *Arner v. Sharper Image Corp.*, 1995 U.S. Dist. LEXIS 21156, at * 15-16 (C.D. Cal. October 5, 1995); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 111, (2nd Cir. 1986); *Turner v. HMH Publishing CO.*, 380 F.2d 224 (5th Cir. 1967); *see also* Gilson on Trademarks, § 6.04. The actual supervision of quality control does not have to be performed by the licensor itself; rather it can be performed by a representative chosen by the licensor. *See Accurate Merchandising, Inc., et al. v. American Pacific et al.,* 186 U.S.P.Q. 197, 200 (S.D.N.Y. 1975). Moreover, a showing that there was no decline in the quality of the goods and services provided by the licensee in connection with the mark indicates that sufficient quality control was exercised by the licensor. *The University Book Store v. The Board of Regents of the University of Wisconsin System*, 33 U.S.P.Q.2d (BNA) 1385, 1994 TTAB LEXIS 8, at *39, 62 (TTAB July 19, 1994).

Finally, the amount of required quality control over the licensee is lessened "[w]here the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991); *see also Embedded Moments*, 648 F.Supp. at 194 ("Reliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides the basis for such reliance"); *Dept. of*

*Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1132 (9th Cir. 2006) citing *Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 598 (9th Cir. 2002) (because licensor and licensee have such a close working relationship, the particular circumstances of the licensing arrangement indicate that the public will not be deceived); *Accurate Merchandising*, 186 U.S.P.Q. at 200 (license upheld where sole shareholder and president of licensor was officer and fifty-percent shareholder in licensee and could exercise supervision over licensed product on behalf of licensor).

An implied license agreement arose between LFP and HCI based upon their conduct from 2000 to September 2009 when Plaintiffs terminated the implied licensing arrangement.  As discussed above, HCI's own financial records and checks to LFP expressly recognize the nearly $600,000 in payments as "license fee" expenses.  In fact, HCI deducted the expenses on its tax returns as "license fees" pursuant to the license agreement every year it made such payments to LFP.  (Jackson Depo. pgs. 108-11, 114-15, 119-21, and 134-35).

As licensor, LFP was also extremely active and diligent in controlling the quality of the goods and services provided by HCI at the Hustler Cincinnati location.  As discussed above, Theresa Flynt and her management team were appointed by LFP IP as its representatives and managers of quality control for all HUSTLER branded products and stores, including HCI.  Theresa Flynt and her team worked directly with HCI, Jimmy, and Dustin Flynt to perform their appointed duties.  Jimmy, as an employee of LFP and FMG, also had quality control responsibilities.  As part of her duties, Theresa Flynt personally visited HCI on numerous occasions throughout the course of each calendar year.  During these visits she inspected the interior of the store, the HUSTLER branded products being offered, the third party products sold at the location, and the conduct of HCI's employees.

21

In fact, it was Theresa Flynt with her cousin Dustin Flynt who selected the décor and appearance of the Hustler Cincinnati store, which was specifically designed to conform to the appearance of other HUSTLER branded stores across the country.

Theresa Flynt also monitored the quality of the goods and services offered at the Hustler Cincinnati store via a remote video camera which fed directly to LFP's offices in California.  Prior to this litigation, and during Theresa Flynt's control over quality at HCI, there have been no complaints from customers as to the quality of goods and services at HCI.  (Dustin Depo. pgs. 30-31).  Moreover, LFP routinely examined HCI's financial statements and sales reports, and HCI called in their sales numbers on a nightly basis.

The extensive quality control exercised by Theresa Flynt and her team on behalf of Plaintiffs was not even necessary given the relationship between HCI and LFP.  Until recently, Jimmy and Dustin Flynt had been employees of LFP-related entities for several decades.  They worked in several facets of the organization and Jimmy himself operated the Hustler Hollywood stored located in Monroe, Ohio for LFP.  Moreover, Jimmy and Dustin Flynt were previously close with Theresa and Larry, and through those relationships and their work for LFP-related entities, had accumulated thorough knowledge of the quality standards and procedures utilized by Plaintiffs in managing the HUSTLER brand.  Thus, as was the case in *Taco Cabana* and *Embedded Moments*, Plaintiffs would have been justified in relying upon HCI's "intimacy with standards and procedures to ensure consistent quality" for the HUSTLER marks, especially given the lack of any decline  in the quality of goods and services provided by HCI during the license agreement. *See Taco Cabana*, 932 F.2d at 1121.  That Plaintiffs chose to engage in such extensive quality control through Theresa Flynt and her management team only serves to further demonstrate the existence of the license agreement between the parties for use of the HUSTLER marks.

22

Therefore, based upon the foregoing, a valid license agreement, whether oral or implied, existed between the parties and Plaintiffs' likelihood of success on the merits is established.

> **b.  Because A License Agreement Exists Between HCI And LFP, HCI Is Estopped From Challenging The Degree Of Quality Control Exercised By Plaintiffs Or Plaintiffs' Ownership Of A Valid Trademark.**

A licensee is estopped from contesting the "validity of the licensor's title during the course of the licensing arrangement." *Westco Group, Inc. v. K.B. & Associates, Inc.*, 128 F.Supp.2d 1082, 1086 (N.D. Ohio 2001) (citations omitted). The licensee's entrance into the licensing agreement is an agreement that the licensor is the owner of the trademark. *Medd v. Boyd Wagner*, 132 F.Supp. 399, 405-06 (N.D. Ohio 1955); *Chrysler Motors Corp. v. Alloy Automotive Co., Inc.*, 661 F.Supp. 191, 192-93 (N.D. Ill. 1987). The licensee has agreed by its entering into the contract that the licensor is the owner of the trademark and is estopped from raising questions with regard to adoption and use. *Medd*, 132 F.Supp. at 405-06.

Moreover, a licensee cannot attempt to benefit from its own misfeasance in claiming that its license is a naked license as a result of its own ability to offer inferior or nonuniform goods and services under the trademarks. *Westco Group*, 128 F.Supp.2d at 1089; *see also John C. Flood of Virginia, Inc. v. John C. Flood, Inc.*, 700 F.Supp.2d 90, 20-21 (D. Col. 2010) (holding that the case for estoppel is strongest where the licensee is challenging the validity of the mark based on its own conduct, namely abandonment based on inadequate supervision by the licensor). Thus, HCI is estopped from challenging the validity of LFP's right to use and license the HUSTLER marks, challenging LFP IP's ownership of the

HUSTLER marks, and from claiming that the license between it and LFP is a naked license as a result of its own misfeasance.

### c. Any Alleged Common Law Rights In The HUSTLER Marks Claimed By HCI Were Merged Into The License Agreement With LFP.

"A licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F.Supp.2d 1078, 1095 (D. S. Dakota 2006) (citations omitted); *see also Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2nd Cir. 1986) (a licensee who enters into a licensing agreement acknowledges the licensor's superior rights to the marks); *Dress for Success Worldwide v. Dress 4 Success*, 589 F.Supp.2d 351, 359 (S.D.N.Y. 2008) (whether licensee had any prior rights is a moot question because the license agreement extinguished any that had existed); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F.Supp.2d 914, 923 (C.D. Ill. 2000) (licensee's claims of independent rights were lost or merged into license when he accepted his position as licensee and acknowledged that the licensor owns the marks and that his rights are derived from and inure to the benefit of the licensor). Simply put, if the licensee had ownership of the marks, it would not have needed to enter into the license to use them. *A&L Labs., Inc. v. Bou-matic LLC,* 429 F.3d 775, 781 (8th Cir. 2005).

Any alleged rights held by HCI to the HUSTLER marks were extinguished when HCI entered into the licensing agreement with LFP, thus acknowledging and accepting Plaintiffs' superior rights in the mark. This conclusion is further supported by Jimmy's execution of a written License Agreement in connection with HH-Ohio. Moreover, the 1984 Consulting

Agreement provided Jimmy with a security interest in the marks, which is again completely inconsistent with prior ownership. Thus, each time Jimmy used the HUSTLER marks, he paid for the right to do so.

Furthermore, to the extent Jimmy/HCI claims a common law interest in the HUSTLER marks by virtue of HNG's use, that contention is meritless. As conceded by Jimmy and Dustin, HNG and HCI were completely separate corporate entities with vastly different marketing and operational strategies and offered completely different goods and services, i.e., HNG was a newsstand, whereas HCI was a retail store modeled after HUSTLER HOLLYWOOD. Thus, HCI cannot bootstrap HNG's prior use of the marks to its benefit.

Moreover, even if HCI was a continuation of HNG, HNG abandoned the marks when it closed down. A mark is deemed abandoned under the Lanham Act where its use has been discontinued without intent to resume use. 15 U.S.C. § 1127. Such intent can be inferred from the circumstances surrounding the cessation of use. *Id.* Here, even if HNG held any rights in the HUSTLER marks, they were lost when HNG presumptively abandoned the marks when it ceased use and closed down the business permanently with no intent to resume operations. There was an eight month gap between HNG closing and HCI opening. By the time HCI opened, LFP was already using the HUSTLER HOLLYWOOD name in connection with a retail store.

**B. PLAINTIFFS' LIKELIHOOD OF SUCCESS IS ALSO ESTABLISHED BY THE EIGHT FACTOR LIKELIHOOD OF CONFUSION ANALYSIS.**

Even if Plaintiffs had not established a likelihood of confusion based upon the license agreement between HCI and LFP, Plaintiffs have still met their burden through the traditional likelihood of confusion analysis. Likelihood of confusion is generally

determined by considering eight factors: (1) strength of the senior mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the intent of defendant in selecting the mark, and (8) the likelihood of expansion of the product lines. *Daddy's Junky Music v. Big Daddy's Family Music*, 109 F.3d 275, 280 (6th Cir. 1997) citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). "[A] plaintiff need not show that all, or even most, of the factors are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988).

### 1.    Strength of the Marks

Generally, "'[t]he more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due.  A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both.'" *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 793-794 (6th Cir. 2004) (citation omitted).  In addition, an incontestable trademark -- one that has not been successfully challenged within five years of registration -- is presumed to be strong. *See AutoZone*, 373 F.3d at 794.

The HUSTLER marks are decidedly strong.  It is the subject of numerous, incontestable federal trademark registrations.  Moreover, Plaintiffs have owned and used the HUSTLER marks for several decades and spend over $5,000,000 per year in support of the mark.  Thus, this factor weighs in favor of likelihood of confusion.

### 2.    Relatedness of the Goods

"If the parties compete directly, confusion is likely if the marks are sufficiently similar." *AutoZone*, 373 F.3d at 797; *see also Daddy's Junky Music Stores*, 109 F.3d at 282.

The relatedness inquiry focuses on whether goods with comparable marks are similarly marketed and appeal to common customers such that consumers are likely to believe they came from the same source or are somehow connected with or sponsored by a common company. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002). Where the products perform the same function, there can be no serious contention that the products are not related. *Schneider Saddlery Co., Inc. v. Best Shot Pet Products International LLC*, 2009 WL 864072, at *10 (N.D. Ohio 2009) ("There is a substantially increased likelihood of confusion where goods are identical, particularly if there is similarity between the relevant marks").

Here, Plaintiffs and HCI are in the business of adult entertainment products.  In fact, prior to the termination of its license agreement with LFP in September 2009, the majority of goods sold by HCI were Plaintiffs' goods.  Even now, HCI continues to sell Plaintiffs' goods though it must now purchase those goods through other third party distributors.  Thus, this factor weighs in favor of likelihood of confusion.

### 3.    Similarity of the Marks

Analysis of similarity focuses on the "pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's Junky Music Stores*, 109 F.3d at 283; *see also Wynn I*, 839 F.2d at 1188.  Where "marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likelihood of confusion declines." *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992).  Where a portion of a mark dominates the overall commercial impression of the remainder of the mark, that portion's similarity or dissimilarity to the other mark may be given more weight in the overall comparison.  *See Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352, 359 (7th Cir. 1983).

The marks at issue here are virtually identical. HCI is making prominent use of Plaintiffs' famous HUSTLER marks through its use of HUSTLER on its store located at 411 Elm Street, Cincinnati, Ohio. Thus, this factor weighs in favor of likelihood of confusion.

### 4. Actual Confusion

While evidence of actual confusion is the best evidence of likelihood of confusion, the Sixth Circuit recognized that "due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Daddy's Junky Music Stores,* 109 F.3d at 284. Thus, the absence of such evidence is not weighed against a plaintiff unless "the particular circumstances indicate such evidence should have been available." *Id.* Where there has been only a limited opportunity for confusion to occur, circumstances do not indicate that evidence of actual confusion should have been available. *See Vining Indus. v. M.B. Walton, Inc.*, No. C-3-96-314, 1997 U.S. Dist. LEXIS 23763, at *21-22 (S.D. Ohio March 20, 1997) (no evidence of actual confusion should have been available where defendant had only been selling its product in stores for roughly seven months).

Here, it has only been a year since Plaintiffs terminated the oral or implied license agreement with HCI. Given this short time frame, a lack of any evidence of actual confusion is not significant. Thus, this factor has no weight in the likelihood of confusion analysis.

### 5. Marketing Channels

This factor considers how and to whom the respective goods or services of the parties are sold. *Champions Golf Club, Inc.*, 78 F.3d at 1120. The court must consider "the similarities or differences between the predominant customers of the parties' respective goods." *Daddy's Junky Music Stores,* 109 F.3d at 285 (internal quotations omitted). "Further, a court must determine whether the marketing approaches employed by each party resemble each other." *Id.*

Here, the parties offer identical goods and services to identical consumers. In fact, HCI continues to offer Plaintiffs' own goods to consumers. Thus, this factor weighs in favor of likelihood of confusion.

### 6. Degree of Consumer Care

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 285. A consumer purchasing inexpensive goods will be even less careful in making purchasing choices. *Worthington Foods*, 732 F.Supp. at 1448. Therefore, the modest cost of a particular good can increase the likelihood of confusion. *See Gray*, 295 F.3d at 649 ("[A]verage customer is not likely to exercise a high degree of care in purchasing relatively inexpensive and fungible products, such as snack food").

Here, the adult entertainment goods sold by Plaintiffs and HCI are inexpensive and consumers do not exercise significant care in purchasing such products. Thus, this factor weighs in favor of a likelihood of confusion.

### 7. Intent in Selecting the Mark

As to this factor, the question is whether "the defendant adopted its mark with the intent of deriving benefit from the plaintiff's mark." *Frisch's*, 670 F.2d at 648-49. A defendant's purported good intentions are irrelevant and do not move this factor against the plaintiff. *Worthington Foods*, 732 F. Supp. at 1450.

HCI has continued its use of the HUSTLER marks after Plaintiffs' termination of the license agreement with the explicit intent of inducing consumers into purchasing its adult entertainment products believing they were licensed or authorized by Plaintiffs. In fact, Jimmy admitted that HCI benefits from HH-Ohio's advertising efforts. This factor therefore weighs heavily in favor of a likelihood of confusion.

### 8. Likelihood of Expansion

This factor is irrelevant where the parties already use the marks on identical goods. *Victoria's Secret Stores*, 194 F.Supp.2d at 728; *Barrios*, 712 F.Supp. at 619. Here, the parties are already competing in the adult entertainment industry. Thus, this factor is irrelevant to the analysis. However, the HUSTLER brand will be expanding, as Theresa is in the process of opening a new Hustler store in Cincinnati.

### 9. There is a Strong Likelihood of Confusion in This Case.

As discussed above, a likelihood of confusion exists here as a result of HCI's use of Plaintiffs' HUSTLER marks on identical goods sold to the same consumers. The Court thus concludes that HCI's continued use of the HUSTLER marks after termination of the license agreement creates a strong likelihood of confusion even under the eight-factor analysis.

Plaintiffs have therefore demonstrated a likelihood of success on the merits under the preliminary injunction analysis.

### C. PLAINTIFFS WILL BE IRREPARABLY HARMED IF HCI'S USE OF THE HUSTLER MARKS IS NOT PRELIMINARILY ENJOINED.

Where a plaintiff establishes a likelihood of success on the merits of a claim for infringement or unfair competition, irreparable harm necessarily follows. *See Wynn Oil Co. American Way Service Co.*, 943 F.2d 595, 600 (6th Cir. 1991); *Shephard's Co. v. The Thomson Corp.*, No. C-3-99-318, 1999 U.S. Dist. LEXIS 21051, at *24 (S.D. Ohio July 15, 1999) (citation omitted). "The law of this Circuit holds that no particular finding of likelihood of entry or irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999). Here, Plaintiffs have established a likelihood of success based upon HCI's continued use of the HUSTLER marks after termination of the oral or

implied license agreement. Moreover, HCI's use of the HUSTLER marks satisfies the likelihood of confusion analysis. Thus, Plaintiffs have established that irreparable harm will result from HCI's continued use of the HUSTLER marks.

**D. THE THREAT OF HARM TO PLAINTIFFS GREATLY OUTWEIGHS THAT TO HCI.**

Where the plaintiff is an authorized owner of a trademark and the defendant is improperly using that mark, the threatened harm to the plaintiff outweighs the threatened harm to the defendant. *KFC Corp. v. Goldey*, 714 F.Supp. 264, 267 (W.D. Ky. 1989) (citations omitted). Plaintiffs have established ownership in the HUSTLER marks and the improper use of that mark both through HCI's continued use of the mark after termination of the oral or implied license agreement and under the likelihood of confusion analysis.

The balance of harms weighs heavily in favor of Plaintiffs. Plaintiffs do not seek to put Jimmy or HCI out of business. Plaintiffs merely seek to stop HCI from infringing on the HUSTLER marks and engaging unfair competition. In other words, Plaintiffs only seek to force HCI to comply with its legal obligations. Meanwhile, the harm to Plaintiffs is substantial. For example, HCI has a Facebook page advertising for "Jimmy Flynt's Cincinnati Boutique," which improperly uses the HUSTLER marks. Thus, the significant harm to Plaintiffs decidedly outweighs the relatively slight harm to HCI.

**E. THE PUBLIC INTEREST IS BEST SERVED BY ISSUING A PRELIMINARY INJUNCTION AGAINST HCI'S USE OF THE HUSTLER MARKS.**

The public interest is especially served where a former licensee is continuing use of the licensor's mark because the licensee's status increases the probability of consumer confusion. *See Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. 3:05CV-515-H, 2005 U.S. Dist. LEXIS 29411, at * 16 (W.D. Ky. Nov. 21, 2005); *Church of Scientology Int'l v. The*

*Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2nd Cir. 1986); *KFC Corp. v. Goldey*, 714 F.Supp. 264, 267 (W.D. Ky. 1989). "There is an especially strong need for injunctive relief 'when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder.'" *Molly Maid*, 2008 U.S. Dist. LEXIS 50544, at *6 (citation omitted).

In the instant matter, HCI is a former licensee who has continued use after termination of the oral or implied license agreement by Plaintiffs. Moreover, HCI's use of the mark HUSTLER CINCINNATI is likely to confuse the public and prevent Plaintiffs from controlling its own product's reputation. *See Blockbuster Ent. Group v. Laylco, Inc.*, 869 F.Supp. 505, 516 (E.D. Mich. 1994) (holding that in addition to protecting consumers from confusion, the public interest is served in protecting the right of a trademark owner to control its own product's reputation) (citation omitted). Thus, the public interest is best served in granting Plaintiffs' a preliminary injunction against HCI's use of the HUSTLER marks.

**F. PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS FEES DUE TO HCI'S WILLFUL AND DECEPTIVE INFRINGEMENT OF THE HUSTLER MARKS.**

Under the Lanham Act, an award of attorneys' fees is within the discretion of the district court. *T. Marzetti Co. v. Roskam Baking Co.*, No. 2:09-CV-584, 2010 U.S. Dist. LEXIS 61500 (S.D. Ohio May 27, 2010). 15 U.S.C. § 1117(a) provides that courts may award reasonable attorneys' fees to the prevailing party in "exceptional" cases. Thus, section 1117(a) yields two inquiries: (1) whether a plaintiff was a "prevailing party," and (2) whether this case was "exceptional." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006).

With respect to the second inquiry, although the statute does not define "exceptional," the Sixth Circuit has held that "a case is not exceptional unless 'the infringement was malicious, fraudulent, willful, or deliberate.'" *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004) (quoting *Hindu Incense v. Meadows*, 692 F.2d 1048, 1051 (6th Cir. 1982)). However, a prevailing defendant need not show bad faith on the part of the plaintiff in order to prove that a case is "exceptional" under the Act. *Marzetti*, 2010 U.S. Dist. LEXIS 61500 at *31. Knowledge that permission is required to use a mark is evidence of willful or malicious infringement. *Audi*, 469 F.3d at 550.

Similarly, the Ohio Deceptive Trade Practices Act provides for fee awards in cases where a defendant is found to have "wilfully engaged" in what the defendant knew to be a "deceptive" trade practice. R.C. § 4165.03(B).

Plaintiffs are entitled to recover their attorneys' fees due to HCI's malicious, willful, and deliberate infringement of the HUSTLER marks. As set forth above, HCI was aware that it needed permission from Plaintiffs in order to use the HUSTLER marks. Indeed, HCI (and its owner Jimmy) repeatedly asked for and obtained permission to use the HUSTLER marks over the past 30 years. Thus, this is an exceptional case, and HCI's willful and deceptive actions entitle Plaintiffs to an award of their attorneys' fees.

## VII.  ISSUES OF LAW (EVIDENTIARY)

Plaintiffs are not aware of any specific evidentiary issues of law.

## VIII.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs' Proposed Findings of Fact and Conclusions of Law are filed contemporaneously herewith.

## IX.   WITNESS LIST

Plaintiffs intend to call the following witnesses at the Preliminary Injunction Hearing:

> (1) Michael Cummings, Vice President of Finance for Flynt Management Group, LLC.  Mr. Cummings will testify as to corporate formalities observed by LFP and LFP IP, Plaintiffs' use of the HUSTLER marks, license agreements executed by Plaintiffs, license payments received by Plaintiffs, quality control measures by Plaintiffs, HCI's corporate history, and Jimmy's employment history.

> (2) Theresa Flynt, Executive Vice President of Flynt Management Group, LLC.  Ms. Flynt will testify as to the quality control procedures used by LFP and LFP IP in connection with the HUSTLER marks.

> (3) Allie Jackson, accountant for HCI, on cross-examination.  Mr. Jackson will testify as to HCI's license agreement, HCI's payment of license fee expenses to LFP, HCI's accounting for such payments, and the tax implications of such payments.  Mr. Jackson is also expected to testify as to HCI's corporate history and Jimmy's employment history.

> (4) Jimmy Flynt, on cross-examination.

Plaintiffs reserve the right to call other witnesses on rebuttal, depending on evidence presented by Defendant.

## X.   EXHIBIT LIST

Plaintiffs' Exhibit List is filed contemporaneously herewith.

Respectfully submitted,

/s/ Mark A. Vander Laan
Mark A. Vander Laan (0013297)
E-Mail: mark.vanderlaan@dinslaw.com
Amanda P. Lenhart (0072517)
E-Mail: amanda.lenhart@dinslaw.com
Joshua A. Lorentz (0074136)
E-Mail: joshua.lorentz@dinslaw.com
Robert M. Zimmerman (0079584)
Email: robert.zimmerman@dinslaw.com
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
Phone:        (513) 977-8200
Fax:          (513) 977-8141

**Attorneys for Plaintiffs**
**LFP, Inc. and L.F.P. IP, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been duly served upon the following

by the Court's CM/ECF system this 1st day of October, 2010:

Robert W. Hojnoski, Esq.
Carrie A. Masters, Esq.
REMINGER CO., LPA
525 Vine Street, Suite 1700
Cincinnati, OH 45202
Email: rhojnoski@reminger.com
        cmasters@reminger.com

**Attorneys for Defendant**
**Hustler Cincinnati, Inc.**

/s/ Mark A. Vander Laan

1831549v1

35