## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **L.F.P. IP, LLC and L.F.P., Inc.** | : | **CASE NO.: 1:09CV913** |
| **8484 Wilshire Blvd.** | | |
| **Beverly Hills, CA 90211,** | : | **Judge Bertelsman** |
| | | |
| **and** | : | |
| | | |
| **LARRY C. FLYNT** | : | **FIRST AMENDED COUNTERCLAIM** |
| **9211 Robin Dr.** | | **OF DEFENDANTS HUSTLER** |
| **Los Angeles, CA 90069,** | : | **CINCINNATI, INC. AND JIMMY R.** |
| | | **FLYNT** |
| **Plaintiffs,** | : | |
| | | |
| **vs.** | : | |
| | | |
| **HUSTLER CINCINNATI, INC. and** | : | |
| **JIMMY R. FLYNT,** | | |
| | : | |
| **Defendants/Counterclaimant** | | |
| **s.** | : | |

* * * * * * * * * *

Defendants/Counterclaimants, Hustler Cincinnati, Inc. ("HCI") and Jimmy R.

Flynt ("Jimmy" or "Jimmy, Sr."), through counsel, for their Amended Counterclaim

against Plaintiffs LFP IP, LLC ("LFP IP"), L.F.P., Inc. ("LFP") and Plaintiff Larry C.

Flynt ("Larry") states as follows:

### PARTIES

1.      Jimmy R. Flynt (hereinafter "Jimmy"), is a natural individual and is

currently a resident of Nevada.  Jimmy has a second home in Florence, KY and

spends just under 50% of his time in the greater Cincinnati area.

2.      Plaintiff Larry C. Flynt (hereinafter "Larry") is a natural individual and

is currently a resident of the State of California.

3.      Jimmy and Larry Flynt are brothers, partners, co-founders and co-owners of the Hustler enterprise which was founded in the late 1960's in Ohio.

4.      Defendant Hustler Cincinnati, Inc. (hereinafter "Hustler Cincinnati" or "HCI") is an Ohio Corporation with its principal place of business at 411 Elm Street in Cincinnati, Ohio.  Hustler Cincinnati was incorporated on March 28, 2000 and since that time has been the on paper operating entity of the Hustler Cincinnati retail store located at 411 Elm Street in Cincinnati, OH.  Jimmy Flynt is the sole named shareholder of Hustler Cincinnati, Inc.  Hustler Cincinnati, Inc. is the successor-in-interest to Hustler News & Gifts, Inc. which gave consent to Hustler Cincinnati, through Jimmy Flynt, to use a similar name when HCI was incorporated.[1]

5.      Plaintiff, L.F.P., Inc. ("LFP") was formed as an Ohio corporation on September 29, 1976.  LFP was formed out of Jimmy and Larry's partnership which was almost seven years old at that point.  Through an illusory merger and mere continuation, LFP became a California corporation in or around 1982.  LFP is a successor-in-interest and mere continuation of Mini Clubs of America, Inc., an Ohio corporation that was formed as part of Jimmy and Larry's partnership prior to January of 1972.  Jimmy was the sole shareholder of Mini Clubs. LFP does not currently know who its owners/stockholders are.  Jimmy and Larry Flynt each claim an ownership interest in LFP.  LFP does not know why it was formed, how it was capitalized, or what its assets are.  LFP has never operated a HUSTLER retail store. LFP claims that it is the former registrant of various HUSTLER marks.  LFP does not

---

[1] Hustler News & Gifts, Inc. was incorporated in Ohio on Oct. 21, 1997.  It was the on paper operating entity of the Hustler retail store at 34 E. Sixth Street, between October, 1997 and approximately December of 1999.  Jimmy Flynt was the sole shareholder, officer and director of this entity.  Through this entity, Jimmy Flynt was the first to use the Hustler mark in commerce related to retail services.

know how it came to be the registrant and has no knowledge of paying any money or consideration for such marks.  LFP assigned all rights that it had, if any, in the Hustler marks, to non-party LFP Publishing Group, LLC, in or around October of 2003.  LFP has never contracted with Defendant Hustler Cincinnati, Inc.  Before the current dispute between Jimmy and Larry, they were both "directors" of Plaintiff LFP.  LFP currently contends that Jimmy is neither an officer or director.  LFP contends that its current directors are Larry Flynt, Michael Klein and Theresa Flynt.  LFP contends that Michael Klein is the President.  Theresa Flynt has recently testified that she does know if she was or is a director.

6.     Defendant LFP IP, LLC is a newly formed entity that was registered as a Delaware limited liability company on or around October 30, 2006.  This entity has no employees, no assets, no bank accounts, and conducts no business.  It has never contracted with HCI.  HCI has never paid any money to LFP IP.  LFP IP does not know why it was set up and does not know who its owners are.  LFP IP claims to be the registrant of various trade and service marks with the USPTO through assignments from non-parties to this action.  LFP IP never paid any money for any trade or service marks and has never used any HUSTLER or HUSTLER-related marks in commerce.  LFP IP has never owned, operated or controlled a HUSTLER retail store.  LFP IP has never licensed any HUSTLER marks to any retail stores.  LFP IP does not collect any royalties/licensing fees.  Although LFP IP alleges in its Complaint and Motion for Preliminary Injunction that it is the current "owner" of the HUSTLER marks, Plaintiff Larry Flynt claims and has recently testified that he, individually, owns and controls the HUSTLER marks.  Larry Flynt believes that he has the unfettered right/authority to use the HUSTLER marks in any way he

3

desires. Before his recent "dispute" with his brother, Larry Flynt admits that Jimmy Flynt had the "implicit right" to use the HUSTLER marks, particularly with respect to a retail store in Cincinnati.

## GENERAL FACTUAL ALLEGATIONS REGARDING JIMMY AND LARRY'S PARTNERSHIP AND THE HUSTLER ENTERPRISE

7.    Jimmy and Larry Flynt are brothers, partners, co-founders and co-owners of the Hustler enterprise which was founded in the late 1960's in Ohio. Jimmy and Larry are partners through an express oral partnership agreement or pursuant to an implied partnership agreement.

8.    Jimmy and Larry formed an express oral partnership agreement or implied partnership agreement in 1969 in Cincinnati, Ohio. Their partnership was formed in Ohio, has been renewed/ratified in Ohio, and has continued through the present time. This partnership has continually conducted business in Ohio since its inception. This partnership has done business primarily under the name/brand/mark "Hustler" through various private business entities all of which have functioned as one business enterprise/entity or "incorporated partnership" (hereinafter the "Hustler Enterprise"). Jimmy and Larry's partnership / enterprise was started in Ohio, became profitable in Ohio, became nationally known in Ohio, and has always done business in Ohio. All entities through which partnership business has been conducted, often under the brand name "Hustler," constitute partnership property, were formed from partnership property, and have their origins in the State of Ohio.

9.    Jimmy and Larry Flynt have conducted their partnership through various business entities which have always functioned as one company/enterprise – marketed and branded to the public as "HUSTLER." Although the number, type

and names of these affiliated and related entities has changed and evolved over the years, regardless of the names or number of entities, there has always been unity of ownership, control, operation, and management. Like many partners, Jimmy and Larry have dealt with each other and have acted toward each other as partners while obtaining the various advantages of the corporate form. Their professional relationship and dealings have been casual, informal, and based on trust, loyalty and confidence. They have been fiduciaries to one another. No persons other than Jimmy or Larry have ever held an ownership interest (equitable, beneficial or legal) in any of the various privately-held entities that have been set up within their partnership/enterprise.

10.    Jimmy and Larry Flynt have used the Hustler name and mark in commerce continuously for more than 40 years. They have built the HUSTLER brand side-by-side each making significant contributions.

11.    For more than 40 years, Jimmy and Larry together have built the Hustler brand side-by-side as partners, expressly and impliedly, by agreement and through their actions. What started as a string of Ohio go-go clubs (Hustler clubs) turned into a national magazine (Hustler magazine) and today, an international multi-media empire including several adult and non-adult magazines, websites, video content, a chain of gentlemen's clubs (through a third-party exclusive royalty/licensing arrangement), a chain of retail stores, a casino/card room in southern California, a clothing/apparel and adult novelty line, and various other adult and mainstream business activities, goods, services and interests.

12.    The HUSTLER name/brand/mark has grown in terms of popularity, scope, breadth, and geographic region since 1969. HUSTLER was first used in retail

services (by Jimmy Flynt/Defendant Hustler Cincinnati, Inc.) beginning in downtown Cincinnati in October of 1997. Such use has been continuous through the present time.

13.     Over the years, Jimmy and Larry have held various titles in various different corporations and business entities that have been formed to carry out their partnership business.    Titles have generally been informal and somewhat loose. Often times, Jimmy and Larry have shared titles.

14.     Larry and Jimmy's partnership agreement has been continued, renewed, ratified and re-affirmed, expressly and impliedly, many times over the years as their business has grown and diversified.

15.     For 40 years, Jimmy and Larry have shared in the profits of their business partnership/enterprise, generally by receiving compensation/salary (and benefits) through one or more of their privately and jointly owned business entities that have been set up within their partnership.

16.     Larry and Jimmy have shared in the ups and downs of their partnership. They have shared control and have had mutuality of agency. They have generally made decisions together although at times they have independently made decisions in the best interests of their mutual and shared business affairs, binding the other.

17.     It had always been Jimmy and Larry's agreement and intent that their business would stay "in the family."    They have always sought to protect each other, monetarily and otherwise. Jimmy has been loyal to Larry and has repeatedly protected their partnership/company property and assets.    The agreed-upon partnership plan has always been to re-invest profits into their business, to grow

their enterprise, and to create a sustained enterprise/brand that would continue to exist beyond their years.

18.    The monies generated by the various entities within the Hustler enterprise (i.e., within Larry and Jimmy's partnership) have been shared, re-invested, pooled and commingled in order to grow the overall business.  Monies are and generally have been pooled between entities through sham loans, investments, contracts and the like.

19.    But for Jimmy's capital and non-capital contributions, ideas, labor, talents, investments, energies, services, loyalty and trust, Jimmy and Larry's partnership and business enterprise never would have achieved the success or growth that it has and very likely would not exist today in its current form.  But for Jimmy's contributions, the Hustler brand (including Hustler magazine) never would have been established and never would have become successful/profitable.  But for Jimmy's contributions and actions, the Hustler brand (including Hustler magazine) most likely would have ceased to exist in the mid to late 1970's and/or early to mid 1980's during a period of time when Larry was physically and/or mentally incapacitated and was otherwise acting in an irrational, destructive and reckless manner.   As Larry's business partner, Jimmy was instrumental in the initial development and growth of their partnership/company; Jimmy was instrumental in keeping the company together during a difficult time period; Jimmy has been instrumental in the second and most recent wave of growth and expansion and profitability beginning in 1997.

20.    Despite the size, success, geographic reach and complex "corporate" structure of the Hustler enterprise that Jimmy and Larry have built, their business

partnership, communications and dealings have generally been oral and generally have been informal and casual.  Their relationship has always been based on mutual trust, confidence, candor and loyalty.

21.   Jimmy and Larry's partnership has generated significant revenues, public exposure, fame, goodwill, assets, trademarks, copyrights, and other partnership property and interests.  Their partnership has likewise resulted in significant public adversity including multiple high profile criminal obscenity prosecutions against Jimmy and Larry together, as partners/co-owners.  Jimmy and Larry have been indicted together in connection with their business affairs on two occasions in Hamilton County and another time in Cuyahoga County.  There was an effort, though unsuccessful, to re-institute dismissed charges against Jimmy and Larry in connection with the downtown Cincinnati Hustler retail store, in Hamilton County in 2003.   At that time, Larry disclaimed any involvement, ownership or association with the downtown store.

22.   During the course of their business relationship, Larry and Jimmy have shared legal advisors, both in connection with criminal matters as well as their business/partnership interests.   Jimmy and Larry have also shared financial advisors and have mutually sought the advice and service of various executives, managers, and employees in connection with their business affairs and operations.

23.   At times, both Jimmy and Larry individually have been named "on paper" as the sole shareholder/legal owner of one or more of the various entities that have been set up within their incorporated partnership.  Regardless, all stock, assets and business activities have always been carried on pursuant to their underlying express or implied partnership agreement that they would be 50-50

8

owners/partners. Jimmy and Larry have always agreed to share in the ownership of the business entities that have been created and carried on within their partnership using partnership property.

24. Jimmy and Larry's ownership interests in the various entities through which their partnership has been conducted have been legal, equitable and/or beneficial.

25. Over the years, Larry and Jimmy have held partnership property individually and collectively. On more than one occasion, stock and other assets have been transferred without consideration "on paper" by and between Jimmy and Larry (individually and/or through one or more corporations or business entities set up to run their operations) pursuant to the goals, purposes, plan and intent of their partnership. Although Jimmy, at times, has made on paper asset transfers to Larry as his partner, Jimmy has maintained beneficial/equitable ownership interests in those assets. Larry has never bought out Jimmy's share of their incorporated partnership nor has Jimmy ever received the fair monetary value of his ownership interest/equity as reflected by his life's work.

26. As a matter of law, all assets and monies generated by the various divisions and entities within Larry and Jimmy's partnership have been and continue to be partnership assets. Partnership property includes all property brought in the partnership as well as all property acquired by partnership property regardless of whose name the property is held in.

27. From the beginning of their partnership and through the present time, Jimmy has maintained an ownership interest (legal and equitable) in his and Larry's partnership/business enterprise. The present-day Hustler enterprise reflects

Jimmy's life work and would not exist but for Jimmy's capital and non-capital contributions.

28.     HUSTLER is synonymous with Jimmy and Larry Flynt ("the Flynts" or "the Flynt brothers") as a result of their business dealings and activities over the past 40 years.  Jimmy and Larry have been held out and have held each other out to the general public / mainstream media and to the adult entertainment industry as business partners, co-owners and/or co-founders of Hustler (as a brand name). Jimmy Flynt has specifically been held out in the greater Cincinnati area since 1997 as the owner and operator of a downtown Cincinnati HUSTLER retail store.  At times Larry has claimed an ownership interest in such store.  At other times, he has expressly disclaimed any ownership or involvement.

29.     This action is the result of a current and ongoing dispute between Jimmy and Larry.  Beginning in or around February of 2009, Larry embarked on a course of conduct in an effort to squeeze/push Jimmy out of their family business and to otherwise cause economic harm to Jimmy and to Hustler Cincinnati, Inc. Larry has breached his fiduciary duty to Jimmy.

30.     Both of the Plaintiff entities, as well as Defendant Hustler Cincinnati, are born out of Jimmy and Larry's partnership.  Jimmy has an ownership interest in the Plaintiff entities.  Larry contends that he exclusively owns and controls them. Although Jimmy controls and is the 100% shareholder of Defendant, Larry has claimed an ownership interest in HCI against whom he has initiated this action.  In the past, Larry has expressly disclaimed any ownership interest or involvement with the business operations of HCI.

## FACTUAL CHRONOLOGY & HISTORY OF THE HUSTLER NAME/MARKS

31.     Larry <u>and</u> Jimmy have continuously used the HUSTLER marks through *their* companies since 1969.

32.     Jimmy and Larry initially entered into an oral partnership agreement and/or implied partnership agreement in Cincinnati, Ohio in 1969 to go into the bar/club business together.  They agreed to join together as 50-50 partners to start and carry on a business for profit.  They had a dream and vision but very little money.  Their plan was envisioned in 1967 before Jimmy left for Vietnam.  In or around November of 1969, after Jimmy returned from Vietnam, he and Larry orally agreed, as 50-50 partners, to purchase, open and operate a bar/night club.  This agreement was formed in Cincinnati, Ohio. Jimmy and Larry struck a deal to purchase an existing bar located at 608 Walnut Street in downtown Cincinnati (the current location of the Aronoff Center) for a purchase price of $5,000.

33.     Jimmy delivered a check for $5,000 to the selling bar owner (Byron Jennings) at the top floor of the Central Trust Tower on Fourth Street.  Jimmy asked him to hold the check for a week or so before negotiating it as he did not have sufficient funds to cover the check when it was written. Jimmy did have some money in his checking account which he put toward this payment but he did not have the entire amount.  This check was written out of Jimmy's personal checking account; Larry did not have a checking account. Larry had no money to contribute. Larry had previously filed for bankruptcy and was on the verge of filing bankruptcy a second time (when Jimmy returned home from Vietnam) but it was too early to do so.

11

34.     Jimmy and Larry re-named the bar at 608 Walnut Street the "Hustler Club," hired several female dancers/servers and were able to make enough money in the first week or so to cover Jimmy's $5,000 check by the time it was deposited.

35.     An Ohio corporation, **Dustoff, Inc.** (a name Jimmy came up with) was set up on January 2, 1970 to operate the Cincinnati Hustler Club.  Dustoff was the first business entity formed within Larry and Jimmy's partnership.   Jimmy was the sole shareholder, the President, the sole Director and statutory agent of Dustoff. Through Dustoff, Jimmy personally applied to have the existing liquor license transferred into his name/Dustoff's name. The application was approved. Larry and Jimmy's initial company headquarters were located in an apartment above the Cincinnati Hustler club where Larry and Jimmy lived together for the next several years.   608 Walnut Street became Jimmy and Larry's initial partnership/company "headquarters."   Larry's beneficial ownership interest in the Cincinnati Hustler club/Dustoff was by virtue of his oral partnership agreement with Jimmy.

36.     Even though Jimmy was the sole shareholder of Dustoff, Larry and Jimmy managed and promoted the Cincinnati Hustler club together.  They agreed that they would be 50-50 partners with respect to any subsequent or additional business interests, ventures or activities that would flow from the Cincinnati Hustler club.  As of this time, Jimmy and Larry's primary focus was to make money in the bar/club business.  Jimmy and Larry were young, they were close and their dealings with each other were casual and informal. Their communications and agreements were oral.

37.     The Hustler Club on Walnut Street in Cincinnati was operated (through Dustoff, Inc.) from November of 1969 through the mid to late 1970's.  This Club

served as the model by which Larry and Jimmy opened a string of Hustler Clubs, from 1969-1973, across Ohio in the cities of Dayton, Columbus, Cleveland, Toledo and Akron.

38.    Monies generated from the Cincinnati Hustler Club (that was 100% owned by Jimmy) were used to open the Hustler clubs in Columbus and Dayton. Monies generated from the Cincinnati, Dayton and Columbus clubs were subsequently used to open the Hustler Clubs in Akron, Toledo and Cleveland. Monies/revenues were shared between the Clubs, were used to pay expenses, for marketing and promotion, and were otherwise re-invested.  Larry and Jimmy shared in the profits and losses of the Clubs, held each out as co-owners/partners, shared titles, shared control, bound each other, and ran their businesses together. They each made contributions.  Jimmy made all of the capital contributions; Larry contributed services.  Jimmy was a signatory on all bank accounts that were opened and which were used for their businesses.

39.    In June of 1971, Dustoff filed an application with the United States Patent and Trademark Office (USPTO) to register the service mark "Hustler" in connection with night club services.  This registration was approved on October 24, 1972 and was assigned registration number 945,946 and serial number 393,917. This was the first Hustler trade or service mark registration within Jimmy and Larry's partnership.

40.    Contemporaneous with this initial trademark application/registration, Jimmy and Larry began using the "tm" designation in connection with the commercial use of the Hustler name/mark in connection with operation of their clubs.

41.    By early 1973, there were six total Hustler clubs and approximately several hundred employees on their partnership payroll.  Most of the employees were female dancers/servers.  Larry and Jimmy actively shared the role of managing and promoting the clubs, sharing the profits and losses and trying to grow their business, as partners.

42.    Like the Cincinnati Hustler club, the Dayton, Columbus, Akron, Toledo and Cleveland Hustler clubs were owned and operated on paper by and through separate Ohio corporations that were set up between 1970 and February of 1973 - Kaylar, Inc., West Gay Street Company, 21 South Main Street Company, Jefferson Street Company and Vincent Street Company.  These entities were formed within Jimmy and Larry's partnership.  Jimmy was the President, Director, statutory agent and sole shareholder of each of these entities.  Through these entities, Jimmy personally applied for and obtained liquor licenses to operate the various clubs. Larry never applied for any of the liquor licenses and never held any of the licenses for any of the Hustler Clubs. The clubs could not have operated without a liquor license.  Although Jimmy was the sole shareholder of the six Hustler clubs, Larry was involved in the operation of the clubs and has always claimed an ownership interest in them.  In fact, Larry has always maintained that he (and Jimmy) got their start in the bar/club business.  Larry and Jimmy had an oral agreement to operate and control the Hustler clubs as 50-50 partners.  Larry's ownership interest in the clubs was solely as a consequence of his oral agreement with Jimmy.

43.    Larry was going through a divorce in or around 1972-73 from Kathleen Chappa aka Kathleen Barr aka Kathleen Flynt.  As part of his partnership with Larry, Jimmy agreed to give/transfer the Dayton Hustler Club to Kathy in

settlement of their divorce, to include transfer of the corresponding liquor license issued through Kaylar, Inc. Kathy was not allowed to continue to use the Hustler name/mark.

44. In addition to the Hustler clubs, Larry and Jimmy opened another club/bar in Columbus called "Whatevr's Right." This bar was opened and operated through yet another Ohio corporation that was formed, W.N.R., Inc. W.N.R., Inc. applied for and held the required liquor license. Jimmy was the sole shareholder and President of W.N.R., Inc.

45. Through their mutual lawyers, Larry & Jimmy set up a parent/holding company, **Mini Clubs of America, Inc.**, which was registered and incorporated in Ohio prior to January of 1972. Larry and Jimmy conducted business through Mini Clubs during the early and formative years of their business relationship and partnership. Jimmy was the sole shareholder of Mini Clubs. Like the operating entities of the Hustler Clubs, though Larry did not own any stock in Mini Clubs, he has claimed to have had an ownership interest in it through his business relationship and oral agreement with Jimmy. Larry and Jimmy shared in the profits and losses of Mini Clubs as they did with the Hustler Clubs. Jimmy and Larry also shared titles and exercised mutuality of control. They each made contributions, shared in the ups and downs and the profits and losses. At times, Jimmy and Larry each held the title of President of Mini Clubs. Initially, Mini Clubs was headquartered at 608 Walnut Street in Cincinnati and then the headquarters were moved to 36 West Gay Street in Columbus where the Columbus Hustler Club was located. Jimmy was the statutory agent for Mini Clubs.

46.    In furtherance of their partnership agreement and business arrangement, in order to raise cash and to further promote their Hustler Clubs, beginning in January of 1972, Jimmy and Larry began publishing a short newsletter called the Hustler newsletter, published by and through Mini Clubs. This was the first time Hustler was used in publishing (through an Ohio corporation that Jimmy was the 100% shareholder of).  Larry and Jimmy also developed a Hustler Club membership program for their club patrons.  The Hustler newsletter started as a four page black and white publication.

47.    From January, 1972 through 1973, the Hustler newsletter grew in length and eventually turned into a color publication.  The primary purpose of magazine was to promote Larry and Jimmy's clubs, specifically, their female dancers.  They began to call the publication "The Hustler," an official publication of Mini Clubs of America, Inc.  For a short period of time, Larry and Jimmy published "The Hustler" regionally.  Mini Clubs was regarded as the parent company for the Clubs, i.e., for "Hustler."  By mid 1973, the magazine was 40 pages in length. The press run grew from approximately 5,000 to 50,000 through both subscriptions and newsstand sales. Jimmy and Larry raised money through solicitation of advertisements.

48.    Jimmy and Larry had plans to franchise the Hustler clubs across the country. They used various promotional materials, including table top advertisements in their clubs, to promote their membership program and to advertise their intentions of franchising their clubs.   Their franchising plan was to be administered through Mini Clubs of America, their holding company.  Larry and

Jimmy reached an agreement to sell a Hustler club franchise in or around January of 1974 for $50,000 but the deal fell through.

49.   In June of 1973, Mini Clubs filed an application for a service mark registration for restaurant and nigh club services in the United States Patent and Trademark Office for Mini Clubs of America with the developed Mini Clubs logo -  which was first used in commerce on or around January 6, 1972.  The Mini Clubs USPTO application was approved in November of 1974 and assigned registration number 997,705.  The Mini Clubs logo/service mark became the initial logo/emblem for Hustler Magazine.  This original Mini Clubs logo/mark is still used today within Larry and Jimmy's partnership/Hustler Enterprise.

50.   In August of 1973, Larry and Jimmy's mutual attorneys prepared an ante-nuptial agreement which was signed by Jimmy and his soon-to-be wife, Bernice Green.  Jimmy and Bernice were married several months later in Las Vegas.  Larry was Jimmy's best man.  The ante-nuptial agreement stated that Jimmy was the sole shareholder of the various entities through which Jimmy and Larry did business at that time (Mini Clubs, Kaylar, Dustoff, W.N.R., West Gay Street, Jefferson Street Company, 21 S. Main Street Company and the Vincent Street Company).  The contract stated that Bernice was to acquire no interest in those entities or to the Hustler business.

51.   In the Fall of 1973, Jimmy and Larry had discussions with Ron Fenton, the publisher of Gallery magazine, a national publication, out of Chicago.  An agreement was reached to merge Hustler/Mini Clubs with Gallery Magazine which was publicly announced on September 19, 1973. Larry authored a press release where he stated that he and Jimmy were **co-founders of Mini Clubs**.  Upon

announcement of the merger with Gallery, Jimmy and Larry temporarily ceased operation of the Hustler newsletter/magazine with the October, 1973 issue. They continued operation of the Hustler Clubs. The deal with Gallery subsequently fell through due to problems Gallery had with its distributor.

52.    Larry and Jimmy then began making efforts to launch their own *national* men's sophisticate magazine – to be called "Hustler."  At the same time, Jimmy and Larry continued in their plans to franchise the Hustler Clubs. They dreamed big and had plans to franchise clubs throughout the country.  Through their mutual business lawyers, Jimmy and Larry put together a detailed franchise packet and various informational/marketing materials. They included detailed financial projections based on their newest Hustler Club in Cleveland (operated through Vincent Street Co.). The franchise packet was sent out to various potential business prospects. The franchise packet chronicled the start of the Hustler clubs by Larry and Jimmy as business partners.  The franchise packet noted that Mini Clubs was the owner/registrant of the HUSTLER marks.

53.    The primary motivation in launching a national magazine was to advertise and promote their plans to franchise Hustler clubs.

54.    Jimmy and Larry reached an agreement with a distributing company out of Derby, Connecticut called Capital Distributing Company to print and distribute their magazine nationally (and to front the printing/distribution costs subject to re-payment out of sales proceeds).  As part of this agreement, Capital, on behalf of Mini Clubs and as the assignee of Mini Clubs, successfully applied to register the "Hustler" trademark with the U.S. patent and trademark office for use in connection with an entertainment magazine. The application was filed on May 06,

1974 and noted that "Hustler" was first used in commerce (in publishing) by Mini Clubs on January 1, 1972 (by virtue of the first Hustler Newsletter). The trademark registration application was approved on May 20, 1975 and assigned registration number 1,011,001.

55.    Larry and Jimmy initially funded the magazine through partnership monies generated by the Hustler Clubs, i.e., with partnership funds that Jimmy was the sole "on paper" owner of.  At the time, the Clubs provided Jimmy and Larry's sole source of revenues.  Jimmy made significant capital contributions into Hustler magazine through monies that were technically his as the 100% shareholder of the six Hustler Clubs and their parent company, Mini Clubs of America.

56.    Jimmy, as 100% shareholder of Dustoff, Kaylar, West Gay Street Company, Jefferson Street Company, 21 South Main Street Company, and the Vincent Street Company, and of Mini Clubs, was the first to use the Hustler mark in the bar/club business.  Jimmy, as 100% shareholder of Mini Clubs, was the first to use the Hustler mark in commerce in connection with publication of a men's magazine.

57.    The inaugural issue of Hustler magazine as a national magazine, Vol. 1, No.1, was published in July of 1974. Just prior to publication of this issue, Jimmy and Larry established another Ohio corporation – **Hustler Magazine, Inc**.  Hustler Magazine, Inc. was incorporated on March 14, 1974 and was set up as a <u>wholly owned subsidiary of Mini Clubs of America</u>.  This was stated on the masthead of the July, 1974 issue.  Jimmy was the sole "on paper" owner and shareholder of Hustler Magazine, Inc. by virtue of his 100% ownership of Mini Clubs of America.  Hustler Magazine, Inc. was capitalized and funded through monies generated by the Hustler

Clubs and through Mini Clubs of America.  Larry claimed and has claimed an ownership interest in Hustler Magazine, Inc. through his partnership agreement with Jimmy.  The launch of Hustler magazine reflected the expansion and continuation of Jimmy and Larry's oral partnership to carry on a publishing business for profit as 50-50 co-owners.

58.    At the time Hustler Magazine, Inc. was incorporated, Jimmy and Larry had approximately 9 Ohio corporations through which they did business.  These entities were treated as one company and were all considered within Larry and Jimmy's partnership agreement.  As has always been the case, monies were pooled/shared/commingled among the entities out of which Jimmy and Larry took profit distributions (usually in the form of wages/salary). Jimmy was the signatory on all bank accounts.  All of these entities were mutually controlled by Jimmy and Larry.  Jimmy and Larry shared in the profits and losses, made decisions together, exercised mutuality of agency and each made contributions. Partnership property/monies were used to expand, promote and grow the Hustler Clubs, to publish the Hustler Newsletter and to start Hustler magazine.

59.    Jimmy was the 100% shareholder and director of Hustler Magazine, Inc.  Jimmy and Larry were co-publishers and both were officers.

60.    Beginning with the inaugural issue of Hustler magazine as a national four-color men's magazine (Vol. 1, No. 1 - July, 1974), Jimmy and Larry included full-page franchising ads for the Hustler Clubs, to be sold by Mini Clubs.  They used the Mini Clubs service mark/logo throughout the magazine, on merchandise and as the Hustler "logo" -

61.    Jimmy and Larry initially lost money with Hustler Magazine.  Jimmy continued to make capital contributions to the magazine through the Hustler Clubs and Mini Clubs that he was the 100% shareholder of.

62.    It was expensive to publish Hustler Magazine, which was funded by partnership monies generated by the Hustler Clubs.  Jimmy (and Larry) began siphoning withholding tax dollars from their female employees/dancers as a means to fund the magazine and keep it afloat.  Jimmy and Larry became delinquent with their taxes and were getting significant pressure from the taxing authorities to pay their past-due tax obligations. As Jimmy was the sole shareholder of the corporations through which the Hustler Clubs did business, as well as the liquor permit holder, Jimmy faced civil and criminal liability with respect to the burgeoning tax delinquencies.  Hustler magazine was increasing its sales volume and was starting to do better, but was barely breaking even.

63.    Larry and Jimmy were about to lose their distributor – Capital Distributing, because the first several issues of the magazine were not profitable and because Capital was printing and distributing the magazine at a loss.  Larry and Jimmy reached an agreement with Capital that Capital would continue to front the costs required to print and distribute Hustler magazine for an additional period of time in exchange for a temporary assignment/security interest in the Hustler mark (1,011,001).  As such, on or about December 23, 1974, Mini Clubs made a temporary assignment of the mark to its subsidiary, Hustler Magazine, Inc., which in turn made a temporary assignment to Capital Distributing.

64.    Larry gave an extended "interview" in the July, 1975 one-year anniversary of Hustler Magazine during which he **admitted that he and Jimmy**

were the **"sole owners."**  The "Mini Clubs" logo was used on the cover of that issue and throughout the magazine.  Mini Clubs continued to be the "parent" of HMI.

65.    In the early Summer of 1975, Jimmy and Larry got a tip that there were nude photographs of Jackie Onassis Kennedy that were available for sale through an Italian paparazzi, Settimio Garritano.  Little did they know that this tip would turn their magazine into an instant and overwhelming commercial success though certainly not without controversy.  Larry did not have a passport; Jimmy did.  Jimmy and Larry reached an agreement to purchase the available Jackie O. photos for approximately $18,000.  Jimmy and Larry made this decision together. These funds were to be paid from partnership monies generated by the Hustler Clubs which continued to support the magazine. Jimmy individually traveled to Rome, Italy and brokered a deal for these photographs.

66.    Jimmy traveled back to Ohio from Rome with the purchased Jackie O. photos/film in his possession.  The Jackie O. photos were published in the August, 1975 issue of Hustler magazine.  Mini Clubs of America remained the "on paper" owner of Hustler magazine as of this issue.  The Jackie O. issue essentially turned Hustler magazine into an overnight commercial success story.  This issue generated significant media and public attention across the country, good and bad.  The sales volume and circulation of Hustler magazine dramatically increased.  The Jackie O. issue generated sufficient monies to pay off Jimmy and Larry's tax debts, personally and with respect to the Ohio corporations through which the clubs were operated. Jimmy personally deposited a sizeable check that was received from their distributor from the sales proceeds of the Jackie O. issue into a bank account that

Larry and he co-owned and were both signatories on. The remaining money was re-invested into their partnership/company and otherwise shared between them. Larry and Jimmy shared in the profits and in the success of Hustler magazine as co-owners.

67.     The overnight success of Hustler magazine following the Jackie O. issue garnered significant media attention. A story ran in Columbus Monthly in September of 1975 which documented same. This article was written following an extensive interview with Larry. The article chronicled Larry's initial business struggles and bankruptcy filing before Jimmy's return from Vietnam. Similar to Larry's published interview in the July, 1975 issue of Hustler magazine, the Columbus monthly article noted that Jimmy and Larry **co-owned** Hustler Magazine, Inc. (Jimmy owned 100% of the shares and Larry's interest stemmed from his oral partnership with Jimmy.)

68.     But for Jimmy's actions in obtaining the Jackie O. photos and "loaning" to the partnership funds that were, on paper, his own, Hustler magazine likely would have lost its distributor and otherwise ceased to exist by the end of 1975. But for the Jackie O. photos, Hustler magazine would not have had the commercial success that it has had for the past 35+ years.

69.     Around the same time that Jimmy and Larry made plans to purchase the Jackie O. photos, they also set up a mail order company to be called Leasure Time Products, Inc. At the time, Larry was dating a young woman named Althea Leasure who started as a dancer in the Hustler Clubs when she was 18 years old. Leasure Time Products ("LTP") was to be an affiliated entity to Hustler Magazine, Inc. and Mini Clubs of America. Its purpose was to solicit sales for adult products

through advertisements placed in Hustler magazine.  The "mail order" business was highly controversial and created risk.

70.    After Hustler magazine became successful following the Jackie O. issue, on or about January 20, 1976, Capital Distributing re-assigned the Hustler mark to Hustler Magazine, Inc. Hustler Magazine, Inc. continued to be wholly owned by Mini Clubs (i.e., by Jimmy as 100% shareholder).

71.    Following the success of the Jackie O. issue of Hustler magazine, Larry and Jimmy decided to focus their partnership affairs on running, growing and promoting Hustler Magazine and gave up on the Hustler club franchise idea.  They started to take steps to wind down their bar/club business.  Jimmy made arrangements to sell/transfer the liquor licenses that he owned through the various Ohio entities through which the clubs were operated.

72.    In April of 1976, Jimmy, as owner and director of HMI, made arrangements to have an outside financial audit conducted.  That audit was performed and the results were presented to Jimmy in a leather-bound publication. This was the first time that an outside audit had been conducted.  LTP and Mini Clubs were referenced in this audit as related companies to HMI.

73.    Continuing and expanding their partnership, Larry and Jimmy created a distributing company, Flynt Distributing, Inc., incorporated in Ohio on April 28, 1976. At the same time, Jimmy and Larry incorporated Chic Magazine Inc. in Ohio on April 29, 1976.  Chic Magazine, Inc. was created as the "on paper" operating entity of a second publication that was developed – Chic magazine.  Flynt Distributing and Chic magazine were developed within Larry and Jimmy's

partnership.  Jimmy held the title of "President" of Flynt Distributing and primarily ran it; Larry focused on the publication of Chic.

74.    During this period of time, Larry focused on the editorial side of the magazines and Jimmy ran the day-to-day business operations and administrative responsibilities. As Larry wrote in an internal Hustler newsletter to employees in May of 1976, Jimmy was Larry's confidant and business advisor.[2]  Jimmy and Larry continued to share titles, control, and profits. They made decisions together.  Also, at times, they individually made decisions and entered into contracts in furtherance of their mutual business interests, binding one another. Larry and Jimmy each made significant contributions to the growth and expansion of Hustler magazine, CHIC magazine, Flynt Distributing and to their overall business operations.  The company headquarters remained in Columbus.  Their office space and number of employees started to grow rapidly to keep up with the needs of the magazine.

75.    With the development of their second magazine and plans to develop and distribute additional periodicals and publications, in July of 1976, Hustler Magazine Inc. registered the trade name "LFP publications" with the Ohio Secretary of State.  A few months later, on September 29, 1976, Plaintiff L.F.P., Inc. ("LFP") was incorporated in Ohio.  LFP was to serve as the "on paper" parent/holding company for Hustler and Chic magazines as well as Flynt Distributing.  LFP was to essentially replace Mini Clubs as the parent company within their incorporated partnership.  Since Jimmy and Larry were getting out of the club/bar business, it

---

[2] In the Spring of 1976, as Jimmy and Larry's partnership/business operations were rapidly expanding, an internal company newsletter (i.e., of the "house organ" type) was created so as to keep employees abreast of various issues, personnel, successes, developments and the like.  Initially, this was called "Hustler News…for Hustler employees."  Later, it was changed to "Chic/Hustler News." HMI registered "Chic/Hustler News" as a trademark for "magazine of the house organ type" with the USPTO effective February 8, 1977 – Registration No. 1,058,426.

did not make sense, from a marketing/branding standpoint, for their parent/holding company to be called "Mini Clubs." As Larry was the older brother and publisher (with Jimmy being co-publisher and otherwise focused on the day-to-day business operations), Larry was promoted as the "face" of Hustler magazine to compete with their primary competition in the men's sophisticate magazine industry - Hugh Hefner (of Playboy) and Bob Guccione (of Penthouse).

76. Within months of LFP being incorporated, Jimmy (who was married with children by this time) executed a Last Will and Testament which documented his ownership interests in Mini Clubs and LFP (the parent/holding companies) and which expressed his intent to leave such interests/assets to his brother, Larry, in the event of his passing. Jimmy's Will, like his ante-nuptial agreement with Bernice, reflected his partnership agreement with his brother.

77. LFP was set up within Larry and Jimmy's partnership and was capitalized/funded with partnership assets generated by Hustler Magazine, Inc., Mini Clubs and/or the Hustler Clubs. Larry and Jimmy continued their partnership agreement to be 50-50 owners of LFP. LFP was a mere continuation of Dustoff and Mini Clubs, the original registrants/owners of the Hustler marks.

78. Jimmy and Larry's partnership, primarily through publication of Hustler magazine, was very profitable in the late 1970's. Larry and Jimmy were indicted and tried in Hamilton County (as co-publishers and co-owners of Hustler magazine) in 1976-77. These charges stemmed from the publication and distribution of eleven issues of Hustler magazine between July of 1975 and May of 1976 in Hamilton County. The charges were tried in February of 1977. Larry was convicted; Jimmy was acquitted. Larry posted bond and an appeal was filed.

Ultimately, the conviction was reversed and remanded but the charges were never re-tried.

79. In March of 1978, approximately a year after his conviction and during a time when Larry was going through a period of emotional instability and purported "religious conversion" (which he now attributes to his underlying bipolar disorder), Larry was shot in Lawrenceville, GA. Larry sustained significant injuries which led to nerve damage/pain and paralysis in his legs. It was touch and go if Larry was going to survive. Larry was initially treated in Atlanta and was then transferred to Ohio State Medical Center. After an extended hospitalization, he was released from the hospital. Jimmy was at his side during this difficult time. Larry's assailant was not caught and was not known. There were many opinions and "theories" regarding Larry's shooting including governmental conspiracies and the like.

80. In or around 1979, Larry and his wife, Althea, moved from Columbus, Ohio to southern California.[3] Larry and Jimmy's company/partnership headquarters, including key staff, were also re-located to California. Larry & Jimmy continued to have business interests in the Midwest, on the East coast and throughout the country. Jimmy initially stayed behind with his wife and two children (Dustin Flynt and Jimmy Flynt II) as he wanted to raise his children in the Midwest. Jimmy commuted to the west coast as needed, and otherwise traveled, worked and communicated with Larry and staff remotely.

81. The years that followed Larry's shooting proved to be very difficult and dark times. Larry went through an extended period of emotional instability and

---

[3] Larry and Althea Leasure were married in Columbus, Ohio in August of 1976. Jimmy was Larry's best-man.

recklessness.  For extended periods of time, Larry (and Althea) essentially went into exile in their bedroom behind a 500 pound steel door guarded by private security guards who were armed and dangerous.  Althea and Larry developed severe drug addictions.[4]

82.    Larry had very little day-to-day involvement with the business affairs of Hustler magazine during the years following his shooting.  The magazine was well known and established by this time and essentially ran itself through its managers, executives, editors, photographers, etc. that were in place.  Jimmy tried his best to keep things running, to maintain a staff and to manage his brother's behavior, recklessness and drug addiction.  It was not easy and it was not smooth.

83.    In time, primarily due to pain, physical incapacity and disability, drug addiction, and his underlying mental illness (bipolar disorder), Larry began to act in a very irrational, unstable, reckless, bizarre and destructive manner both personally and in business.  Larry's actions and behaviors during this time period are well documented in news media articles and in court records.  Larry had numerous arrests and run-ins with state and federal judges due to his criminal and contemptuous behavior and his outrageous & reckless conduct.  Larry's conduct was not only bizarre and outrageous but was also dangerous.  He made threats against President Reagan, federal judges, his family, acquaintances and others.

84.    In the late 1983/early 1984, Larry was sentenced by a federal judge in California to serve 15 months in federal prison and also ordered to undergo a psychological evaluation.  Larry's sentence followed a string of arrests/incidents, courtroom outbursts, outrageous conduct, and contempt findings imposed by

---

[4] Althea subsequently contracted HIV/Aids.  She died in June of 1987 as a consequence of drowning in a bathtub.

federal judges between October of 1983 and February of 1984.  Larry had several outbursts where he shouted obscenities and threats at federal judges, including the U.S. Supreme Court, during oral arguments held on Nov. 8, 1983 in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S. Ct. 1473. At one point thereafter, Larry appeared in federal court in California wearing an American flag as a diaper and wearing an unauthorized purple heart.  This conduct led to additional charges. Ultimately, after an extended court hearing, Larry was ordered to receive further psychiatric evaluation and was sent to federal psychiatric prison in Butner, N.C.  He was released in late July, 1984 after serving five months.[56]

85.    In late 1983 into the early part of 1984, Larry was literally attempting to give away all of his and Jimmy's partnership/company assets, to include the goodwill and assets of Hustler Magazine, Inc. and L.F.P., Inc., to an atheist group. Jimmy acted to protect the company and his (and Larry's) assets, applied for and was appointed as Larry's conservator. The company was in very poor shape at this time due to Larry's recklessness. Employee morale was low, employee turnover was high, profits were abysmal, and lenders were getting cold feet. Thereafter, Jimmy moved his family (wife and two young boys, Jimmy Flynt II and Dustin Flynt) from Kentucky to Southern California where he took over complete company control. Jimmy remained Larry's court-appointed conservator through November of 1984. During Larry's conservatorship, he continued to act in a very reckless and

---

[5] Larry gave a deposition while incarcerated in connection with a civil lawsuit that was pending against him in federal court in Virginia by the late Reverend Jerry Falwell.  That matter proceeded to trial in December of 1984 resulting in a verdict in favor of Reverend Falwell on one of the claims.  Through a series of appeals, that case ultimately made its way to the United States Supreme Court, which reversed the verdict.
[6] In March of 1985, a federal appeals court ultimately overturned the contempt charges due to concerns related to Larry's competency and also out of a desire to simply bring closure to the ordeal.

dangerous way including continued threats against public officials, against Jimmy and others.  It was a very difficult period of time.

86.     But for Jimmy's actions in 1984, all of Larry's assets and all of their partnership property would have been dissipated.  Their business was on the brink and thanks to Jimmy, it survived.

87.     There was a brief period of separation between Jimmy and Larry following Larry's conservatorship and their relationship was strained. This was due to Larry's conduct and behavior.  Larry's drug addiction resumed and intensified, he continued to surround himself (and Althea) with dangerous armed security guards, and he continued to act in a dangerous, reckless and unstable way. At times, Larry had delusional and paranoid thoughts, was detached from reality, and acted accordingly.  Larry even ran for President of the United States in 1984.

88.     Larry's wife, Althea, passed away in June of 1987.  Jimmy had been Larry's best man when Larry and Althea married in 1976 and Jimmy was the first person that Larry contacted when she passed.  Her passing was very difficult for Larry and Jimmy took care of her funeral arrangements and burial which took place on family land in Eastern Kentucky.  After Althea's passing, Larry become severely depressed.  His drug addiction continued.

89.     In late 1988, Larry and Jimmy's personal and professional relationship began to improve and they agreed to patch up their differences and continue their partnership.  Larry was able to ultimately kick his drug addiction and resume a more active lifestyle and role in his and Jimmy's business affairs.

90.     The 1980's proved to be a very difficult and rocky period of time in Larry and Jimmy's partnership but it persevered nonetheless.  Business was

primarily conducted through LFP during these years.  Very little progress or growth was made with their business but that was about to change thanks in large part to a major motion picture that was being developed and also due to Jimmy's vision, ideas, services and contributions.

### JIMMY AND LARRY'S PARTNERSHIP IS RE-AFFIRMED AND RE-ENERGIZED AND THE HUSTLER NAME/MARK IS USED FOR FIRST TIME IN RETAIL SERVICES

91.    From the mid to late 1980's into the early to mid 1990's, Jimmy and Larry's partnership/business was sustaining itself but business was flat and was generally struggling. Their business continued to focus primarily on the publication and distribution of magazines, published and sold through LFP.  In addition to Hustler magazine, Jimmy and Larry developed and/or acquired, published and distributed several additional men's sophisticate and mainstream (non-adult) publications. Although they grew their portfolio of magazines, overall magazine sales numbers/revenues were dropping as adult video content and the internet were emerging.

92.    Under the Hustler name/brand, partnership funds were used to test and eventually enter the adult video market, initially through Beta and VHS tapes and later through DVD's and through the internet.

93.    As the 1990's progressed, as Larry's mental illness and underling pain came under control, as he got clean and sober after a 12-14 year drug addiction, and as Larry and Jimmy's personal relationship stabilized and strengthened, Larry and Jimmy's partnership and business activities became re-energized.

94.    In or around 1995, after a several-year search by Jimmy and Larry to acquire their own commercial building in Los Angeles County, CA, Jimmy and Larry

mutually decided and agreed to purchase a 10 story commercial building at 8484 Wilshire Blvd. in Beverly Hills, CA.  This building was re-named the Flynt building or "Flynt Publications" and their business operations were moved into this building from a nearby building that they had been renting space in.  A California entity was set up to acquire this property.  This building was purchased, in part, with partnership funds.  The rest was financed.  Jimmy continued to spend significant periods of time in Southern California during which time he continued to live with Larry.

95.    In the mid 1990's, Larry began working on an autobiography.  Around the same time, Larry and Jimmy were notified that a screenplay was being written about their journey from poor boys in Eastern Kentucky to their beginnings in the bar business in Ohio to the start and eventual success of Hustler magazine.[7]  Larry and Jimmy communicated with and spent time with the writers, the director, and leading cast members in the Cayman Islands.

96.    In December of 1996, Columbia Pictures released this movie entitled "The People vs. Larry Flynt."  This movie, which is part fiction and part non-fiction in its final form, generated a significant amount of press (including Golden Globe and Oscar nominations) and also helped to market and further re-energize Larry and Jimmy's partnership and business endeavors.  Larry and Jimmy attended the Oscar's and Golden Globes together.

---

[7] In addition to telling the story of Jimmy and Larry's rags to riches story, the idealized movie drama tells the story of State v. Flynt I although, in the movie, Larry is the only one on trial.  The movie also tells the story of Larry's subsequent shooting, his drug addiction, his isolation, his outrageous activities and behavior, his incarceration in federal prison, his dramatic and rocky relationship with Althea, Althea's drug addiction, Althea's infliction with Aids and ultimate death resulting from her drowning in her bathtub. The movie also portrays the civil lawsuit between Larry & Hustler Magazine, Inc. and the Reverend Jerry Falwell which ultimately made its way to the U.S. Supreme Court.

97. There were several movie premiers held for the movie, including a premier in Cincinnati in early January of 1997. Larry and Jimmy arranged for this premier due to their long-ties to Cincinnati. They personally attended the premier and after-party. They also promoted Larry's autobiography, "An Unseemly Man" (265 pages in length) released at approximately the same time as the movie, while in Cincinnati.

98. While visiting Cincinnati for the movie premier of *The People vs. Larry Flynt* on January 7, 1997, Jimmy and Larry discussed the fact that Hustler magazine had not been available for sale in Hamilton County since their 1977 trial. Jimmy came up with the idea of opening a small book store/news stand in downtown Cincinnati to sell Hustler magazine and other men's sophisticate and mainstream magazines. As of this time, Hustler did not have a retail arm of its enterprise.

99. Larry supported and agreed with Jimmy's vision to open a Hustler retail store to have its beginning / test market in Cincinnati. While in Cincinnati, Larry and Jimmy orally (and impliedly) agreed, as 50-50 partners, to pursue a Hustler retail division of Hustler to start in downtown Cincinnati. This agreement was a continuation, re-affirmation, ratification and expansion of their express/implied partnership agreement first entered into in 1969 (in Cincinnati) and/or was a new oral partnership agreement and/or an implied partnership agreement. Just as Larry and Jimmy had a vision for a chain of night clubs in the early 1970's, they envisioned a chain of Hustler retail stores beginning in 1997.

100.   Over the next several months, Jimmy pursued a location to open a retail store / news stand in Cincinnati and sought the necessary permits/licenses. Jimmy found a location at 34 E. Sixth St., formerly occupied by King's News. Jimmy personally negotiated a sub-lease/assignment of lease with the existing tenant/store owner, Polly King.  Jimmy also sought out and hired and trained a small staff as well as a bookkeeper/accountant, Allie Jackson III, whose office was and continues to be in Florence, KY.

101.   Jimmy's and Larry's retail vision and concept became a reality on October 22, 1997 when the first ever Hustler retail store opened its doors in downtown Cincinnati.  Hustler Books, Magazines and Gifts opened to a long line of customers and with significant local media attention. This was the first time the "Hustler" name/mark was used in connection with brick and mortar retail services. An Ohio corporation, Hustler News & Gifts, Inc., was set up and incorporated on October 21, 1997 to operate this store.  Jimmy Flynt was the sole shareholder of Hustler News and Gifts, Inc.  Initially, only magazines were sold.  Also, Jimmy came up with the idea of making and selling Hustler-branded apparel.  Jimmy tacked up a few "Hustler" t-shirts on the wall with a sales price. They sold well and he then made arrangements to have Hustler-branded shirts silk screened and inventoried. This was the first time that the "Hustler" brand/mark had been used in apparel. After several months, Hustler News & Gifts began selling adult videos and other adult and non-adult goods.

102.   Jimmy came up with the name Hustler Books Magazines and Gifts.  It was implicit that Jimmy could use the Hustler name.  He did not ask for permission

as none was needed. Larry (and LFP) was fully aware that the newsstand would used the Hustler name.

103. Shortly after Hustler News & Gifts was incorporated and began doing business, Larry and Jimmy pursued and ultimately finalized the purchase of a bankrupt card room/casino in Gardena, CA. Larry began taking steps to obtain a gaming license from the State of California. A separate California Entity (Majestic Properties, Inc.) was incorporated in California to purchase the real property. The idea was to renovate and then re-open the card room as the "Hustler" casino.

104. In February of 1998, within months of Hustler Books, Magazines and Gifts opening for business, Larry was interviewed by a reporter for the Cincinnati Enquirer at which time he acknowledged the instant success of the store and further commented that plans were being developed as a result of such success to open additional Hustler retail stores. Due to the instant success of Hustler Books, Magazines and Gifts, Jimmy and Larry made plans to open additional Hustler stores.

105. Although Larry was closely involved with and held himself out to the Cincinnati media and public, in part, as an owner/co-owner of Hustler News and Gifts, Jimmy was the sole shareholder. Jimmy managed, controlled and operated Hustler News & Gifts. Larry's ownership interest in this store, if at all, stemmed from his oral partnership agreement with Jimmy. Larry contends that he did not want the Cincinnati store "in his name" because he did not want to run the risk of a felony prosecution or conviction in Hamilton County which would put his gaming

license in jeopardy. For the benefit of their partnership and their business, and in direct reliance thereon, Jimmy agreed to accept this risk.[8]

106.  Less than six months after Hustler News & Gifts opened, in early April of 1998, Larry and Jimmy were indicted and charged with various criminal counts of obscenity by the State of Ohio in the Hamilton County Court of Common Pleas under Case Number B9802210.[9]

107.  After Hustler Books, Magazines and Gifts was open for business and while the Hamilton County charges were pending, Jimmy and Larry, as partners, decided to pursue a second Hustler retail store in West Hollywood, California.  They found a site on Sunset Boulevard which was previously occupied by a Blockbuster Video Store and an adjacent/attached Boston Chicken Restaurant.  Jimmy came up with the idea of combining the properties, converting the Boston Chicken Restaurant into a café and the Blockbuster into an upscale retail boutique.  Jimmy came up with the name: "Hustler Hollywood."  Jimmy was involved with the planning, design, construction, and other preliminary aspects of getting the Hustler Hollywood opened for business.  During the preliminary stages, Jimmy coined the phrase: "***Relax...it's just sex!***"  This phrase became and continues to be the popular and catchy motto/marketing slogan of Hustler's retail operations and products, including a recently launched toy and novelty line.

---

[8] Although Larry trumpets himself as a First Amendment champion and although Larry told the Cincinnati press in the Summer of 1997 that he was "looking for a rematch" with Hamilton County, Larry has recently testified that he did not want the Cincinnati store "in his name" because he did not want to run the risk of a felony prosecution or conviction in Hamilton County which would put his gaming license in jeopardy.

[9] These charges stemmed from the alleged sale of adult-themed videos to a youth at Hustler Books News and Gifts. Jimmy and Larry retained a team of lawyers, including Lou Sirkin in Cincinnati, Paul Cambria and his law firm, Lipsitz Green in Buffalo, NY and Alan Isaacman in Beverly Hills. Mr. Cambria applied for *pro hac vice* admission on Jimmy's behalf just as he had previously done in 1976-77 when he represented Jimmy in connection with State v. Flynt I.

108.   As part of his partnership agreement with Larry to share in the profits and losses of the company as co-owners, and in direct reliance thereon, between July and November, 1998, while the Sunset store was being constructed/remodeled, Jimmy permitted Defendant HH Entertainment, Inc. (a partnership entity) to apply for federal trademark registration of  the "Relax…it's just sex!" slogan for retail store services related to adult entertainment products without direct financial compensation to Jimmy.  Jimmy also permitted LFP to apply for federal trademark protection of "Hustler Hollywood" as a service mark.  Both applications were ultimately approved in 1999.   Jimmy was expressly and/or impliedly induced to believe, by Larry and his/their representatives and advisors that he would retain an ownership interest in these marks as part of his partnership/ownership in the Hustler "close corporation." Jimmy was led to believe and did believe that these trademark/service mark registrations and the associated value and goodwill of same were being performed within his and Larry's incorporated partnership, that such marks were being obtained as part of their partnership property and that he had and retained an ownership interest therein just as he had an ownership in all other intellectual property acquired by their partnership.

109.   The Hustler Hollywood retail store and café opened for business at 8920 Sunset Blvd., West Hollywood, CA on December 3, 1998.  This was the **second** time that the Hustler name was used in retail services.  This store has been owned and operated "on paper" by HH-Entertainment, Inc. (formerly Hustler Entertainment, Inc.), a non-party to this action. The West Hollywood Hustler Hollywood store was envisioned as part of Jimmy and Larry's partnership, was

capitalized with partnership funds and became a partnership entity/asset.  As part of the interior design/décor of the newly built Sunset store, a large backlit wall (roughly 20 feet long and 8 feet tall) was designed, created and installed to greet customers as they entered the store.  This wall, which remains in place today, contains the "Relax...it's just sex!" slogan with credit given to Jimmy Flynt.  Larry is now trying to take credit for coming up with this slogan.

110.   Months after the Hustler Hollywood store opened in West Hollywood and while the Cincinnati store continued to operate at 34 E. Sixth St., the 1998 Hamilton County Criminal Charges against Jimmy and Larry (*State v. Flynt II*) commenced trial in the courtroom of Judge Dinkelacker on May 10, 1999.  On May 12, 1999, while jury selection was still ongoing, a plea agreement was reached whereby it was agreed that Hustler News and Gifts would be substituted as a Defendant as to several of the counts, that the corporate entity would plead guilty to two counts of pandering obscenity, and that all of the remaining charges would be dismissed.  The Court imposed a $10,000 fine on Hustler News & Gifts which was subsequently paid by Hustler News & Gifts.   All remaining charges were dismissed. Jimmy and Larry's attorneys/defense team as well as outside legal expenses, were paid by Jimmy through Hustler News & Gifts, Inc. This included Larry's defense.   In all, over $400,000 were paid out in legal fees and expenses for Jimmy **and** Larry's defense.

111.   In the Summer/Fall of 1999, the City of Cincinnati evicted Hustler News and Gifts from 34 E. 6th St. through eminent domain proceedings as part of the City's plan to build a contemporary arts center at the corner of Sixth and Walnut streets. Hustler News & Gifts operated through this time without payment of

any licensing or royalty fees to LFP or to any other person or entity. HNG, through Jimmy, had the right to use the Hustler name.  Larry and LFP were fully knowledgeable of this use and acquiesced to same.

112.  Jimmy proceeded to search for a new location to re-open a Hustler retail store in Cincinnati.  A store was temporarily opened in early November, 1999 at 609-611 Race Street but after a dispute with the building owner, Jimmy/Hustler News & Gifts moved out and sought a new location.

113.  Around this time, in the Fall of 1999, Jimmy and Larry agreed to pursue a third Hustler retail store as part of their partnership.  Jimmy found a site off of I-75 in Monroe, Ohio, at 1038 Lebanon St.  Using funds/partnership monies generated by Hustler News & Gifts, Inc., Jimmy acquired this real estate for $280,000.  He subsequently obtained a deed for this property.  He worked closely with the architects and contractors to design and build a 7,200 square foot retail store that to be built from the ground up.

114.  After acquiring the Monroe, Ohio property, Jimmy found an available building at 411 Elm Street to re-open a downtown Cincinnati store.  He personally negotiated and subsequently entered into a lease agreement with an option to buy and the doors of Hustler Cincinnati opened in early April, 2000.[10]   Larry attended the grand opening.  The Hustler Cincinnati store was and is operated by Defendant Hustler Cincinnati, Inc., an Ohio corporation incorporated in late March, 2000. Hustler News and Gifts, Inc., through Jimmy Flynt, gave consent to Hustler Cincinnati, Inc. to utilize a similar name. Jimmy Flynt has been the sole

---

[10] A three year lease agreement (signed April 3, 2000 with a commencement date of February 1, 2000) was executed which contained a purchase option (or, alternatively, a 5 year lease renewal option). The rent for year one was $3,000/month; year two was $3,150/month and year three was $3,308/month.  This was an arm's length transaction.

shareholder, officer and director of this operating entity as he was with Hustler News & Gifts, Inc., the predecessor-in-interest company.

115.   In or around May of 2000, shortly after Hustler Cincinnati opened at 411 Elm St. in Cincinnati, after the appropriate permits were obtained, ground was broken for construction of the Monroe, Ohio Hustler store.   Larry and Jimmy attended the ground-breaking ceremony which received a fair amount of media attention.  Larry and Jimmy were photographed with Hustler hard hats and golden shovels.

116.   By June of 2000, construction was complete on the newly remodeled Hustler Casino which opened for business in Gardena, CA.  Larry was successful in obtaining a gaming license and a new California entity had been set up to operate the casino – (El Dorado Enterprises, Inc.)

117.   A few months later, on or about October 12, 2000, as construction was ongoing for the new Monroe store, Jimmy transferred the deed to the Monroe property to Lakeville Properties, Inc., an Ohio Corporation set up to hold the real estate.  This transfer was without consideration.  Jimmy was induced by Larry and by representatives of LFP/Lakeville, through direct and implied representations and/or intentional silence, that such property transfer was being made in connection with Jimmy and Larry's ongoing partnership and business dealings and that Jimmy would continue to have an ownership interest in the property, which was acquired with and improved with partnership funds.   Jimmy was induced into believing that the Monroe Hustler store and property, like the Cincinnati store (and Sunset Blvd. store) were part of Jimmy and Larry's vision for a Hustler retail chain to be born out of their Ohio partnership agreement.

118.    A new Ohio corporation, Hustler Hollywood of Ohio, Inc. (n/k/a HH Monroe, Inc.) was set up and incorporated on November 14, 2000 within Jimmy and Larry's Ohio partnership to serve as the operating entity of the Monroe store. Although the Monroe store, like all other facets of the Hustler enterprise, was born out of Jimmy and Larry's partnership, on paper, Jimmy was the 100% stockholder of the shares that were initially issued.  Jimmy became the sole officer (President) and sole director.

119.    Around the time the Monroe, Ohio Hustler Hollywood store was getting ready to be opened for business, Allie Jackson, III (the accountant and bookkeeper for Hustler Cincinnati, Inc.) was hired to provide bookkeeping and accounting services for Lakeville Properties, Inc. (the on paper entity set up to hold the real estate) as well as Hustler Hollywood of Ohio, Inc., n/k/a HH-Monroe, Inc. (the entity set up to operate the store).   Mr. Jackson continued in this role until sometime in mid 2009.

120.    The "Hustler Hollywood" store in Monroe, Ohio held its grand opening on December 16, 2000 and has been in operation ever since.[11] [12]

121.    Just before the Monroe, Ohio store opened, a 10 year "retail lease" agreement was put together between Lakeville Properties as the landlord and newly formed Hustler Hollywood of Ohio, Inc. Larry signed the lease as President of Lakeville and Jimmy signed the lease as President of Hustler Hollywood of Ohio. The monthly rental amount started at $14,700 and escalated to $17,500 in year 10.

---

[11] Jimmy performed all activities necessary to get the Monroe store opened.  He found and purchased the property; worked to obtain the necessary zoning, permits and licenses; attended local zoning/planning meetings; oversaw and coordinated construction activities; got the store set up and stocked; hired and trained the staff and otherwise got the store opened.

[12] The interior of the Monroe store, like the store in West Hollywood, was designed with a curved, six-foot-high wall more than twenty-feet in length to separate apparel and lingerie from adult videos. This wall is commonly referred to as the "Relax" wall.  Since the Monroe store opened, this wall has read, in large letters: "Relax…it's just sex!" with credit given to Jimmy.

These figures were used based on expected sales/profits and part of Jimmy and Larry's plan to share in the profits and in an effort to pool/commingle funds.

122.   The Monroe store was an instant and overwhelming commercial success and exceeded Jimmy and Larry's sales expectations.   The store began generating significant amounts of income.

123.   After the Monroe store started to generate significant amounts of cash, Jimmy/Hustler Cincinnati exercised the option to purchase the 411 Elm Street property in downtown Cincinnati out of which the Hustler Cincinnati store was operating.   The negotiated, arms-length, sales price was $250,000.   The building was purchased with partnership funds and became a partnership asset.   Closing took place on March 28, 2001, at which time ownership of the building was transferred by warranty deed to Hustler Cincinnati, Inc.   The 411 Elm Street property was purchased by Hustler Cincinnati because it was the plan/goal of Larry and Jimmy, through Hustler Cincinnati, Inc., to maintain a long-term Hustler retail presence in Cincinnati.   That was certainly Jimmy's intent, plan and understanding and that is what he was affirmatively led to believe.

124.   In or around July of 2001, as the Monroe, Ohio Hustler store continued to generate significant amounts of money, Jimmy and Larry agreed, as part of their 50-50 partnership agreement, to further drain the profits out of the Monroe store (owned 100% by Jimmy) back to Lakeville and/or LFP to assist with further growth and expansion of their retail division and various other business interests that they were pursuing. As a means to drain funds, in or around July of 2001, with guidance from their mutual attorneys and financial advisors, a completely new 10 year lease agreement was drafted between Lakeville and Hustler Hollywood of Ohio, Inc.  This

new lease was designed to replace the initial lease (which was less than 6 months into a 10 year term) and to significantly raise the monthly rent from $14,700 a month to $27,000 a month for the first year.  Whereas the initial 10 year lease had a rent escalation clause increasing the rent to $17,500 by year 10 (2010), the new lease provided a rent escalation clause increasing the rent to $30,000 a month for years 4-6 and $33,000 a month for years 7-10.  Larry signed this revised lease on behalf of Lakeville and Jimmy signed it on behalf of Hustler Hollywood of Ohio. No consideration was given to Jimmy/Hustler Hollywood of Ohio to double the monthly rent.  This was not an arms-length transaction.  Jimmy agreed to this revised lease because he was induced to believe by Larry, and by representatives of Lakeville Properties and LFP that the Monroe, Ohio Hustler store was part of their partnership and that all profits generated were partnership profits even if drained back into LFP or other entities within their business.

125.  At the same time that a revised lease was put together for the Monroe store in July of 2001, and in a further effort to drain the significant profits being generated by that store back to California, Jimmy also agreed to sign off on a purported "licensing agreement" whereby Hustler Hollywood of Ohio, Inc. agreed to pay $65,000 a month to LFP for use of the Hustler trademarks.  This was not a true licensing agreement and was not an arms-length transaction.  It was a sham.  It was nothing more than a tool to share monies among affiliated entities within Jimmy and Larry's partnership.  Hustler Hollywood of Ohio, Inc., through Jimmy, had every right to use the trade name Hustler and the various Hustler trade and service marks.  According to Larry, from an accounting standpoint and based on advice from "the accountants" – the only way to pool monies into the common

"pot" and to otherwise drain off profits of the retail stores was through purported "licensing fees." At no time was a valid, arms-length licensing contract executed between Plaintiff LFP and any entity through which a Hustler retail store was operated.

126.   The revised "lease" agreement and the new "licensing" agreement that were put in place for Hustler Hollywood of Ohio, Inc. were drafted by Larry and Jimmy's mutual lawyers with involvement from their mutual financial advisors and accountants.

127.   Through the revised "lease" agreement and "licensing" agreement, monies generated from the Monroe store, owned on paper by Jimmy, were poured back into the Hustler enterprise.   For the next several years, Jimmy (through Hustler Hollywood of Ohio, Inc.) invested/contributed more than $1,200,000 of money a year into the Hustler enterprise.   Such monies were used to expand, promote and advertise the entire Hustler enterprise, to include the blossoming retail group. These transfers constituted significant capital contributions by Jimmy.

128.   After the Monroe, OH store opened, in addition to overseeing operations at the Cincinnati and Monroe locations, and to a lesser extent, the Sunset store, Jimmy took on the role and responsibility of further growing and expanding the retail arm of the company.   The initial plan/vision was to open 5 new Hustler retail stores a year throughout the country.   Jimmy traveled all over the United States scouting locations for new stores, obtained the necessary building, zoning and operating permits and licenses, coordinated design and construction, recruited, hired and trained staff, got the stores stocked and set-up to conduct

business and otherwise managed the store openings and initial operations. Jimmy attended every store opening; Larry attended several.

129. In February of 2002, the Fourth Hustler retail store opened in San Diego.[13] This store was built, inventoried and capitalized with partnership funds, including funds generated from the Monroe, Ohio store.

130. In June of 2002, Cincinnati Magazine published an in-depth story about Jimmy entitled "Our Man Flynt." This story focused primarily on Jimmy's ownership, vision, involvement and activities with the Hustler enterprise and retail stores, the success of the stores and his vision for further expansion. The Monroe Hustler Hollywood store was featured in the article. Jimmy was quoted in the article as saying that he intended to have a retail store in the Queen City for many years to come. As of the time this article was published, Jimmy believed (and was led to believe by Larry and LFP representatives) that the existing and forthcoming retail stores, regardless of whose name they were put in, were part of his and Larry's partnership arrangement and vision and that monies generated from those stores (partnership funds) would further grow and diversify the Hustler brand (i.e., Jimmy and Larry's partnership).

131. On June 20, 2002, Jimmy was inducted into the Hustler Hollywood Walk of Fame outside the Hustler Hollywood store on Sunset Blvd. This public induction reflected Jimmy's significant contributions to the adult entertainment industry and to the Hustler enterprise over the years.[14]

---

[13] A Nevada limited liability company, HH San Diego, LLC, was set up to operate this store.
[14] The Hustler Walk of Fame is modeled after the famous Hollywood Walk of Fame and consists of hand prints cast in concrete molds which are then affixed to the sidewalk directly outside the front doors of the Hustler Hollywood store on Sunset Blvd. in West Hollywood, CA. The walk of fame includes twelve large concrete squares, roughly 16"x16" in size that contain the names and hand prints of an exclusive (and famous) group of adult film stars and other pioneers in the adult entertainment industry, including Larry and Jimmy. Jimmy's square which is part of the Hustler walk of fame contains his hand prints, name, date of induction and the saying: "Relax...it's just sex!"

132. There was an induction party/ceremony on June 20, 2002 at the Hustler Hollywood store located on Sunset Blvd when Jimmy was inducted into the Walk of Fame. Larry attended the ceremony and spoke to the large crowd that attended. Shortly after Jimmy cast his hands in a wet concrete mold, Larry made the following emotional statement, captured by an audio and video recorder:

> "...I want to say something on a serious note if I can. He's been a loyal brother and with me from the beginning. And he's contributed more to this industry than many of you will ever know and I'm very proud of him."

133. Between 2004 and 2007, Jimmy and Larry's Hustler retail division grew rapidly. Through Jimmy's vision, contributions (capital and otherwise), labor, time, energy and talents, "Hustler Hollywood" boutiques (several with cafés) opened in Lexington, KY (July 16, 2004, through HH Lexington, LLC), Fort Lauderdale, Florida (July 23, 2004 through HH Ft. Lauderdale, LLC), New Orleans, LA (November 18, 2004 through HH New Orleans, LLC), Nashville, TN (June 17, 2005 through HH Nashville, LLC), Tacoma, WA, (September 8, 2006 through HH Tacoma, LLC), and St. Louis, MO (May 7, 2007 through HH St. Louis, LLC).[15] Individual corporations/limited liability companies were set up to own/operate these various stores "on paper" within Larry and Jimmy's incorporated partnership. Each of these stores were funded/capitalized with partnership monies, including monies generated by the Monroe Store when Jimmy was the 100% shareholder and which he re-invested/contributed back into the enterprise. These entities have used the "HUSTLER" name and marks in the absence of any licensing contracts.

---

[15] During this period of time, two other stores opened, in South Beach, FL and Tempe, AZ but those stores are no longer in operation.

134.   Like the West Hollywood, CA and Monroe, Ohio stores, each of the Hustler Hollywood stores was designed and constructed with a large interior "Relax" wall or sign which contains the "Relax...it's just sex" slogan with Jimmy's name attached.  In addition, the "Relax" slogan has been and is used to market the stores on Hustler websites, is used on employee uniforms/t-shirts, is used on Hustler merchandise and on the shopping bags that are given to customers following a purchase.

135.   In this action, Plaintiffs have suggested that Defendant Hustler Cincinnati, Inc. has tried to mislead the consuming public and create the false impression that there is some association, affiliation, sponsorship, endorsement or license relationship between Plaintiffs' products and/or services and HCI's products/services.  Notwithstanding the fact that Defendant HCI has been considered an affiliated and related entity within Larry and Jimmy's partnership (up until Larry's recently efforts to squeeze Jimmy out), it has been Plaintiffs themselves who have continued to market and promote HCI as part of the Hustler retail group.

136.   In addition to the brick and mortar Hustler retail boutiques that are currently in operation, since approximately February of 2005, the general public (in Ohio and across the country) has been able to shop for Hustler and non-Hustler goods and products at www.hustlerhollywood.com.  In addition to serving as the online retail store, this site has served to market and promote the various retail stores.  At all times prior to the filing of this Amended Counterclaim, Plaintiffs have affirmatively held out the Hustler Cincinnati store as part of the Hustler retail group. The Hustler Cincinnati store has been continuously listed under the Hustler

Hollywood retail locations link/tab at www.hustlerhollywood.com and www.hustlerworld.com. There are and have been numerous different links on the internet/world wide web to the www.hustlerhollywood.com website.  Up until very recently, any individual who visited the www.hustlerhollywood.com website or the affiliated www.hustlerworld.com or www.hhretail.net websites have learned that the Hustler retail chain/arm/division was as a consequence of Larry and Jimmy's vision for an upscale adult boutique.   Now, it is falsely represented that the Hustler retail concept was "Larry's vision."   Jimmy's slogan, "Relax…it's just sex!" continues to be used throughout Hustler retail group although Larry is now attempting to take credit for this slogan which he had no part of coming up with.

**OVER THE YEARS, INCLUDING RECENT YEARS, JIMMY HAS SHARED, TRANSFERED AND INVESTED SIGNIFICANT ASSETS WITHIN THE HUSTLER ENTERPRISE IN ORDER TO GROW SAME IN DIRECT RELIANCE ON HIS PARTNERSHIP RELATIONSHIP WITH LARRY AND HIS OVERALL OWNERSHIP STAKE IN THE HUSTLER ENTERPRISE INCLUDING THE HUSTLER TRADEMARKS/BRAND AND INTELLECTUAL PROPEERTY**

137.   Beginning in the late 1960's and 1970's, when the original Hustler Clubs, Mini Clubs of America, Inc. and Hustler Magazine, Inc. were owned 100% "on paper" by Jimmy, and through recent years, Jimmy has transferred partnership assets to Larry or otherwise shared assets with Larry in direct reliance on their partnership relationship and mutual fiduciary duties to each other.  In recent years, by illustration, without consideration or legal obligation to do so, Jimmy has transferred millions of dollars of cash, property and other assets to Larry and/or to entities set up within their enterprise related to the Hustler retail stores and properties in Cincinnati, Monroe and other locations.  These transfers were not gifts and were not arms-length transactions. Jimmy made these transfers in reliance on his partnership relationship with Larry and in an effort to pool money for the benefit

and growth of their company. Now, Plaintiffs are attempting to use these transfers/investments to suggest that Jimmy/HCI lost its ownership rights to the Hustler name and established goodwill in connection with the downtown Hustler Cincinnati retail store.

**Jimmy/Hustler News & Gifts, Inc. pays for all legal fees and expenses associated with the prosection of him and Larry in 1998-99:**

138. Larry actively tried to "get arrested" in Cincinnati beginning in 1997. He communicated his alleged desire to have a "re-match" with the State of Ohio to his attorneys, to the Cincinnati and non-Cincinnati media and others. As part of this plan, Larry passed out hundreds of issues of Hustler magazine on Fountain Square in May of 1997.

139. Ultimately, after Hustler News & Gifts, Inc. was open for business, Larry and Jimmy were indicted.

140. A team of lawyers were retained at a significant expense. All of the legal fees and expenses, totaled over $400,000, were paid by Hustler News & Gifts, Inc. which Jimmy owned 100% on paper. Jimmy paid for Larry's defense and for his defense believing that he and Larry were partners. He was expressly and/or impliedly induced into this belief by Larry and representatives of LFP.

**Jimmy/Hustler Cincinnati, Inc. is induced/coerced to transfer legal title to the 411 Elm St. Building to Larry/Elm 411 and to then pay excessively high rent – believing all the while that the property/business was a partnership asset within his and Larry's overall incorporated partnership:**

141. Hustler Cincinnati has operated a retail store at 411 Elm Street in Cincinnati since March of 2000, originally pursuant to a $3,000/month lease.

142. Jimmy/Hustler Cincinnati, Inc. exercised a purchase option and acquired legal title to the 411 Elm Street property in March of 2001 for $250,000.

It was Jimmy's plan and intent at that time to maintain a long-term retail presence in downtown Cincinnati. He was induced to believe and otherwise did believe that this retail operation was part of his partnership with his brother.

143.   In May or June of 2003, Larry requested that Jimmy sell or transfer the 411 Elm St. property to him.  Jimmy was induced to believe by Larry and representatives of LFP that it was necessary to consolidate partnership / company assets in connection with further expansion and growth and in the overall best interests of the company.  A purchase agreement was drafted by Jimmy and Larry's mutual attorneys after a new Ohio limited liability company was set up to take possession of the property – Elm 411, LLC.  Larry Flynt claims that he owns and controls Elm 411.

144.   Jimmy and HCI were led to believe and were otherwise induced into believing that they would continue to conduct a Hustler retail store at 411 Elm Street, that the property and business would stay within the partnership, that Jimmy would retain ownership and control of the property and business (equitable and legal), and that a long term lease agreement would be put in place through which monies would be shared between HCI and Elm 411 and/or other related or affiliated entities.

145.   More than a year after Jimmy was induced to sign off on an Agreement of Purchase and Sale (on behalf of Hustler Cincinnati, Inc.) regarding the 411 Elm Street property, a closing was held on March 21, 2006.  On March 30, 2006, a general warranty deed (signed by Jimmy, as President of Hustler Cincinnati on March 15, 2006) was recorded transferring title/ownership of the property to Elm 411, LLC.  The "on paper" sales price was $280,000, which consisted of Elm 411,

LLC taking over the existing mortgage and also assuming previously-assigned "debt." No actual money was paid to Hustler Cincinnati, Inc.

146. Efforts were made to try to make this transaction appear as an "arm's length" transaction. It wasn't. There was no negotiation and no money changed hands. Jimmy/HCI were induced to believe that the transfer was being made in accordance with the overall business plans and activities of the Hustler enterprise in which Jimmy was an owner with Larry.

147. After this purported sale, and in accordance with the Agreement of Purchase and Sale, HCI began paying monthly rent to Elm 411 in the amount of $5,500 – nearly double the original lease amount. This arrangement was worked out as a means of sharing monies/assets between affiliated entities. The rental amount was not determined through any negotiations, but instead was calculated based on the cash flow of Hustler Cincinnati.

148. Jimmy was led to believe and was otherwise induced by Larry and by representatives of LFP that monies being paid by HCI "on paper" as rent were being shared/pooled within the enterprise/partnership and that Jimmy retained an ownership interest in such monies.

149. Had Jimmy known that Larry would later attempt to evict him from the Elm Street property, that Larry would attempt to prevent him from using the Hustler trade name/mark or that Larry would pursue a competing "Hustler" retail store in Cincinnati, Jimmy/HCI never would have agreed to transfer ownership of the 411 Elm Street property to Elm 411/Larry.

**Jimmy is induced to transfer the real property located at 1038 Lebanon Rd., Monroe, Ohio to Larry/Lakeville Properties**

150.   In December of 1999, Jimmy purchased and acquired legal title to the real property located at 1038 Lebanon Road in Monroe, Ohio.  This property was acquired with money paid by Hustler News & Gifts.  This property was purchased in order to build a Hustler Hollywood retail store.  Ground was broken in or around May of 2000 and construction was complete by December of 2000. Construction costs were paid with partnership funds.  A Hustler Hollywood store has been in operation ever since.

151.   In October of 2000, Jimmy was induced by Larry and by LFP to transfer title to this property to Lakeville Properties, Inc., which was incorporated in November of 1999.   Jimmy was induced and otherwise believed that transfer of such property was within his and Larry's partnership and was being done in furtherance of their partnership affairs.  Jimmy did not receive any consideration for transferring the deed to this property to Defendant Lakeville Properties.  As far as he was concerned, the asset was "staying in the company" and he was retaining his ownership interest therein.

**Between December of 2000 and December of 2004, Jimmy, as 100% shareholder of Hustler Hollywood of Ohio, Inc., is induced to share assets and/or gratuitously transfer significant sums of money/property to Larry, LFP, and Lakeville Properties**

152.   At the time the Monroe store opened for business in December of 2000, there were no "agreements" in place related to "licensing," "royalties" or management.  There was a purported written lease agreement put in place (dated October 12, 2000 with a commencement date of January 1, 2001) between Hustler Hollywood of Ohio, Inc. and Lakeville Properties.  This agreement was signed at the same time Jimmy transferred the deed to 1038 Lebanon Street, Monroe, OH to Lakeville Properties.  This initial lease agreement provided for a 10 year term with a

10 year renewal option.  The rental amounts adjusted between $14,700/month to $17,500/month over the initial 10 year term.  This agreement was signed by Jimmy on behalf of Hustler Hollywood of Ohio, Inc. and by Larry on behalf of Lakeville Properties, Inc.  Jimmy was led to believe that this agreement was being put in place solely as a means to share monies within the family of companies/enterprise and specifically within his partnership with Larry.

153.  The Monroe store did exceptionally well from a revenue and profitability standpoint from the time it opened its doors. It exceeded all expectations.  Based on the amount of cash that was coming in the door, approximately six or seven months after the Monroe store opened, Jimmy was requested to sign a new/second lease agreement which, like the first agreement, was dated October 12, 2000 and contained a commencement date of January 1, 2001.  This second lease agreement was prepared by Jimmy and Larry's mutual lawyers who were on retainer.  According to its terms, it was a 10 year agreement like the first agreement; however, the rental payments were significantly higher. The monthly rent was set at $27,000/month for the first three years, $30,000/month for years 4-7, and $33,000/month for years 7-10.  This was not an arm's length transaction.  Jimmy signed off on the second lease under the guidance of his and Larry's newly retained mutual legal advisors as well as their mutual financial advisors believing that it was being put in place in their mutual best interests and as a means to lawfully transfer monies from companies that Jimmy was the "on paper" 100% owner of to other divisions of the company to allow further growth and expansion.

154.   Around the time the "second" lease was put in place with respect to the Monroe store, approximately 6-7 months after the Monroe store opened, Jimmy was requested to sign off (on behalf of Hustler Hollywood Ohio, Inc., as licensee) on a "licensing agreement" (effective date: January 1, 2001) with LFP, Inc., as licensor.   This agreement purported to license the Hustler trademarks to the Monroe store for a staggering $65,000/month.  Jimmy was told that the purpose of this agreement was to lawfully  transfer the excessive cash being generated by the Monroe store back to LFP, Inc. to be used for further company growth and expansion, to include the growing "retail division."   Then President of LFP, Jim Kohls, signed off on the licensing agreement.  Jimmy and Hustler Hollywood Ohio, Inc. had the right and authority to use the Hustler name in connection with the Monroe store.   Larry, LFP, Inc. and all affiliated partnership entities were knowledgeable and involved with the construction and opening of the Monroe store to include the signage, advertising, marketing and promotion.  The Hustler name was used for several months without any "agreement" in place.

155.   After the second lease and licensing agreements were "put in place," a large sum of cash was transferred from Hustler Hollywood Ohio, Inc. to LFP to be used for company business and endeavors.

156.   The "lease" and "licensing" agreements  that Jimmy agreed to sign off on approximately 7 months after the Monroe, Ohio Hustler Hollywood store was in business were illusory/invalid.   It was a sham.   They were not arms-length transactions.   There was no negotiation regarding the payment amounts or the details of the purported agreements.   There was no offer, no acceptance, no meeting of the minds, and no bargained for consideration received by Hustler

Hollywood of Ohio, Inc. The amounts were simply worked out between Larry and Jimmy's mutual accountants and financial representatives in an effort to drain the available cash from the Monroe store in order to use such funds to further expand, diversify and grow their mutual business interests, to include expansion of the Hustler retail chain.

157.  For more than four years, Jimmy agreed to transfer close to $100,000 a month out of Hustler Hollywood of Ohio, Inc., rather than to keep the monies for himself, because he believed and was otherwise induced into believing that the sharing of these monies was within his overall partnership and business agreement with Larry, and that he was retaining an ownership interest in such funds/property to include any and all asserts/property generated from such funds and that such funds/investments were "going back into his company."

**After being induced to gratuitously transfer millions of dollars of assets to Larry, Jimmy is further induced to gratuitously transfer 100% of his "on paper" ownership of Hustler Hollywood of Ohio, Inc., an extremely profitable and valuable business, for no consideration**

158.  After being induced to gratuitously transfer the Hustler Hollywood Monroe real property (1038 Lebanon Street, Monroe, OH) in October of 2000 to Lakeville Properties and after being induced to gratuitously transfer over $1,200,000 a year to Larry/LFP/Lakeville Properties, Jimmy was further induced to sell/transfer his 100% ownership of the operating entity of the Hustler Hollywood store in Monroe. This store continued to generate significant sums of money/revenues and was highly profitable.

159.  Toward the end of 2004, Jimmy agreed to sign off on a sham sale of his 100% ownership of the Hustler Hollywood store in Monroe to Hustler Entertainment, Inc. (an entity that Larry claims he owns and controls) for an "on

paper" transaction price of $150,000.  As of this time, Jimmy was President of both entities.  This stock transfer request was made at roughly the same exact time that Jimmy was asked to sell/transfer his ownership of the 411 Elm Street property in Cincinnati to Elm 411, LLC.  Like the 411 Elm St. property, Jimmy was induced to sell/transfer his stock in Hustler Hollywood of Ohio, Inc. to Hustler Entertainment, Inc. (n/k/a HH Entertainment, Inc.) through representations by Larry, by representatives of Larry, LFP and Hustler Entertainment that the transfer of such stock was necessary in order to consolidate assets for purposes of obtaining financing that was sought for additional business growth and expansion.  Jimmy was led to believe that he would retain his ownership interests (equitable and legal) in Hustler Hollywood of Ohio, Inc. after transferring "on paper" his 100% ownership of the outstanding and issued shares because he was led to believe that such transfer was simply a means to consolidate partnership assets in Larry's name in order to assist with various financing applications that were being prepared within their partnership and/or that such transfers were otherwise in the bests interests of the Hustler enterprise.

160.  Jimmy agreed to sign off on a document that purportedly memorialized the transfer of his stock interests on or about December 15, 2004. It was signed by Jim Chamberlain, as CFO of HH-Entertainment, Inc.  Chamberlain was the CFO of LFP and the entire family of affiliated/related companies within Larry and Jimmy's partnership at the time and was primarily in charge of orchestrating the flow of money within the company and specifically between divisions/operating entities.  He was also responsible for putting together the financing application(s) related to business growth and expansion.

161.   No stock certificates were issued or transferred after Jimmy signed off on the stock sale agreement.

162.   There was no negotiation related to the transfer of Hustler Monroe stock. There was no negotiation related to the sales price. Jimmy was not looking to sell the shares.  Jimmy had no independent interest or motivation to sell the shares of a company that was generating significant money.

163.   As of December of 2004, the Hustler Hollywood of Ohio, Inc. shares had a market value well above the $150,000 transaction price.  At the time, the Hustler Hollywood store was generating approximately $5,000,000 in sales revenues.  It remained the most profitable of the Hustler retail stores.

164.   Notwithstanding the fact that $150,000 was not even close to the true value of the Hustler Hollywood of Ohio, Inc. stock, Jimmy was never actually paid that amount.  Although a check was written for that amount to Jimmy from Hustler Entertainment, as part of his ongoing agreement with his brother, Jimmy agreed to pass that money back to LFP through purported "back-dated licensing fees" from Hustler Cincinnati, Inc. to LFP. That is the only reason HCI began making purported "licensing" payments to LFP.  At no time did HCI begin making payments to LFP for purposes of use/continued use of the Hustler name/marks which it owned and had priority of usage rights.

165.   After Jimmy signed off the illusory, invalid, unenforceable stock sale agreement, Jimmy signed off, as President, on a document changing the name of Hustler Hollywood Ohio, Inc. to HH-Monroe, Inc.

**Beginning in early 2005, Jimmy, through HCI, is induced to make monetary transfers to LFP believing such transfers were being made to consolidate partnership assets for further expansion and growth**

166.   Immediately upon receipt of the $150,000 check issued to Jimmy from Hustler Entertainment (for the alleged sale of Monroe, Ohio Hustler Hollywood stock) in January of 2005, Jimmy deposited those funds into the Hustler Cincinnati, Inc. bank account.   Allie Jackson, HCI's accountant, at the direction of LFP's accounting team, then "back dated" accrued licensing fees of $8,400 as far back as necessary (i.e., 18 months) in order to send $150,000 back to LFP. Essentially, a sham back-dated licensing arrangement was developed so that the illusory sales proceeds could be sent back to California.  There was never any intention for Jimmy Flynt to actually receive any consideration for the Hustler Hollywood Ohio Inc. stock.   Allie Jackson had not accrued any licensing expenses on the books of Hustler Cincinnati, Inc. before this arrangement was made.

167.   Similar to the other gratuitous transfer made by Jimmy, beginning in February of 2005, HCI began sending $8,400 a month to LFP for purposed "licensing fees."  These transfers were nothing more than a means to pool money back to California so that monies could be distributed from there to various divisions and projects within the Hustler enterprise.

168.   At no time was a written or oral "licensing" agreement (or any other similar agreement) put in place between Larry and Jimmy or between Hustler Cincinnati and LFP, Inc., LFP IP, LLC or any LFP related entity related to use of any "Hustler" trademarks or intellectual property by the Hustler Cincinnati store. Plaintiffs have admitted there was no contract.

169.   Hustler Cincinnati, Inc., through consent from Hustler News & Gifts, Inc. and Jimmy Flynt, has always had the legal right and authority to use the Hustler marks in connection with its retail store, operations, marketing and branding.  Hustler Cincinnati, Inc. did not give up its ownership and usage rights to the Hustler name and marks by virtue of Jimmy Flynt agreeing to "invest" monies generated by HCI back to LFP which were docketed on the books as "licensing payments."  Such payments were not based on any legal requirement or contract, but instead were a means to share monies among affiliated and related entities within Larry and Jimmy's incorporated partnership.  Such transfers were made in reliance on such relationship and representations made by Larry and LFP to induce such action. Such transfers were stopped when Jimmy learned of Larry's attempts to squeeze him out of their business and to otherwise cause economic damage to him.

## LARRY'S SQUEEZE OUT OF JIMMY AND EVENTS GIVING RISE TO THIS ACTION

170.   Jimmy has two sons – Jimmy Flynt II and Dustin Flynt.

171.   Jimmy II worked for the Hustler enterprise between approximately 1992 and November of 2007.  Dustin worked for Jimmy and Larry and the Hustler enterprise and "family of companies" from approximately 1997 until November of 2007. Dustin worked for the Cincinnati and Monroe, Ohio Hustler retail stores from 1997 until approximately 2005 when Larry asked Jimmy if Dustin could move to Southern California to be his personal assistant and to begin on an executive track in the company.  By that time, Jimmy II was already working his way up the executive ranks.  Thereafter, Dustin moved to California and moved in with Larry at his personal residence.

172.   In late 2007/early 2008, while Jimmy was traveling overseas, Larry suddenly and without explanation terminated Jimmy II and Dustin.   Severance packages were provided.   These terminations were done without notice to Jimmy. When he later informed what had happened, not only did a rift occur in his relationship with his sons but tension also started to develop between he and Larry.

173.   At some point in 2008, Jimmy II and Dustin partnered up to start a company. Their plan was to enter the adult entertainment industry using their surname, Flynt, to sell and market adult videos.

174.   Jimmy II and Dustin made arrangements to publicly announce and launch their company at the 2009 AVN (Adult Video News) Convention in Las Vegas in early January, 2009.   Jimmy Flynt was not involved in any way with his boys' start-up company.

175.   At some point, Larry learned of his nephews' plans to enter the adult entertainment industry, initially in the DVD segment, using the Flynt surname.  On or about January 9, 2009, Larry filed a federal trademark infringement lawsuit and sought injunctive relief against his nephews and their company in federal court in Los Angeles.

176.   In or around the time this trademark action was filed, Larry contacted Jimmy demanding that Jimmy "get control of his boys" and exert pressure on his boys to comply with his settlement demands, which included monetary compensation ($100,000) and an agreement not to use the Flynt name, alone, to market products.   Larry made threats to Jimmy that if he could not make the lawsuit go away (i.e., if he could not persuade his sons to give in to Larry's demands) then he would "cut him off" financially.   Larry told Jimmy that he would

take his (Jimmy's) compensation and share of the partnership profits and use such monies to fund the lawsuit that he instituted against Jimmy's sons. Larry was blunt and unequivocal in threatening economic adversity and harm to Jimmy unless Jimmy was willing and able to exert sufficient and effective fatherly influence to affect the outcome of Larry's federal lawsuit in Larry's favor.

177. As of January of 2009, Jimmy drew his share of the profits of his partnership with Larry (i.e., the Hustler enterprise) through non-party, Flynt Management, LLC, a company that was set up in 2003 within Larry and Jimmy's partnership as the entity through which executives (and Larry and Jimmy) would be paid. In addition to his profit distributions, Jimmy received health and other fringe benefits, including a 401K retirement plan, a car and an expense account, all through Flynt Management, LLC.

178. Jimmy reached out to his sons in an effort to persuade them to give up on using Flynt name, standing alone, in connection with their newly formed business and to otherwise heed to Larry's demands, which included a monetary payment. Jimmy's sons believed strongly in their legal position and in their newly formed company and were unwilling to simply give up.

179. Beginning in February, 2009, Larry embarked on a course of action intending to "squeeze" Jimmy out of the Hustler business/enterprise, to oppress his ownership interests, to interfere with the operations and interests of Hustler Cincinnati, Inc., and to otherwise cause economic harm/loss to Jimmy and to Hustler Cincinnati, Inc.

180. First, Larry gave the directive to stop Jimmy's pay (direct deposited every two weeks into Jimmy's personal checking account). Larry claimed that he

was taking Jimmy's compensation to fund his lawsuit against Jimmy's sons.    No explanation was given to Jimmy outside of Larry's threats.  At one point in late February, 2009, Flynt Management direct deposited funds into Jimmy's checking account and then a few hours later, took them back out.  Jimmy sought an explanation but none was provided.

181.   After Jimmy's pay had been stopped, in early April of 2009, Larry sent Jimmy two legal bills incurred in connection with his lawsuit against Jimmy's sons and asked that Jimmy pay those bills directly.

182.   On or about April 29, 2009, Tom Candy, a long time employee of the Flynt companies (and former CFO), contacted HCI's accountant, Allie Jackson III. Tom asked/instructed Allie to "loan" $400,000 from Hustler Cincinnati, Inc. to LFP Internet Group, LLC (one of the entities within the Hustler enterprise) in connection with a mysterious "major project" that the "internet group" was working on.  Tom held himself out as "Executive Vice President" for LFP Internet Group, LLC, a title he did not actually hold.[16]  Tom told Allie that he was aware that Hustler Cincinnati had "excess cash" based on weekly financial reports that, at the time, were provided by Mr. Jackson, on behalf of Hustler Cincinnati, to LFP's accounting group in California. Tom requested Allie send a wire transfer of $400,000 and suggested that time was of the essence – asking for the funds to be wired "tomorrow."  Tom followed up his phone communication with an e-mail communication and a proposed "promissory note." Mr. Candy wrote that he was contacting the "different division (sic) that have excess cash and requesting that they transfer funds to us for the project."  Tom provided instructions for transferring the money to a bank in Beverly Hills, CA.  Allie

---

[16] From late 2003 until the present, Tom Candy has worked exclusively at the Hustler Casino located in Gardena, CA.  He has had no involvement with respect to the internet group.

immediately notified Jimmy of this request. Jimmy told Allie not to make the transfer.  Allie called Tom to inform him that Jimmy had instructed him not to make the funds transfer.  Tom responded:  "this is going to be a problem" (i.e., Larry is going to get angry and retaliate).

183.  Larry has admitted that he gave the directive in or around April of 2009 to use a fraudulent promissory note / loan request in an effort to obtain "excess cash" from the bank account(s)/possession of Hustler Cincinnati, Inc.  Larry believed that he was entitled to those proceeds even though Jimmy was the sole shareholder of Hustler Cincinnati, Inc.  There was no "major internet project," no other divisions were requested to loan "excess cash" and Larry/LFP Internet Group, LLC had no intention of paying the requested $400,000 loan back.

184.  Less than a week after the $400,000 loan request was denied, by letter dated May 5, 2009, and sent via overnight mail to Hustler Cincinnati, Inc. at 411 Elm Street, a letter was sent to the Hustler Cincinnati store indicating that it was in breach of its written lease agreement with Elm 411, LLC, demanded $31,419 in alleged "back rent" and demanded that Hustler Cincinnati vacate the premises. Litigation concerning this dispute remains ongoing in the Hamilton County Court of Common Pleas.


185.  A letter dated June 15, 2009 was sent by an agent of Flynt Management Group, to Jimmy at his Las Vegas residence advising him that his purported position as an "unpaid consultant" was being terminated by FMG. Jimmy had never heard of this title.

186.   On June 25, 2009, Jimmy received a second letter at his Las Vegas residence from Flynt Management advising that due to "recent events that have clearly placed you in a conflict of interest of Mr. Larry C. Flynt" he was being terminated, effective immediately, and that all of his benefits were being stopped. He was instructed to turn in his company car under threats that if he failed to do so, "FMG shall deem the vehicle stolen, and take whatever legal actions are available to it to secure the return of the vehicle."  Jimmy returned his company car to a dealership.  Flynt Management did not follow the normal course of events or company policy in their purported "termination" of Jimmy. No compensation or severance was offered.   Larry did not offer to buy out Jimmy's share of their partnership.    There was no legitimate business reason to terminate Jimmy's pay and benefits.

187.   On or around September 3, 2009, Michael Klein, President of LFP, Inc., wrote a letter to Hustler Cincinnati, Inc. alleging that HCI was in default of alleged "licensing obligations" to LFP.  No mention was made to LFP IP, LLC.  Mr. Klein wrote another letter dated September 14, 2009 seeking to terminate an alleged "licensing" contract between LFP and HCI.  Again, no mention was made to LFP IP, LLC.

188.   In furtherance of Larry's efforts to squeeze Jimmy out of their partnership and to otherwise cause economic harm to him and to HCI, Larry, with the assistance of various representatives of LFP, is currently pursuing a new Hustler retail store to open at 16-18 East Seventh Street in downtown Cincinnati.  Pursuit of a second downtown Hustler store, blocks away from HCI, is presumably being done in order to "compete" with HCI and/or interfere with HCI and/or "trade off" of

HCI's goodwill and name.  Larry is attempting to use partnership funds to pursue a second downtown Cincinnati Hustler retail store only to inflict economic harm to Jimmy and HCI and as part of his continuing course of conduct that amounts to bad faith, willfulness, and maliciousness.

189.   This action, like the Elm 411 eviction action, was initially commenced in a malicious effort to prevent Jimmy/HCI from using the Hustler name in connection with its retail store which has been in operation since 1997 and to otherwise "pave the way" for Larry to open a new Hustler retail store in downtown Cincinnati, to create confusion with HCI's operation, to trade off HCI's name, advertising and goodwill and to otherwise steal their customers and interfere with their business.

## CAUSES OF ACTION

### Count I – Action for Accounting and Dissolution of Partnership with Appointment of Receiver and Equitable Distribution of Partnership Property

190.   Defendants restate and incorporate by reference herein all preceding paragraphs of this Counterclaim as if fully rewritten herein.

191.   A partnership is an entity of two or more persons to carry on as co-owners a business for profit.  A partnership may be express (written or oral) or implied.  An implied partnership must be found to exist from the totality of the attendant facts and circumstances.  There is no bright line test to determine the existence of a partnership.  Partnerships are unique entities in that the involved parties are relatively free to define for themselves the formation and parameters of their relationship, and it is not necessary that an agreement of partnership be in any particular form.

192.   There are numerous nonexclusive factors that can be considered, including but not limited to: the sharing of profits and losses from a business, the existence of an oral or written agreement, co-ownership of assets, mutuality of agency and control, the nature of tax returns filed, whether the parties work in a business, share receipts, consult with eachother, sign contracts and whether it appears to others that business is run as a partnership.   Since every business relationship is unique, no single fact or circumstance can operate as a conclusive test for the existence of a partnership.  One of the critical aspects of a partnership includes whether each individual <u>contributed</u> to the enterprise.

193.   Partnership property includes all property brought into the partnership stock as well as all property acquired by partnership property.  Each partner is an agent for the partnership and title to partnership property may be held in the name of only one partner, rather than in partnership name or in the name of all partners. The property rights of a partner are his rights in specific partnership property, his interest in the partnership, and his right to participate in the management.

194.   It is well established that partners owe a fiduciary duty to one another and that a partner has a legally recognized claim for breach of fiduciary duty against a co-partner. A fiduciary relationship is "one in which special confidence and trust [are] reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."

195.   The usual and normal remedy for a breach of fiduciary duty or other legal conflict among partners is an accounting.  An accounting is an appropriate remedy for a range of wrongs including breach of fiduciary duty, conversion, and

conspiracy. An accounting is generally a prerequisite to an action at law that arises from the affairs of a partnership.

196.  Most states, including Ohio and California, have recognized the common law concept of a "close corporation" which bears a close, almost unmistakable presence to a partnership.  A close corporation blends features of the corporate and partnership form and is generally regarded as a hybridization of the two. Owners/shareholders in a close corporation and/or partners in a partnership are usually employees of the corporation/partnership.

197.  A close corporation is generally characterized by at least two indicia: first, a relatively small number of shareholders as compared to a publicly held corporation, and, second, one whose shares are not traded on a national securities exchange or regularly quoted on an over-the-counter market, and are only rarely bought and sold.  In addition to these universals, it is frequently characterized by an identity of management and ownership, and, by its unmistakable resemblance to the partnership form. It has, indeed, been referred to at times as a "chartered partnership," "incorporated partnership," and as "a corporation de jure and a partnership de facto," and other terms descriptive of the participants' usual and customary intention to consider themselves as partners *inter sese* while obtaining the advantages of the corporate form.  A partnership can be comprised of multiple, related and affiliated business entities/close corporations which operate as one entity/enterprise/company/business.

198.  Given the nature of the close corporation, which shares many of the advantages of publicly held corporations yet more closely resembles a partnership or individual proprietorship in actual operation, courts have been called upon to

step outside the traditional rules of law that have long governed corporate operation and to borrow from allied disciplines those principles and rules which seem best to comport with the mixed nature of the close corporation form.

199.   The "close corporation" form is peculiarly susceptible to a particular form of misuse or abuse by the majority or controlling shareholders. Commonly known as a "squeeze-out" or "freeze-out," it refers to manipulative use of power or control to eliminate or manipulate the interests of owners with less power, control or legal ownership interests.  It also refers to actions which seek to reduce their share of voting power or percentage of ownership of assets, or otherwise unfairly deprive them of advantages or opportunities to which they are entitled. Instances and methods of squeeze-outs, as reported in the decisions dealing with the problem, are many and varied, and appear limited only by human ingenuity motivated by greed or hope of advantage.

200.   Stock certificates are not required to prove ownership in a corporation, partnership, close corporation or business entity.  Ownership can either be legal or equitable.  Partners can agree (expressly or impliedly) to share in the ownership of corporate stock if such stock is formerly issued.   Ownership of a predecessor company or business entity can and does give rise to an ownership interest in newly-created successor companies even if such ownership is not formally documented on the corporate books

201.   For the reasons stated herein, Jimmy and Larry have been business partners since 1969 when they agreed to carry on a business for profit.  Their partnership has operated over the years through various business entities as an "incorporated partnership" and/or single entity/enterprise.  There partnership has

been continuous; there has never been an accounting or distribution of partnership assets/property.

202.   Larry owes a fiduciary duty to Jimmy as his partner.

203.   As set forth herein, neither Jimmy nor Larry could have built the Hustler empire on their own.  From the beginning, they did it together.  They each contributed.

204.   Before Jimmy's return from Vietnam in 1969, Larry could not make it in business on his own.  He was flat broke and had already filed for personal bankruptcy.

205.   Without Jimmy, there would have been no Hustler Clubs in the early 1970's.  Jimmy owned the Ohio corporations through which the clubs were operated and which held the necessary liquor licenses.

206.   Without Jimmy, neither the Hustler newsletter nor Hustler magazine would have existed.

207.   Without Jimmy, there would have been no Jackie O. photos and without Jimmy, Hustler magazine would not have been successful.

208.   Without Jimmy, there would be no Hustler retail nor would Larry and Jimmy have enjoyed a resurgence of their brand/business beginning in or around 1997.

209.   Hustler's retail division has been highly successful and profitable.  Hustler would not have a retail division but for Jimmy's vision, initiative, efforts and labor.  The retail division has allowed the company to sustain its publication business and to grow and expand into the various lines of business that it is currently in today.

210.   Since their partnership started in 1969, and excluding outside companies with whom licensing or related agreements have been put in place, no individual other than Jimmy or Larry have ever owned any stock or otherwise maintained an ownership interest in any entity which was created with Larry and Jimmy's partnership.

211.   Jimmy has dedicated his life and career to the development, success, growth and longevity of the Hustler brand.  He has made significant contributions (economic and non-economic).  Jimmy has shared in the profits and losses.  Since he was 21 years old, Jimmy has stood side-by-side with his brother through significant adversities and hardships.  He has always protected and supported his brother and partner.  Jimmy has always been a loyal brother. Jimmy has been involved in virtually all aspects of the Hustler enterprise/close corporation (i.e., "the company").  He has held various titles and responsibilities and "on paper" he has held various company assets.   Throughout the years, Jimmy did what was needed to expand the goals of the partnership, often behind the scenes and under the radar.  Although Larry has generally been promoted as the face/mascot of the Hustler enterprise, such role has not conferred him with a greater percentage of ownership.

212.   At times, *legal* title of the various affiliated and related entities through which Larry and Jimmy have conducted business have been held solely in Jimmy's name for the benefit of their partnership.  At other times, entities have been held solely in Larry's name. Regardless, partnership property remains partnership property.

70

213.  Jimmy has conferred significant benefits and assets "on paper" to Larry without consideration based on his partnership and fiduciary duty and his reliance on Larry's fiduciary duty to him.

214.  Larry and Jimmy have always done business in Ohio where it all started.  They have long considered Cincinnati, specifically what used to be 608 Walnut Street, as the birthplace of Hustler and of their business.

215.  As set forth herein, Larry and Jimmy have operated their partnership and enterprise down through the years as one privately held company - an "incorporated partnership" – organized, structured and operated through a family of affiliated closely held corporations and business entities.  They have used the corporate form in order to obtain the various tax, financial, and liability benefits as well as for criminal protection.  All of the initial "corporate entities" were initially formed and incorporated in Ohio.  All of the present-day entities, are born from the initial Ohio entities, are successors in interest to the initial Ohio entities and are mere continuations of those Ohio entities.

216.  Larry and Jimmy's affiliated and related entities have always been managed/controlled/owned together and have always shared / commingled employees, assets, resources, and agents.    Until Larry's recent efforts to squeeze Jimmy out of their business, all of the entities have been exclusively controlled by Larry and Jimmy.  All of these entities constitute partnership property; they only exist due to the early Ohio corporations, due to business dealings in Ohio, monies generated in Ohio, and Larry and Jimmy's partnership which began in Ohio.

217.  Jimmy seeks to dissolve his partnership with Larry in the county where it was formed.  Jimmy seeks a dissolution of his oral and/or implied partnership

agreement(s) with Larry, beginning in 1969 and running through the present time, a formal accounting, a winding up of its affairs and a distribution of partnership assets in accordance with law and equity. Jimmy also seeks the appointment of a receiver and for an pre-judgment Order precluding Larry from disposing, transferring, selling, offering to sell or encumbering any partnership property or otherwise from conducting any business outside the normal course of business.

218. Jimmy seeks at least a 50-50 distribution of partnership assets or a different percentage based on law or equity.

219. Jimmy seeks the imposition of a constructive trust related to partnership property held by or controlled by Larry, by the Larry Flynt Revocable Trust or by any entity owned/controlled by either which may be in possession of partnership assets.

**Count 2 – Breach of Fiduciary Duty**

220. Defendants restate and incorporate by reference all preceding paragraphs as if fully restated herein.

221. A fiduciary relationship is "one in which special confidence and trust [are] reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." It is well established that partners owe a fiduciary duty to one another and that a partner has a legally recognized claim for breach of fiduciary duty against a co-partner. It is also well recognized that shareholders in a close corporation owe eachother a fiduciary duty. Majority shareholders owe minority shareholders a heightened duty.

222. As set forth herein, Larry, by and through various entities that have been set up within their enterprise, has breached fiduciary duties to Jimmy by

squeezing Jimmy out of the partnership/enterprise beginning in or around February of 2009.

223.   In retaliation for litigation that Larry instituted against Jimmy's sons and which Jimmy was unable to affect, Jimmy's pay/compensation/share of the profits were stopped suddenly without explanation and without cause.   Jimmy's benefits were subsequently stopped.   Jimmy was told to return his company car or it would be reported as stolen.   Jimmy was given no severance nor was he given the legal or equitable value of his ownership interests or the value of the assets he has transferred over the years to Larry without consideration.   Jimmy has been excluded from access to company employees, property, documents and matters. His communications have been blocked.

224.   After Jimmy refused to send $400,000 in cash out of HCI's bank account to the LFP Internet Group, LLC in April of 2009, a threat of eviction was levied against HCI/Jimmy by Larry.   Litigation subsequently ensued and continues. This action was initiated to prevent HCI/Jimmy from using the Hustler trade name/marks in connection with the Hustler Cincinnati store.

225.   In addition to his pay/compensation and benefits being stopped, Larry has also allegedly taken action to cut Jimmy out of the Larry Flynt Revocable Trust as a beneficiary after years of promises made regarding his financial interest therein.

226.   Larry is pursuing a "competing" Hustler retail store blocks away from the Hustler Cincinnati store at 411 Elm Street.

227.   Larry has retained significant assets/property that Jimmy conferred to him in reliance on their partnership relationship.

228.   Larry has abused his control and power to the detriment of Jimmy.

229.   As a result of Larry's breach of fiduciary duties, Jimmy Flynt has suffered and will continue to suffer damages in the future in excess of $75,000.

## Count 3 – Fraud (Actual and/or constructive and/or in the inducement), Unjust Enrichment, Imposition of Constructive Trust

230.   Plaintiffs restate and incorporate by reference all preceding paragraphs.  Plaintiffs specifically restate and incorporate by reference paragraphs 137 to 169.

231.   Actual fraud requires (a) a representation or, where there is a duty to disclose, a concealment of fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) an injury proximately caused by the reliance.

232. Constructive fraud is any inequitable conduct which is not accompanied by affirmative false representations.  Constructive or legal fraud may arise from the circumstances of a transaction or the relationship of the parties without the existence of fraudulent intent affecting the conscience. Constructive fraud is synonymous with legal fraud and is such as is implied by law from the nature of the transaction itself.  The remedy of constructive fraud is designed, in part, as protection against the effects of overweening confidence, self-delusion, or the infirmities of hasty and precipitate judgment.  Constructive fraud leads to consequences equivalent to those following actual fraud.  Constructive fraud may be found from the relation of the parties to a transaction, or from circumstances

and surroundings under which it takes place.  Constructive fraud does not require fraudulent intent, and, therefore, constructive frauds are assumed to have been committed by acts without regard to motive; however, a constructive fraud claim does require the existence of some peculiar confidential relationship between the parties which affords the power and means of one to take undue advantage of or exercise undue influence over another.

233.   A claim of fraud in inducement arises when party is induced to enter into an agreement through fraud or misrepresentation; the fraud relates not to nature or purport of contract, but to facts inducing its execution.   Fraudulent inducement occurs because of misrepresentation of facts outside a contract or other wrongful conduct which induces a party to enter into a transaction.

234.   "Unjust enrichment" occurs when a person has and retains money or benefits that in justice and in equity belong to another."

235.   A "constructive trust" is a trust by operation of law which arises against one who, by fraud, actual or constructive, by duress or abuse of confidence or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. The constructive trust is an equitable remedy that protects not only against fraud, but also unjust enrichment, where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud. Ordinarily, constructive trust arises without regard to intention of person who transferred property.   Where a confidential or fiduciary relationship exists between donor and donee, a transfer is generally looked upon with some suspicion that undue influence may have been brought to bear on the

donor by the donee. Thus, where there has been a gift to a fiduciary, a presumption [of undue influence] arises, and the party with the superior position must go forward with proof on the issue of undue influence and fairness of the transaction while the party attacking a completed gift on that basis retains the ultimate burden of proving undue influence by clear and convincing evidence.

236. As described herein, to the extent there is not a partnership relationship between Larry Flynt and Jimmy Flynt, Larry Flynt and LFP have been unjustly enriched due to benefits conferred by Jimmy and HCI with Larry and LFP's knowledge and with their retention of those benefits, under circumstances where it would be unjust to do so without fair and equitable payment/compensation. Significant assets have been transferred "on paper" by Jimmy to various entities that Larry claims to solely own and control. These transfers (of property, money, and goodwill) were made based on Jimmy's belief and understanding that they were being made in connection with his partnership with Larry and based on Larry's promises to him, expressly and impliedly. Jimmy Flynt was induced to make these transfers in reliance on such relationship and in reliance on his ownership interest and place in the Hustler enterprise which he helped to build. To the extent there was no partnership, the asset transfers and conferred value by Jimmy were fraudulently induced and it would be inequitable to allow the transferred property and assets to be retained without fair consideration. If there was not a partnership, actual or implied, between Jimmy and Larry Flynt at the time of these transfers, a constructive trust should be created for the protection of those monies/assets for Jimmy who, by equity and good conscience, deserves recovery of same.

237.  It would be unjust and inequitable to permit Larry to retain the benefits conferred by Jimmy over the years without fair and just compensation. Larry is in possession and control of significant assets which he simply would not have but for Jimmy's contributions, services, investments and asset transfers. As set forth herein, Jimmy has directly and/or indirectly transferred assets to Larry consisting of real property, money, intellectual property, ideas, concepts, and other things of value.

238.  Defendants have specifically alleged detailed acts of fraud whereby Jimmy may have been coerced and/or induced (through false promises or active silence) to transfer significant monies and assets to Larry believing that he was doing so to further their business affairs and as part of their partnership.  If Larry takes the position that he and Jimmy did not/do not have a partnership agreement then the transfers made by Jimmy were made in response/reliance to fraudulent misrepresentations, actual or constructive.

239.  As set forth herein, Larry fraudulently induced Jimmy to transfer to him "on paper" ownership of the real property located at 411 Elm Street in Cincinnati, ownership of the real property located at 1038 Lebanon Street in Monroe, Ohio as well as 100% of the issued stock in HH-Monroe, Inc. (formerly Hustler Hollywood of Ohio, Inc.).   Jimmy also made significant cash transfers (totally approximately $5,000,000) while he was 100% shareholder of HH Monroe, Inc. through illusory, non-arms length "lease" and "licensing" agreements. Jimmy, through Defendant HCI, has also made significant cash transfers from 2005 to the present in the form of purported "lease" and "licensing" fees. Such fees were gratuitously paid in an effort to "share" monies with Larry under the belief that

same was being done to grow and expand their business.  Jimmy made those transfers in reliance on representations from Larry as well as representations and advice of from mutual agents of Jimmy and Larry.  Jimmy made these transfers believing that they were made in furtherance of his and Jimmy's partnership and business affairs. These transfers were not gifts.  These transactions were not arms-length transactions.  Jimmy was not compensated for these transfers.

240.   At no time has HCI paid any monies to LFP IP, LLC even though LFP IP, LLC claims that it has previously acquired certain Hustler marks by assignment from LFP.  Defendant HCI used the Hustler and Hustler Cincinnati marks without payment of any fees (to LFP or to any other individual or entity) since March of 2000 when it opened at 411 Elm Street.  Before that, Defendant's predecessor-in-interest, Hustler News & Gifts, Inc. used the Hustler marks in connection with a retail store in downtown Cincinnati from October of 1997 through December of 1999. Jimmy Flynt, through Hustler News & Gifts, and then through Hustler Cincinnati, Inc., was the first to use the Hustler marks in commerce in connection with adult-themed retail services (as well as Hustler apparel), in Ohio or anywhere in the U.S.  Jimmy was also the first to use in commerce the Hustler marks in connection with adult-themed retail services in Ohio under the "Hustler Hollywood" mark beginning in December of 2000 in Monroe, Ohio. All of these uses were with full knowledge and acquiescence of Larry Flynt and LFP.

241.   Defendants only agreed to begin making monthly payments of $8,400 a month to LFP beginning in or around February of 2005 as part of Jimmy and Larry's partnership agreement, plans and goals.  Such monies were paid because Jimmy was induced to believe, and did believe, by Larry and by representatives of

LFP, that such transfers were being made as part of his partnership agreement with Larry and in an effort to share/pool partnership funds for further growth and expansion of the Hustler enterprise. These $8,400 per month payments were capital contributions by Jimmy through HCI into his incorporated partnership with Larry.   These contributions were induced through fraud, undue influence, and breach of confidence and fiduciary duty.   Had Defendants known that Plaintiffs would some day institute a trademark action against them arguing that it had superior rights to the Hustler marks in connection with retail services (in Cincinnati or elsewhere), HCI never would have began making such payments in the first place.   Plaintiffs induced Defendants to begin making these payments by virtue of the confidential and fiduciary relationship between these entities within Larry and Jimmy's partnership.

242.   HCI did not receive any consideration in exchange for payments that have been made for purported licensing fees for which there was no contract and which were not otherwise legally required. Such transfers were not gifts.   It would be inequitable to allow Plaintiffs to retain those payments based on Plaintiffs' initiation of this action and other related conduct that is being taken adverse to Defendants' interests as more fully described herein.

243.   To the extent there is no partnership between Larry and Jimmy, Defendants submit that Jimmy was fraudulently induced to make these various "on paper" transfers to Larry based on false promises, in part related to Jimmy's interest in the Larry Flynt Revocable Trust which Larry would customarily dangle over Jimmy's head like a carrot.   Larry has testified that he recently "cut Jimmy out" of his trust, a trust that has been funded with partnership funds and fund

which rightfully belong to Jimmy. Defendants submit that, in hindsight, it appears that Jimmy was fraudulently induced to make these various asset transfers to Larry so that Larry would obtain "more" control within their Enterprise so as to put him in a "majority shareholder" position able to manipulate and oppress Jimmy's ownership interests.

244. For the reasons stated herein, HCI was fraudulently induced by LFP to begin making monthly "licensing" payments in or around February of 2005. Defendant seeks a determination that there was no such licensing contract or obligation. Defendant seeks recoupment of all purported "licensing" fees paid to LFP as well as recovery of monies currently being put into escrow. Defendant further seeks a determination that Defendant bears no future obligation to make any monetary transfers to LFP or to LFP IP, LLC or to any related or affiliated party.

245. Plaintiffs are entitled to compensation for the benefits unjustly conferred in excess of $75,000.

## Count 4 – Wrongful Termination

246. Defendants restate and incorporate by reference all preceding paragraphs as if fully re-stated. Specifically, Plaintiffs restate and incorporate by reference paragraphs 170-189.

247. Larry Flynt has recently claimed that Jimmy has always been "his employee" rather than his partner. Larry has asserted that Jimmy was most recently an Ohio employee and that he was paid salary for "his work and services" in Ohio. Although Jimmy and Larry have been agents to eachother, have worked for (as well as co-owned) the Hustler enterprise and have shared a fiduciary relationship, Jimmy denies and strongly disputes that he has simply been Larry's

at-will employee terminable at will. Pleading alternatively, if Larry and Jimmy have not been partners and/or are not partners, expressly or impliedly, then, in that event, Jimmy had an express and/or implied employment agreement/contract with Larry such that Larry would "employ" and compensate Jimmy for the remainder of his life and that he could only be terminated, if at all, "for cause."  This agreement was premised, in part, based on course of dealing, numerous representations made to (and about) Jimmy, Jimmy's ownership interest in his and Larry's partnership, and other various factors as described herein. Larry breached this agreement when Jimmy's pay was stopped in February, 2009 and when his benefits were stopped in June of 2009 without cause, justification or explanation. Larry attempted to terminate Jimmy for an ulterior purpose, specifically as a consequence of a dispute that Larry had with Jimmy's sons.

248.  Owners in a close corporation / incorporated partnership are often employees and commonly share in the profits through salary payments.  An owner of a close corporation who also works for the close corporation cannot be terminated at will absent a legitimate business reason and even then is entitled to receive the equitable value of his ownership interest.  As set forth herein, Jimmy, like Larry, has recently taken profits out of the company through payment of salary through Flynt Management Group, LLC.

249.  To the extent that it is determined that Jimmy is a minority owner within the Hustler enterprise, his discharge/termination was not only in violation of his express or implied employment agreement but was otherwise wrongful in violation of public policy.  Most states, including Ohio, California and Nevada recognize as public policy a heightened fiduciary duty between majority and

minority owners in a close corporation/entity. A majority or controlling owner has a fiduciary duty not to misuse his power by promoting personal interests at the expense of company interests. Majority or controlling owners breach such a fiduciary duty to minority owners when control is utilized to prevent the minority from having an equal opportunity in the business. Absent a legitimate business purpose, such a breach is actionable.

250.   There was not a legitimate business purpose for Jimmy's termination. He was terminated solely as a result of Larry's efforts to obtain influence over his now-concluded litigation with Jimmy's sons and/or in retaliation for Jimmy's inability to influence his sons.  Larry's termination of Jimmy was also motivated by Larry's greed and his attempts to take a greater share/interest of the Hustler enterprise.

251.   Larry's acts as described herein were committed maliciously, fraudulently, oppressively and in bad faith with the intent of injuring Jimmy, and/or with a willful and conscious disregard of public policy and Jimmy's express and/or implied contract for continued, long-term, employment for the remainder of his life. Because these acts were carried out by managerial employees in a deliberate and intentional manner, Jimmy is entitled to recover punitive damages in a sum sufficient to punish and deter such future conduct.

252.   Jimmy has suffered, and is suffering, substantial losses of earnings and employment benefits, and has suffered mental and emotional distress and discomfort, all to his damage in an amount exceeding $75,000.

**Count 5 – Declaratory Judgment**

253.    Defendants restate and incorporate by reference herein all preceding paragraphs in this Counterclaim.

254.    Defendant HCI seeks a declaration of rights from this Court that it has not infringed on any rights of Plaintiffs, that it has not breached any contract or agreement with Plaintiffs, that it has not caused any damages or harm to Plaintiffs and that it bears no liability to Plaintiffs in law or equity.  Defendant HCI further seeks a declaration regarding its ownership and rights to use the HUSTLER and HUSTLER-related trade and service marks including the "Hustler," "Hustler Cincinnati," and "Relax…it's just sex!" marks in connection with its established retail operation.  Defendant HCI seeks a declaration that it has the legal and/or equitable right to use these marks.  Defendant further seeks a declaration and Order that Plaintiffs (and all entities affiliated or related to Plaintiffs, including any person or entity in privity with Plaintiffs) be permanently enjoined from any further interference with Defendant's business including the use of the Hustler and Hustler Cincinnati marks.

255.    Jimmy seeks a declaration of rights as to Plaintiffs, specifically Larry, has to their respective assets and ownership interests and also with respect to their respective rights as to usage of the HUSTLER and HUSTLER-related marks and intellectual property.

**Count 6 - Unfair Competition / Abuse of Process / Malicious Bad Faith Pursuit of Litigation / Tortious Interference with Business Activities / Tortious Interference with Business Expectancy**

256.    Defendants restate and incorporate by reference all preceding paragraphs as if fully re-written herein.

257.   Abuse of process arises when one maliciously misuses legal process for an ulterior and wrongful purpose. Malicious pursuit of litigation in bad faith constitutes unfair competition under Ohio law.

258.   For the reasons set forth herein, Defendants asserts that this action is not founded upon good faith but was instituted with the intent and purpose of harassing and injuring Defendants.  This action is part of Larry Flynt's ongoing attempt to squeeze Jimmy out of their business, to interfere with HCI's business, and to cause economic harm/damages to HCI.  This action is also part of Larry Flynt's and LFP's ongoing efforts to open a new Hustler retail store in downtown Cincinnati and to trade off HCI's goodwill, advertising and customers all to the detriment of Jimmy and HCI.

259.   Defendant seeks damages in excess of $75,000.

**Count  7 — Injunctive Relief**

260.   Defendants restate and incorporate by reference all preceding paragraphs as if fully re-written herein.

261.   For the reasons stated herein, Defendants seeks this Court to enjoin Plaintiffs, to include any individual or entity related or affiliated or in privity with Plaintiffs, from further pursuit of a "Hustler" retail store in the greater Cincinnati / Northern Kentucky area, and from further interference with Defendant HCI's goodwill, customers or business contracts or operations.

262.  Defendants further seek to enjoin Plaintiffs from disposing, transferring, selling, offering to sell, devaluing, dissipating, or encumbering any partnership asset/property, from taking any loans, for applying for any loans, or from conducting any business outside the normal and ordinary course of business.

263.    Defendants further seek a pre-judgment Order requiring Plaintiffs to pay compensation to Jimmy consistent with his ownership/partnership interest.

**WHEREFORE**, based on the foregoing, Defendants/Counterclaimants request the following relief:

1.    For an Order that the general partnership between Jimmy Flynt and Larry Flynt be dissolved; for a comprehensive investigation of partnership transactions and the adjudication of the partners' rights;

2.    For a formal accounting;

3.    For an Order that the partnership affairs be wound up by Jimmy Flynt or other court-appointed receiver;

4.    For an Order directing Plaintiffs and their privies and affiliates to turn over copies of all  company books, accounts, records, documents, data and other financial, business and other records, including that of all affiliated entities and individuals, in order to effect equitable dissolution and accounting;

5.    For an award of no less than 50% of the assets, profits and current value of partnership assets/property;

6.    For compensatory damages in excess of $75,000,

7.    For a Declaration of Rights as requested herein,

8.    For injunctive relief as requested herein,

9.    For an award of punitive damages for Plaintiffs' malicious actions,

10.    For recovery of Defendant's attorneys fees, costs and expenses,

11.　For monetary sanctions, and

12.　For any and all other relief to which Defendants are entitled, legally or equitably.


Respectfully submitted,

REMINGER CO., L.P.A.


/s/ Robert W.  Hojnoski＿＿＿＿＿＿＿＿
Robert W. Hojnoski (0070062)
Carrie A. Masters (0083922)
525 Vine St., Suite 1700
Cincinnati, OH 45202
T: (513) 721-1311; F: 721-2553
Email: rhojnoski@reminger.com;
　　　　cmasters@reminger.com
**_Trial Counsel for Defendant /_**
**_Counterclaimants, Hustler Cincinnati,_**
**_Inc. and Jimmy R. Flynt_**


## CERTIFICATE OF SERVICE

　　　I hereby certify that a true and accurate copy of the foregoing has been electronically filed this 8th day of November, 2010, through the Court's CM/ECF system.  Electronic notice of this filing will be automatically sent to counsel for Plaintiffs.


/s/ Robert W. Hojnoski＿＿＿＿＿＿＿
Robert W. Hojnoski, Esq.