UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:09cv0913 (WOB)

L.F.P.IP., INC., ET AL.                          PLAINTIFFS

VS.                          OPINION AND ORDER

HUSTLER CINCINNATI, INC., ET AL.                 DEFENDANTS


       This matter is before the Court on the parties' cross-
motions for summary judgment (Docs. #166, #177), and plaintiffs'
motion to strike defendants' supplemental memorandum (Doc. #182).
Having previously heard oral argument on these motions and having
taken the matter under submission (Doc. #186), the Court now
issues the following Opinion and Order.

                          INTRODUCTION

       This case originated when Larry Flynt filed this action
against Jimmy Flynt to cancel certain Hustler trademarks Jimmy
Flynt was using in his Cincinnati store.[1]

       One of Jimmy's defenses was that he was a partner in all the
Hustler enterprises.  The parties agreed at the suggestion of the
Court that Jimmy would continue to pay substantial license fees
into escrow for use of the trademarks while the litigation was

_____

       [1] As has been the practice of the Court in the litigation, the brothers will be referred to by
their first name.

pending.

The partnership issues were pending, among other claims, in an Ohio state court, but that case was dismissed on the basis of forum *non conveniens* by the state court.[2]

This Court offered to try the partnership claims without a jury as an accommodation to the parties. They accepted this offer and the non-jury trial was held January 19, 2011 through January 25, 2011.

At the end of the partnership trial, the Court took the matter under submission, set a briefing schedule, and entered its Findings of Fact, Conclusions of Law and Opinion on May 12, 2011 (Doc. #165).

The Court found that Jimmy was not and had never been a partner in these enterprises and dismissed his partnership claims.

The partnership claims are closely related to the trademark issues and the Court hereby adopts that decision by reference. Unless modified or reversed by a higher court, the Court finds that the partnership decision is the law of the case.

Larry moves for summary judgment on the ground that he is entitled to a permanent injunction on his trademark claims and on Jimmy's remaining counterclaims. *See* Doc. #166 at 1 ("Larry's MSJ"). Larry's overall position is that Jimmy cannot continue to

_____

[2] The state court may have decided some of the claims.

-2-

use the Hustler name, and should be permanently enjoined from doing so.

Jimmy filed a cross-motion for summary judgment. *See* Doc. #177. Jimmy's overall position is that Larry cannot prohibit him from using the Hustler marks because Jimmy was the first to use them in connection with a retail store, he did so with Larry's implicit permission and without any licensing agreement, and their subsequent licensing arrangement was the result of a "sham" transaction. Accordingly, Jimmy maintains that he is entitled to a judgment stating Larry cannot pursue an infringement action against him. *See* Doc. #176 at 45 ("Jimmy MSJ Response).

**FACTUAL BACKGROUND FOR SUMMARY JUDGMENT MOTIONS**

A morass of corporate entities comprise the Hustler enterprise. Throughout the last four decades, Jimmy and his family members have at various times either worked for the Hustler enterprise, or owned and/or operated corporations associated with the enterprise. The cross-motions on the trademark issues raise this web of interconnected entities and Larry and Jimmy's historical business relationships.

Ultimately, only a handful of undisputed facts are material and dispositive of the trademark issues. Nonetheless, what follows is a short introduction of the background facts, so the context of the parties' later arguments will be clear.

There is no dispute that Larry and his corporations own the

-3-

registered "Hustler" mark.  In 1975, "Hustler" was first

registered as a trademark in connection with the magazine that

bears the same name under Registration Number 1, 01,001.  Larry

controls the Larry Flynt Revocable Trust ("Trust").  The Trust

and Larry own "LFP, Inc. ("LFP").  The original mark, as well as

many other subsequently created "Hustler" and Hustler-related

marks, were assigned to LFP in 1995.  Presently, LFP owns and

controls "LFP Publishing Group, LLC" ("Publishing Group").

Publishing Group is the sole "member and owner" of "LFP IP, LLC"

("IP").  IP is the current assignee of all the marks.  *See*, *e.g.*,

Doc. #166-1 at 1, 7-9, 81-82, 84, 98-114 ("Cummings Aff. &

Exhs.").

     On October 21, 1997, Jimmy incorporated "Hustler News &

Gifts, Inc." ("HNG") and simultaneously opened a store of the

same name in downtown Cincinnati.  He claims he is the sole

owner, director, and president of this corporation, and that the

store opening marked the first time the "Hustler" mark was ever

used in connection with a retail business.  There is no question

that he used the Hustler mark without paying Larry for the

privilege of doing so.  *See, e.g.,* Doc. #179 at ¶¶ 2-8 ("Jimmy

MSJ Aff."); Doc. #179-1 at 1-8; Doc. #179-3.

     Soon thereafter, other "Hustler" retail stores opened in

different areas of the country.  Jimmy was made president of

"Hustler Entertainment, Inc." (a/k/a "HH-Entertainment")

-4-

("HEI").[3]  This corporation was the operating company responsible for the various "Hustler Hollywood" retail stores that began opening in the West in the late 1990's. *See, e.g.,* Larry MSJ Aff. At ¶¶ 33-34.  In light of the Court's prior partnership ruling, there can be no dispute that HEI and the Hustler Hollywood retail stores belong solely to Larry.

After Hamilton County commenced an obscenity prosecution against both Jimmy and Larry for the activities of HNG, the brothers settled the matter with a plea.  In exchange for dropping the charges against Larry and Jimmy, the prosecutor substituted the business as sole defendant.  HNG, in turn, agreed to plead guilty to two counts of pandering obscenity and paid a $10,000 fine.  According to Jimmy, the business also paid the not insubstantial legal expenses for both brothers.  *Id.* At ¶ 9.

After an eviction due to eminent domain proceedings by the City of Cincinnati, HNG relocated to a new subleased space under the banner "Hustler Cincinnati."  However, the new landlord immediately contested the sublease.  A quick resolution in favor of the landlord required yet another relocation.  Jimmy then formed an entirely new corporation and opened another retail

---

[3] For the purpose of this analysis, suffice it to consider Jimmy's capacity as an employee or consultant.  However, since his precise legal status is unnecessary to resolve the trademark issues, the Court neither makes any explicit or implicit findings in this regard.  Jimmy's claims for all manner of fraud and wrongful termination, based on the absence of a partnership interest in the Hustler enterprise, will be taken up later.

store on March 31, 2000, under the name "Hustler Cincinnati,
Inc." ("Hustler Cincinnati"). Jimmy claims he is the sole owner,
director and president of this corporation. This entity
initially used the Hustler name without paying for the privilege
of doing so. *See., e.g., id.* At ¶¶ 3-4, 10-14, 16-19, 22-30; *see
also* Docs. ##179-2, 179-4, 179-5.

Within less than a year, Jimmy formed "Hustler Hollywood
Ohio, Inc." ("HH Ohio"). This corporation was formed to operate
the "Hustler Hollywood" store that opened in Monroe, Ohio in
December 2001. Jimmy claims that he is the owner and president
of HH Ohio. *See* Jimmy MSJ Aff. At ¶¶ 37, 39. Unlike the
Cincinnati stores, the Monroe store did not use the Hustler mark
without compensation. Instead, on January 1, 2001, the president
of LFP and Jimmy, in his capacity of president of HH Ohio,
entered into a written licensing agreement. *See* Doc. #110-4 at
1-6.

A few years later, when his divorce proceedings were
underway, Jimmy gave his deposition on June 3, 2003. The Court
previously found his prior testimony credible, and does so again
now as it pertains to the trademark issues. *See* Findings at 12-
13. In that deposition, Jimmy explained that the Monroe store
paid licensing fee expenses to LFP, resulting in the money
generated by the Monroe store being funneled back to Larry and
LFP. As such, the considerable profits from the Monroe store did

-6-

not wind up as assets in HH Ohio or in Jimmy's personal accounts.
*See* Doc. #98-1 at 62, 75.  Jimmy prefaced these remarks by
stating unequivocally that:

> Well, you have to understand Hustler is Larry Flynt,
> you know.  Everything that bears that name he has
> complete control of mind, sole (sic) and body.  So when
> I think of a club, when I think of a store, when I
> think of a magazine, I think it's him 100 percent.

*Id.*

        In 2004, the previous relationship Larry and Jimmy
maintained between Hustler Cincinnati and LFP changed and became
parallel to the arrangement the Monroe store had with LFP.  The
first piece of evidence that documents this change is a written
but unsigned licensing agreement, dated November 1, 2004, between
Hustler Cincinnati and LFP.  *See* Doc. #181 at 17 ("Jimmy Supp.")
(quoting deposition question that mentions the unsigned
agreement; deposition unclear).  The agreement is virtually
identical to the licensing agreement for the Monroe store and
requires Hustler Cincinnati to pay a licensing fee for its use of
the Hustler mark.  Doc. #98-1 at 31-36.

        There is no dispute that, even if Jimmy and his accountant,
Allie Jackson, were unaware of this unsigned document, both men
were aware that the relationship between LFP and Hustler
Cincinnati had changed.  For example, according to Jimmy and his
accountant, in mid-December 2004 and at Larry's request, Jimmy
(1) transferred al of his stock in HH Ohio to HEI in return for

-7-

$150,000, (2) immediately deposited the $150,000 into Hustler Cincinnati accounts, and (3) immediately had Hustler Cincinnati remit the $150,000 to LFP as "backdated" licensing fees. The backdated fees were intended to cover a total monthly fee of $8,400 for the previous eighteen-month period or approximately from July 2003 through 2004. As the accountant testified at the bench trial, Hustler Cincinnati took the lump-sum licensing payment as a business expense for tax purposes.

Thereafter, Jimmy authorized Hustler Cincinnati to pay the licensing fee every month. Indeed, the canceled checks bear his signature along with the accountant's signature. Hustler Cincinnati considered the payments to be expenses, and so reported for tax purposes. *See, e.g.,* Jimmy Aff. At 38-45; Doc. #53-1 at 54-57 (Mr. Jackson's pretrial deposition); Doc. #155 at 18-20, 31-34 (Mr. Jackson's bench trial testimony); Cummings Aff. & Exhs. At 139-73.

Nothing in the record shows that Jimmy resisted the new licensing arrangement. Nothing in the record shows that he insisted that he owned the "Hustler" mark in association with the Cincinnati store. Instead, the licensing payments continued uninterrupted and unchallenged for years.

In 2007, family discord began to impact Jimmy and Larry's business dealings. At some point in 2007, Jimmy ceased his role as president of HEI and in late 2007 or early 2008 Larry fired

-8-

Jimmy's sons, Jimmy II and Dustin, from the positions they held in the Hustler enterprise. The nephews countered by partnering to start "Flynt Media Corp." When Larry learned of their plans, he filed a trademark infringement suit in federal court in California in January 2009, in which he ultimately prevailed. *See, e.g.,* Jimmy MSJ Aff. at ¶ 33; Doc. #57 at ¶¶ 166-70 ("Jimmy Proposed Findings"); *Larry Flynt v. Flynt Media Corp., et al.,* CIV 09-48 AMH/RZ (preliminary injunction granted and permanent injunction entered after jury trial).

According to Jimmy, while the California suit was pending, Larry demanded that unless Jimmy controlled his sons, kept them from using the Flynt name, compensated Larry monetarily, and resolved the suit, Larry would "cut off" Jimmy financially. Also, according to Jimmy, at this time Larry began to "squeeze" Jimmy out of the business. *See, e.g.,* Jimmy Proposed Findings at ¶¶ 168-70, 173-78. A June 25, 2009 letter terminated Jimmy from his position as an "unpaid consultant" with the "Flynt Management Group, LLC." Doc. #113-2 at 1. June 2009 also marked the last time that Hustler Cincinnati made a licensing payment to LFP. *See, e.g.,* Doc. #8 at 2.

## ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is warranted where "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, [the court] view[s] the factual evidence and draw[s] all reasonable inferences in favor of the non-moving party." *Dominguez v. Corr. Med. Serv.*, 555 F.3d 543, 549 (6th Cir. 2009) (citation omitted). *See also Johnson v. Miles*, Civil Action No. 2009-189 (WOB), 2011 WL 3880507, at * 3 (E.D. Ky. 2011). This "court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept as true mere allegations that are not supported by factual evidence." *Rodriguez v. City of Cleveland*, Nos. 09-3679, 09-3799, 2011 WL 3792371, at 18 (6th Cir. 2011) (internal quotations and citation omitted).

An issue of fact is "material" only if it will affect the outcome under applicable substantive law. A nonmoving party who identifies factual disputes that are irrelevant or unnecessary to the determination cannot defeat summary judgment. A dispute about a material fact is "genuine" only if a reasonable jury could find in favor of the nonmovant. A showing of a "mere scintilla of evidence" or "some metaphysical doubt" as to a material fact is insufficient. Instead, the nonmoving party must present "significant probative evidence" in opposition. *See,*

-10-

*e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50

(1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 586-87 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1478-81 (10th Cir. 1989).

> A party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the
> record, including depositions, documents,
> electronically stored information, affidavits or
> declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
>
> (B) showing that the materials cited do not establish
> the absence or presence of a genuine dispute, or that
> an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1).

## B. Implied License

The parties are in accord on the general applicable law. To

prevail on his claims associated with trademark infringement,

Larry must show that "Hustler" is a valid trademark he owns,

Jimmy used the "Hustler" mark in commence, and his continued use

of the mark is likely to cause "confusion" among consumers. *See*

Larry MSJ at 13-14; Jimmy MSJ Response at 28-29.

It is true that ownership of a registered mark is not

necessarily conclusive of a trademark claim,[4] but it is equally

───────────

[4] A registered trademark only creates a presumption of valid ownership, and that
presumption can be rebutted by showing prior appropriation and continue used of the mark. *See.*,

true that absence of a written or oral licensing agreement is not conclusive of whether a licensee is estopped to raise defenses to a trademark infringement claim.  As the authorities cited by Larry hold, a license for use of a trademark can be implied from the parties' course of dealing.  *See* Larry MSJ at 16-17.  A plaintiff can use the doctrine of an implied license affirmatively, rather than defensively:

> Unlike in the typical implied licensing case, here the State asserts the doctrine of implied license as evidence of its ownership of the marks, as opposed to as a defense to an infringement action.  Although this is an unusual context, the State is correct that an implied license to use a trademark for certain services may arise. . . .  As the Federal Circuit has explained. . . .
>
> > "In some circumstances, however, the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license. . . .  This implied license does not offend the protection afforded patent and trademark rights by federal law. . . ."
>
> The Supreme Court has long recognized that a license may arise absent "a formal granting." . . .  Licenses are contracts "governed by ordinary principles of state contract law."

*Dep't of Parks and Recreation for State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1129-30 (9th Cir. 2006); *Accord McCarthy on Trademarks and Unfair Competition*, 4th ed. § 18:43:50.

---

e.g., *Circuit City Stores, Inc. v. Carmax, Inc.*, 165 F.3d 1047, 1054-55 (6th Cir. 1999); *Allard Enterprises, Inc. v. Advanced Programming Resources*, 146 F.3d 350, 356-57 (6th Cir. 1998); *see also* Jimmy MSJ Response at 29-30 (and cases cited therein).

The Sixth Circuit has long recognized the doctrine of an implied contract in the context of trademarks. *See, e.g., Big Cola Corp. v. World Bottling Co.*, 134 F.2d 718, 721 (6th Cir. 1943). Ohio also "recognizes implied-in-fact contracts" and will find one where the "facts of the particular case" are such that "the court can infer a contract exists as a matter of tacit understanding between the parties." *Ramsey v. Allstate Ins. Co.*, 416 F. App'x 516, 521 (6th Cir. 2011).

The test for an implied license is objective. *See, e.g., Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 824 (3rd Cir. 2006)("Although it appears that there is no express written license agreement between the parties, a trademark license can also be implied. . . . It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.")(internal quotations and citations omitted).

Larry and Jimmy indisputably entered into an implied licensing arrangement by their conduct. Jimmy may have initially used the "Hustler" mark for HNG and Hustler Cincinnati with Larry's implicit permission and for free. But, whatever their original arrangement, it changed by mutual consent and without protest when Jimmy acquiesced with Larry's wishes, and restructured the relationship between Hustler Cincinnati and LFP.

-13-

Thereafter, Hustler Cincinnati paid licensing fees for years to LFP, uninterrupted and without protest, until family dynamics soured their relationship and Jimmy refused to pay.

The unsigned licensing agreement and the parties' objective conduct demonstrate that Hustler Cincinnati operated just like the Monroe store arrangement. The proceeds from these highly successful southern Ohio stores flowed back to LFP largely in the form of licensing fees.[5]

### C. "Naked" License

Jimmy's response to Larry's motion does not directly address the doctrine of an implied license, or argue that the above facts fail to establish one. Nor does his supplemental pleading, which Larry seeks to strike. Instead, Jimmy makes the conclusory assertion that the license was "naked," which describes the situation where a licensor fails to exercise supervision or control over the licensee's activities with the marks, thereby estopping the licensor from enforcing the terms of the license. See Jimmy MSJ Response at 32-33. See also, E. F. Prichard v. Consumers Brewing Co., 136 F.2d 512, 519 (6th Cir. 1943) ("a naked license to use a trade-mark is of no more validity than a naked assignment thereof . . . a trade-mark . . . may be . . . licensed . . . as long as it remains associated with the same product or

---

[5] Jimmy's contention that these fees where a sham to move funds among the corporations (which were really a partnership) rather than actual licensing fees is contra to the Court's previous partnership decision which is the law of the case.

business with which it has become associated in the public
mind"). A "high degree of proof is required to establish this
defense." *McCarthy*, § 18:48.

It is evident to the Court why Jimmy's "naked license"
assertion is mainly conclusory. Larry acknowledges that in the
trademark context an "implied license agreement will be found
where permission to use the trademark is given by the owner
coupled with the exercise of reasonable quality control over the
"licensee." Larry MSJ at 16. Larry also notes that the
requisite control required is minimal and is even less where "the
license parties have engaged in a close working relationship, and
may justifiably rely on each parties' intimacy with standards and
procedures to ensure consistent quality, and no actual decline in
quality standards is demonstrated." *Id.* at 17 (internal
quotations and citation omitted). Larry further cites to the
quality-control efforts undertaken by his daughter, Jimmy's sons,
and Jimmy himself in his simultaneous "employee" capacity with
various Hustler enterprise entities with respect to Hustler
Cincinnati and the Monroe store. He also points to the fact the
LFP routinely examined Hustler Cincinnati financial reports and
received nightly sales reports. *Id.* at 18. Jimmy takes no issue
with these assertions.

Moreover, the "purpose of the control requirement is the
protection of the public [because where] a licensor does not

-15-

maintain control of his licensees in their use of the license, the public may be damaged by products that, despite their trademark, do not have the normal quality of such goods." *Doebler*, 442 F.3d at 823. Neither party suggests the quality of the Hustler goods was changed in any way when they were sold at the Hustler Cincinnati location as opposed to the other Hustler retail stores around the country.

In addition, at least one decision indicates that the familial interconnectedness present in the Hustler enterprise business dealings alone is sufficient to satisfy the "control" requirement. *Id.* ("Such a 'special relationship' may exist here, considering that the litigants were closely-held business entities owned and managed by family members and which included a high degree of interlocking ownership and control.").

### D. Licensee Estoppel

The licensing arrangement that Jimmy entered into operates as an acknowledgment that Larry owns a valid "Hustler" mark and, by extension, that Jimmy does not. The implied license thus prohibits Jimmy from raising any defense he may have had prior to entering the arrangement. This is known as the "licensee estoppel" or "merger" doctrine represented by the cases cited by Larry. *See* Larry MSJ at 19-20; *see also, Pandora Jewelers 1995 Inc. v. Pandora Jewelery, LLC*, No. 09-61490-Civ., 2011 WL 2174012 ** 5-8 (S.D. Fla. 2011).

-16-

Jimmy faults Larry for making "scant reference to authority from the Sixth Circuit" because the Circuit has "seldom addressed such argument in connection with trademark infringement actions." Doc. #181 at 23. Nevertheless, the Sixth Circuit long ago embraced the concept of licensee estoppel in that context:

> As between parties claiming the right to a trade-mark, it is unnecessary to determine whether the mark was adopted and used in such a manner as to entitle one of the parties to be protected in its exclusive use, where the parties entered into a contract in which they agreed that the trade-mark would belong to one of them, who would have the right to its exclusive use. In such a case, the party who has agreed that the other shall be the owner of the trade-mark, is estopped from raising questions with regard to adoption and use; and the inquiry is limited to determining whether the terms of the contract have been violated.

*E. F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d at 522. Jimmy also argues that plaintiffs "have not cited any decisions where the . . . doctrine was applied in connection with an alleged oral or implied license." Jimmy Supp. At 23. While that may be the case, the *Pandora* case cited above does apply the doctrine in an implied license situation. Further, it reflects the generally accepted view on this issue. *See McCarthy*, § 18:63.

On the merits of his arguments, Jimmy takes the position that the licensee estoppel doctrine only applies to written, clear, and signed licensing agreements. *Id.; see also* Jimmy MSJ Response at 34-35. In the section he entitles "licensee estoppel does not apply in the absence of a valid licensing contract, is

-17-

not subject to rigid application, and does not apply when the licensing agreement was induced by fraud, actual or constructive," Jimmy cites three cases. None of them support this sweeping statement. To the contrary.

In one case, as here, the licensee entered into a license even though at the time it purportedly had a claim of entitlement to use the mark based on the argument that the licensor had abandoned its mark by granting the licensee a "naked" license. The court found the licensee was estopped from "using naked licensing as a sword to pry ownership rights from the licensor." *John C. Flood of Virginia, Inc. v. John C. Flood, Inc.*, 700 F. Supp. 2d 90, 96 (D.D.C. 2010). In balancing the equities, that court found it "curious" that the licensees "offered to pay for the very marks that they now claim to have owned" and "even more curious that [they] failed to even mention their claim of ownership" at an opportune moment and that their "failure to assert . . . ownership rights when afforded an obvious opportunity to do so weighs decisively in favor of applying licensee estoppel. . . ." *Id.* at 98.

Another case refused to interpret the Sixth Circuit's *Prichard* decision as allowing a licensee who is estopped to raise a "naked" licensing defense. In so holding that case noted:

> The license is estopped from claiming any rights against the licensor which are inconsistent with the terms of the license. . . . *He is estopped from contesting the validity of the mark, . . . or*

-18-

> *challenging the license agreement as void or against public policy, e.g., because it granted a naked license.*
>
> * * * * *
>
> By entering into the license agreement, the licensee recognizes the licensor's ownership of the mark and by implication, covenants not to challenge the licensor's rights. *This implied covenant also estops the licensee from claiming that the licensor abandoned his rights by failing to exercise adequate quality control during the terms of the license.*
>
> And further, a licensee claiming that its own license is a naked license essentially seeks to benefit from its own misfeasance. By asserting a naked licensing defense, the licensee contends that the licensed trademark or trade name has lost its significance as a source of origin because the licensor has failed to police the licensee's operations. Thus, by relying on its own ability to offer inferior or nonuniform goods and services under the trademark or trade name, the licensee seeks to free itself of the constraints imposed by the licensor's ownership of the trademark or trade name. Not surprisingly, the Restatement (Third) of Unfair Competition observes that the case for applying licensee estoppel is strongest in such a case.

*Westco Group, Inc. v. K.B. & Ass., Inc.*, 128 F. Supp. 2d 1082, 1089 (N.D. Ohio 2011).

A decision cited by Jimmy is a state decision concerning whether a contract was formed as the result of a shareholder nodding his head in assent during negotiation and discussion, not whether an implied-in-fact contract arose from the parties' course of dealing. *Nilavar v. Osborn*, 711 N.E. 2d 726 (Ohio App. 1998).

Even in the absence of recent Sixth Circuit authority on the

subject, the Circuit has long recognized the doctrine of licensee estoppel, there is an absence of any cited authority directly supporting Jimmy's assertions, the weight of authority points otherwise, and the undisputed facts of this case are compelling. Therefore, the Court finds no cause to hold Jimmy is estopped even in the absence of a signed written license.

### E. Jimmy's Prior Use & Other Defenses Are Not Material

Having licensed the mark from Larry after beginning any such "prior use," Jimmy effectively extinguished any claim he may have had to use the Hustler trademark in connection with the Hustler Cincinnati store or to challenge Larry's conduct in connection with the mark. All of the arguments Jimmy raises to either defeat Larry's ownership of a valid mark or attempt to create an issue of fact about valid ownership are, therefore, immaterial. This alone is conclusive of the trademark validity and use issues.

Jimmy contends that Larry had no rights to license the Hustler mark because Larry assigned the mark to one of the other corporations he controlled, and because Jimmy remitted the licensing fee checks directly to LFP instead of the assignee. Foremost, this argument ignores the fact that the assignee was part of the LFP corporate structure controlled by Larry and the Trust. It also ignores the legal consequences of the licensing arrangement mentioned by the very sources Jimmy cites. It

-20-

further ignores Jimmy's own prior deposition testimony to the effect that everything bearing the name "Hustler" is Larry 100% and completely controlled by Larry.

Jimmy's continued focus on the long history and equities of dealings between him and Larry are spillover from his arguments about the existence of a partnership, which the Court previously rejected in the partnership decision.

### F. Jimmy Raises No Genuine Issue Regarding "Confusion"

Larry seeks a permanent injunction based on his claims of trademark infringement. Jimmy asserts Larry has not submitted any evidence that customers are actually confused as to the "ownership and management of the Hustler Cincinnati store." Jimmy MSJ Response at 42. However, Larry notes that, as a matter of law, when a "former licensee continues to use a trademark after the trademark license has been canceled, that continued use satisfied the likelihood of confusion test and constitutes trademark infringement." Larry MSJ at 22 (and cases cited therein). Jimmy takes no issue with this principle of law or that he continued to use the Hustler mark at the Cincinnati store after he stopped paying licensing payments. Thus, the Court finds Jimmy does not raise a genuine issue of fact with regard to the "confusion" element.

-21-

Therefore, the Court being advised,

**IT IS ORDERED** as follows:

1.   Larry's motion for summary judgment on the trademark issues (Doc. #166) be, and it hereby is, **granted**;

2.   Jimmy's cross-motion for summary judgment (Doc. #177) be, and it hereby is, **denied**;

3.   Larry's motion to strike Jimmy's supplemental brief (Doc. #182) be, and it hereby is, **denied as moot**; and

4.   Counsel for Larry shall submit to the Court (serving the same on opposing counsel) a proposed Injunction and/or other Orders implementing this Opinion within **fourteen (14) days** of the date of this Order; Jimmy shall have **seven (7) days** thereafter to file any objections thereto; and Larry shall have **seven (7) days** thereafter to reply.

This 20th day of October, 2011.


_____
**WILLIAM O. BERTELSMAN, JUDGE**

-22-