```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
                    WESTERN DIVISION
```

**CIVIL ACTION NO. 1:09cv913 (WOB)**

L.F.P.IP, LLC, ET AL.                                    PLAINTIFFS

VS.                  **MEMORANDUM OPINION AND ORDER**

HUSTLER CINCINNATI,
INC., ET AL.                                             DEFENDANTS

This matter is before the Court on the motion for summary judgment by plaintiffs as to defendants' Second Amended Counterclaim (Doc. 208), defendants' opposition thereto (Doc. 213), plaintiffs' reply (Doc. 218), and the parties' supplemental briefs (Docs. 231, 232).[1]

### *Introduction*

The lengthy factual history of this dispute between the brothers Flynt may be found in the Court's prior opinions, findings, and orders. *See* Docs. 165, 187.  For present purposes, suffice to say that, after the Court rejected Jimmy Flynt's claim for a partnership stake in the Hustler enterprise and ruled in Larry's favor on his claim for trademark infringement, Jimmy filed a Second Amended Counterclaim, asserting the following claims: (1) An action for Accounting and Dissolution

---

[1] The pending motion was originally filed as a motion to dismiss, but the Court converted it to a motion for summary judgment due to the relevance of voluminous record evidence.  *See* Doc. 222.

of Partnership[2]; (2) Wrongful Termination/Discharge in Violation of Express or Implied Employment Agreement and/or Public Policy; Promissory Estoppel; (3) Breach of Fiduciary Duty; (4) Breach of Contract to Make a Will/Trust; and (5) Fraud (Actual and/or constructive and/or in the inducement), Unjust Enrichment, Imposition of Constructive Trust.  (Doc. 205).  Jimmy seeks, *inter alia*, 50% of the Larry Flynt Trust assets, compensatory damages in excess of $50 million, punitive damages, and attorneys' fees.

Larry thereafter filed the pending motions now before the Court.  The Court heard oral argument and allowed some additional, limited discovery and briefing.  Having done so, the Court now issues this Memorandum Opinion and Order.

### *Analysis*

A. **Employment Claims**

Jimmy avers in his Second Amended Counterclaim that he and Larry had an express or implied employment agreement that Jimmy would have "continued and indefinite employment at/within Hustler for the remainder of [Jimmy's] life," and that Jimmy "would not be terminated without a compelling reason or just cause."  (Doc. 205 ¶ 213).

---

[2] Jimmy acknowledges that the Court has already dismissed this claim but states that it is reasserted to preserve it for appellate review.

2

Jimmy also asserts, in the alternative, a claim for promissory estoppel based upon the same alleged "promise" of lifetime employment. (*Id.* ¶¶ 211-215).

Jimmy's remaining employment claim is that his termination from Hustler was in violation of public policy. (*Id.* ¶¶ 216-218).

### 1. Breach of Contract

"In general, under the employment-at-will doctrine, the employment relationship between employer and employee is terminable at the will of either; thus, an employee is subject to discharge by an employer at any time, even without cause." *Wright v. Honda of Am. Mfg., Inc.*, 653 N.E.2d 381, 384 (Ohio 1995) (citations omitted).

Two exceptions to this doctrine are: (1) the existence of implied or express contractual provisions which alter the terms of discharge; and (2) the existence of promissory estoppel where representations or promises have been made to an employee. *Id.* "Despite [these] exceptions, in the area of employment contracts there still exists a strong presumption that the employment relationship is terminable at will unless the terms of the contract or other circumstances clearly manifest that the intent of the parties is otherwise." *Moore v. Kings Island Co.*, No. CA97-09-097, 1998 WL 230038, at *3 (Ohio Ct. App. April 6, 1998)

(citing *Henkel v. Educ. Research Council of Am.*, 344 N.E.2d 118, 122 (Ohio 1976)).

"The legal effect of an implied contract and an express contract are identical. Therefore, the party asserting an implied contract theory has a heavy burden; to prove the existence of all elements necessary for the formation of a contract." *Id.* at *4 (citation omitted). "Furthermore, for the theory of an implied contract exception to the employment-at-will doctrine to apply there must be a meeting of the minds between the parties as to the underlying terms that concern a discharge." *Schwartz v. Comcorp, Inc.*, 633 N.E.2d 551, 556 (Ohio Ct. App. 1993) (citation omitted).

"In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange." *Miller v. Lindsay-Green, Inc.*, No. 04AP-848, 2005 WL 3220215, at *15 (Ohio Ct. App. Dec. 1, 2005) (citation omitted). "In other words, when entering into a contract, the parties must have a distinct and common intention which is communicated by each party to the other." *Id.* "As part of a meeting of the minds, there must be a definite offer on one side and an acceptance on the other." *Id.* (citation and internal quotation omitted).

Jimmy concedes that he had no written employment agreement, but he contends that an oral contract arose based upon

4

statements by Larry that Jimmy would have "continued" and "indefinite" employment for life. Construing the record in Jimmy's favor, the Court concludes that this claim fails as a matter of law.

First, Jimmy has adduced no evidence from which a reasonable factfinder could conclude that there was a meeting of the minds between him and Larry on the terms of any such agreement. Rather, the evidence shows that, while the brothers worked together for much of their adult life, their employment relationship mirrored their volatile personal relationship. As a result, there were periods of time when the two had disagreements and, as a result, Jimmy left his employment at Hustler. For example, the two fell out in the mid-1980s, and Jimmy was "unemployed" from 1984 to 1989. (Jimmy Flynt Depo. at 114).[3] Jimmy testified that he went back to work after he and Larry "reconciled." *Id.*

Although Jimmy now avers that Larry made a "promise" of "indefinite/continued" employment to him at the time of their reconciliation in November 1988, (Doc. 205 ¶ 105), that allegation is not supported by the record, including Jimmy's own testimony. At the partnership trial, Jimmy merely testified that, in 1988, he and Larry "agreed to put things behind us and move on with our partnership." (Doc. 154 at 53). He also

---

[3] This testimony quotes from a deposition Jimmy gave in his divorce proceedings in 2003.

expressly rejected the proposition that he was an "employee." (*Id.* at 78). No mention was made of any promise to Jimmy of lifetime or indefinite employment or any agreement between the two men regarding such an arrangement.

Indeed, there is no *evidence* -- as opposed to the bare allegations of the counterclaim and Jimmy's declaration concerning his "belief" that he would have indefinite employment (Doc. 179 ¶ 39) -- that the two men ever expressed a *mutual* intent that Larry would employ Jimmy for life or that there was any meeting of the minds as to what the material terms of such an arrangement would be. Rather, the undisputed evidence is that Larry simply put Jimmy back on the payroll and the two men moved forward, continuing their working relationship until their next falling out in 2009 which gave rise to Jimmy's termination and this litigation.[4] *See generally Callender v. Callender*, No.07AP-746, 2008 WL 2026431, at *4-6 (Ohio Ct. App. May 13, 2008) (plaintiff failed to raise triable issue on claim that father created contract to transfer business to him by repeated assurances; good discussion of Ohio law on implied contracts in employment context).

---

[4] In his supplemental brief, Jimmy also argues that Larry promised him in 2008 that he would pay Jimmy $250,000 per year simply to "stay away." Larry concedes that he reached such an agreement and he explained the reason why, but he denies that he agreed to pay Jimmy indefinitely. (Doc. 230-1 at 428– 32). Jimmy has introduced no evidence to dispute this testimony.

6

Second, Jimmy's allegation that a contract of lifetime employment was created because Larry promised him "indefinite/continued" employment runs afoul of the following principle:

> Generally speaking, a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge without cause does not constitute a breach of such contract justifying recovery of damages.

*Henkel*, 344 N.E.2d at 121-22 (citation and internal quotations omitted). *See also Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1040 (6th Cir. 1992) ("The general rule in Ohio is that unless otherwise agreed to by the parties, an employment agreement purporting to be permanent or for life, or for no fixed time period is considered to be employment terminable at the will of either party."); *Sagonowsky v. The Andersons, Inc.*, No. L-03-1168, 2005 WL 217023, at *10 (Ohio Ct. App. Jan. 28, 2005) ("We, however, find that 'permanent' employment status does not change the employment relationship into one terminable only for cause.") (citation omitted).[5]

---

[5] Abundant authorities from other jurisdictions similarly hold. *See, e.g., White v. FCI USA, Inc.*, 319 F.3d 672, 676 (5th Cir. 2003) (applying Texas law); *Ctr. of Hope Christian Fellowship, Local, Church of God in Christ v. Wells Fargo Bank Nevada, N.A.*, 781 F. Supp.2d 1075, 1080 (D. Nev. 2011); *Knudsen v. Quebecor Printing (U.S.A.) Inc.*, 792 F. Supp. 234, 238 (S.D.N.Y. 1992); *Ross v. Times Mirror, Inc.*, 665 A.2d 580, 583 (Vt. 1995); *Foley v. Interactive Data Corp.*, 765 P.2d 373, 381-82 (Cal. 1988); *Stucklen v. Kabro Assocs.*, 795 N.Y.S.2d 256, 257 (N.Y. App. Div. 2005); *Keller v. Sisters of Charity of the Incarnate Word*, 597 So.2d 1113, 1115 (La. Ct. App. 1992).

Furthermore, Jimmy does not dispute that he periodically signed acknowledgments of his at-will employment status, which further undercuts any claim for an implied contract of employment. *See, e.g., Micek v. FlightSafety Int'l Inc.*, No. 2:03-CV-1015, 2006 WL 22179, at *8 (S.D. Ohio Jan. 4, 2006) (discussing cases so holding).

### 2. Promissory Estoppel

Jimmy's claim for promissory estoppel fares no better because he has pointed to no record evidence (again, as opposed to the mere allegations of his pleadings) that Larry made a "clear and unambiguous" representation that "could be reasonably interpreted as limiting the employer's ability to terminate the employment relationship." *Sagonowsky*, 2005 WL 217023, at *15 (citations omitted). Numerous cases hold that vague and ambiguous references to job security, "long term" employment, and other such concepts are insufficient as a matter of Ohio law to support this cause of action. *See, e.g., Snyder v. AG Trucking, Inc.*, 57 F.3d 484, 489 (6th Cir. 1995) (statement by company president that plaintiff could "expect" to be there "until retirement" insufficient to state claim for promissory estoppel); *Andres v. Drug Emporium, Inc.*, No. 00AP-1214, 2001 WL 987804, at *4-5 (Ohio Ct. App. Aug. 30, 2001) (vice-president's statement that plaintiff's employment would be "long term" held insufficient to support promissory estoppel claim).

8

### 3. Public Policy Tort

"A cause of action for wrongful discharge sounds in tort." *Sims v. Village of Midvale*, No 2012 AP 03 0021, 2012 WL 6681851, at *4 (Ohio Ct. App. Dec. 18, 2012) (citing *Greeley v. Miami Valley Maint. Controls, Inc.*, 551 N.E.2d 981 (Ohio 1990)). To prevail on such a claim, a plaintiff must prove: (1) a clear public policy exists and is manifested in a state or federal constitution, in statute or administrative regulation, or in the common law (the clarity element); (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element). *Id.* (citation omitted). The clarity and jeopardy elements involve questions of law; the causation and overriding-justification elements involve questions of fact. *Id.*

"The Ohio Supreme Court has imposed a strict, substantive burden on a plaintiff asserting a public policy to identify the law supporting that policy." *McCormick v. AIM Leasing Co., Inc.*, No. 4:11CV01524, 2012 WL 5874373, at *5 (N.D. Ohio. Nov. 19, 2012). "Unless the plaintiff asserts a public policy and identifies federal or state constitutional provisions, statutes,

9

regulations, or common law that support the policy, a court may not presume to sua sponte identify the source of that policy." *Id.* (quoting *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 173 (Ohio 2011)). A court may not "fill in the blanks on its own motion." *Id.*

In his counterclaim, Jimmy alleges that his discharge violated public policy because it was a consequence of: (1) his refusal to accede to Larry's demand that Jimmy influence then-pending litigation between Larry and Jimmy's sons; (2) his refusal to give Larry a $400,000 loan, allegedly in violation of "Ohio's securities laws"; and (3) Larry's breach of fiduciary to Jimmy due to Jimmy's minority ownership in Hustler. (Doc. 205 ¶¶ 216-218).

This claim fails as a matter of law because Jimmy has not identified any clear source of public policy underlying these three areas, even assuming they contributed to his discharge. He does not explain how the alleged loan requested by Larry constituted a "security" under Ohio law, or how any Ohio securities law was violated. He similarly fails to cite any specific public policy regarding the family litigation in California, and there is no evidence that Jimmy was a minority shareholder in Hustler.

Rather than specifying such sources of public policy as required by Ohio law, Jimmy defaults to an argument about the

10

unfairness of his termination at the age of 61, during a bad economy, after years of what he characterizes as selfless service to his brother. (Doc. 213 at 38). A general appeal to "fairness," however, falls far short of the clarity element discussed above, and summary judgment is thus appropriate on this claim.

    B.   **Breach of Fiduciary Duty**

The elements for a breach of fiduciary duty claim are: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Thomas v. Fletcher*, No. 17-05-31, 2006 WL 3702699, at *2 (Ohio Ct. App. Dec. 18, 2006) (citation omitted).

The Ohio Supreme Court has defined a "fiduciary relationship" as one "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of special trust." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1081 (Ohio 1996) (citation omitted). Examples of such relationships are majority/minority shareholders, members of a close corporation, financial brokers/clients, attorneys/clients, and physicians/patients.

A fiduciary relationship may be created out of an informal relationship, however, "only when both parties understand that a

11

special trust or confidence has been reposed." *Nichols v. Schwendeman*, No. 07AP-433, 2007 WL 4305718, at *3 (Ohio Ct. App. Dec. 11, 2007) (citation omitted).  "Thus, a fiduciary relationship cannot be unilateral; it must be mutual."  *Id.*

This Court has previously rejected Jimmy's claim that he and Larry were partners; thus, no fiduciary relationship exists on that basis.  Further, although Jimmy avers in his counterclaim that a fiduciary relationship existed based on Jimmy's position as a "minority owner/shareholder" in the Hustler enterprise (Doc. 205 ¶ 227), there is no evidence that Jimmy held any such ownership in the companies owned by Larry.  The mere fact that Jimmy owns HCI, a separate company, does not give him any ownership in the entities owned by his brother.

Perhaps recognizing this flaw, Jimmy argues in his brief that a fiduciary relationship arose because of certain transactions which were not conducted at arm's length and which were not "objectively reasonable or fair to Jimmy." (Doc. 213 at 55).  This, of course, puts the cart before the horse.  Before such transactions run afoul of the law, a fiduciary relationship must exist.

Jimmy then makes the same "fairness" argument previously discussed: that the brothers' eventful forty years in their personal and professional relationships creates in Jimmy a right not to be "pushed out" of his position at Hustler and otherwise

12

to be treated fairly. (Doc. 213 at 58). Whatever the appeal of this argument from a moral or familial point of view, it does not raise a triable issue as to the existence of a legally cognizable fiduciary relationship which would make Larry's alleged transgressions actionable.

C. **Breach of Contract to Make Will/Trust**

Jimmy next alleges that Larry promised him, on November 16, 1988, that Larry would include Jimmy as a 50% beneficiary of Larry's trust or will, and that Larry has breached that agreement by cutting Jimmy out of his trust. (Doc. 205 ¶¶ 235-246).

Under California law, which the parties concede applies to this claim, "a contract to make a will cannot be specifically enforced before the promisor's death." *In re Marriage of Drake*, 62 Cal. Rptr.2d 466, 483 (Cal. Ct. App. 1997) (citing *In re Marriage of Edwards*, 38 Cal. App.4th 456, 460-62 (Cal. Ct. App. 1995)). This proposition has several rationales, including: a court cannot compel a person to make a will; a person has the power to amend or revoke a will prior to death; and the promisor has his whole lifetime to comply with the agreement and thus no breach occurs until his death, at which time the cause of action first accrues. *Edwards*, 38 Cal. App.4th at 460-61.

So it is here. Although Jimmy is apparently not presently included in Larry's trust, Larry could at any time change his

13

mind and reverse course, complying with the agreement which Jimmy alleges was made. Until Larry dies, however, such compliance cannot be determined.

Jimmy acknowledges this rule but argues in his brief that an exception exists where the promisor makes an inter vivos transfer of specific property that is the subject of the promise. Jimmy, however, has adduced no evidence of any such transfers.

Summary judgment on this claim is thus also appropriate.

**D.  Fraud/Unjust Enrichment**

Jimmy's final counterclaim is for "Fraud (actual and/or constructive and/or in the inducement), Unjust Enrichment, Imposition of Constructive Trust. (Doc. 205 ¶¶ 247-258).

Viewing the record in Jimmy's favor, there is no evidence to support a claim for fraud, actual or otherwise. That Larry has not followed, in Jimmy's view, the "do right" rule in his dealings with his brother over the years does not elevate such sharp dealings to fraud. Jimmy has identified no specific instances in which Larry made material misstatements known by him to be false in order to mislead and harm Jimmy. Similarly, Jimmy's subjective belief that, by complying with Larry's demands over the years, he was ensuring that he would always have a secure position within Hustler and that Larry would treat him fairly does not support such a claim.

14

Jimmy also has not raised a triable issue as to unjust enrichment because the undisputed evidence shows that he was compensated for his years of service, and the various property transfers about which he complains were supported by consideration, even if he now believes such to have been inadequate in light of the events that eventually unfolded between the brothers.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that the motion for summary judgment by plaintiffs as to defendants' Second Amended Counterclaim (Doc. 208) be, and is hereby, **GRANTED**.

This 2nd day of January, 2013.



Signed By:
William O. Bertelsman  WOB
United States District Judge